# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
)
JAIME RAMIREZ,               )
)
           Plaintiff,   )
)
           v.       )    Civil Action No. 1:07-65 (GK)
)
UNITED STATES CUSTOMS    )
AND BORDER PROTECTION, *et al.*,   )
)
          Defendants.   )
———————————————————————)

## MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.      Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          A.      The Standards of Ethical Conduct for Employees
                  of the Executive Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          B.      The Civil Service Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    II.     Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    III.    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    II.     Plaintiff Has Failed to Establish a Likelihood of Success
          on the Merits of His Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

          A.      Plaintiff Cannot Establish Subject Matter Jurisdiction
                  Over His Claims In This Court At This Time . . . . . . . . . . . . . . . . . . . . . 10

          B.      Even if This Court Had Jurisdiction Over Plaintiff's Claims,
                  He Has Also Failed to Establish a Likelihood of Success
                  on the Merits of Those Claims Because the Challenged
                  CBP Order Does Not Impermissibly Infringe on
                  His First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

               1.      The Challenged CBP Order Does Not Infringe on
                      Plaintiff's First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . 18

               2.      The Government Has a Legitimate and Compelling
                      Interest in Precluding Plaintiff From Creating
                      an Actual or Apparent Conflict of Interest . . . . . . . . . . . . . . . . . 26

III.   Plaintiff Has Failed to Establish He Will Suffer Irreparable Harm Absent
       Extraordinary, Emergency Relief  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

IV.    The Balance of Interests Supports Denial
       of Emergency Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

CONCLUSION   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -36-

# TABLE OF AUTHORITIES

## CASES

American Postal Workers Union, AFL-CIO v. United States Postal Service,
    766 F.2d 715 (2nd Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Andrade v. Lauer,
    729 F.2d 1475 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Beacon Theatres, Inc. v. Westover,
    359 U.S. 500 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Broadrick v. Oklahoma,
    413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

Brown v. Glines,
    444 U.S. 348 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 20

Buckley v. American Constitutional Law Foundation, Inc.,
    525 U.S. 182 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Buckley v. Valeo,
    424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bush v. Lucas,
    462 U.S. 367 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

Carducci v. Regan,
    714 F.2d 171 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 17

Chaplaincy of Full Gospel Churches v. England,
    454 F.3d 290 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34

Citizens Against Rent Control,
    454 U.S. at 295 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CityFed Fin. Corp. v. Office of Thrift Supervision,
    58 F.3d 738 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 32

City of San  Diego v. Roe,
    543 U.S. 77 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Clark v. Community for Creative Non-Violence,
　　468 U.S. 288 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Clements v. Fashing,
　　457 U.S. 957 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 35

Cobell v. Norton,
　　391 F.3d 251 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Commonwealth ex rel. Specter v. Moak,
　　452 Pa. 482, 307 A.2d 884 (Pa. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Connecticut Dep't of Human Resources v. MSPB,
　　718 F. Supp. 125 (D. Conn. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Connick v. Myers,
　　461 U.S. 138 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 21

Coons v. Dep't of the Navy,
　　15 M.S.P.R. 1 (M.S.P.B. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Crandon v. U.S.,
　　494 U.S. 152 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Ex parte Curtis,
　　106 U.S. (16 Otto) 371 (1882) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 27

District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,
　　412 F.2d 165 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Doe v. Goss,
　　Civ. No. 04-2122-GK, 2007 WL 106523 (D.D.C. January 12, 2007) . . . . . . . . . . . . . 11

Dombrowski v. Pfister,
　　380 U.S. 479 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Dorfmann v. Boozer,
　　414 F.2d 1168 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Elrod v. Burns,
　　427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Erlenbaugh v. United States,
    409 U.S. 239 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Fernandez v. State Personnel Bd.,
    175 Ariz. 39, 852 P.2d 1223 (Ariz .App. Div. 2 1992) . . . . . . . . . . . . . . . . . . . . . . . . 24

Ferry v. Hayden,
    954 F.2d 658 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fischer v. Dep't of Treasury,
    69 M.S.P.R. 614 (M.S.P.B. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Fontes v. Dep't of Transp.,
    51 M.S.P.R. 655 (M.S.P.B. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Hohe v. Casey,
    868 F.2d 69 (3rd Cir.1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,
    505 U.S. 672 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Johnson v. Dep't of Health and Human Services,
    93 M.S.P.R. 38 (M.S.P.B. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Johnson v. State Civil Service Dept.,
    280 Minn. 61, 157 N.W.2d 747 (Minn. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Joyner v. Mofford,
    706 F.2d 1523 (9th Cir.), cert. denied, 464 U.S. 1002 (1983) . . . . . . . . . . . . . . . . 23, 24

Kalil v. Johanns,
    407 F. Supp. 2d 94 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kansas v. Colorado,
    514 U.S. 673 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Karahalios v. Nat'l Federation of Federal Employees,
    489 U.S. 527 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

Laird v. Tatum,
    408 U.S. 1 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Lane v. Department of the Army,
        19 M.S.P.R. 161 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

Lovshin v. Dep't of the Navy,
        767 F.2d 826 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

Magill v. Lynch,
        560 F.2d 22 (1st Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 24

Mancuso v. Taft,
        476 F.2d 187 (1st Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Marine Transport Lines, Inc. v. Lehman,
        623 F. Supp. 330 (D.D.C. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Martin v. EPA,
        271 F. Supp. 2d 38 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 33

Mazurek v. Armstrong,
        520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

Ex parte McCardle,
        74 U.S. (7 Wall.) 506 (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

McConnell v. Federal Election Com'n,
        540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

McIntosh v. Turner,
        861 F.2d 524 (8th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Merle v. U.S.,
        351 F.3d 92 (3rd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 24

Meyer v. Grant,
        486 U.S. 414 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

Milk Indus. Found. v. Glickman,
        949 F. Supp. 882 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Muniz v. United States,
        972 F.2d 1304 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

NTEU v. United States,
    927 F.2d 1253 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    34

Nestor v. Hershey,
    425 F. 2d 504 (D.C. Cir. 1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

New York Times Co. v. Sullivan,
    376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    22

Nixon v. Shrink Missouri Government PAC,
    528 U.S. 377 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Otten v. Schicker,
    655 F.2d 142 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Pickering v. Board of Education,
    391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    21, 22, 27

Plaza Health Laboratories, Inc. v. Perales,
    878 F.2d 577 (2nd Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

Population Institute v. McPherson,
    797 F.2d 1062 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9

Public Workers v. Mitchell,
    330 U.S. 75 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    19, 20, 22, 25

Rendish v. City of Tacoma,
    123 F.3d 1216 (9th Cir. 1997), cert. denied, 524 U.S. 952 (1998) . . . . . . . . . . . . . . .    34

Ricks v. Department of State Civil Service,
    200 La. 341, 8 So. 2d 49 (La. 1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    20

Role Models America, Inc. v. White,
    193 F. Supp.2d 76 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    32

Roth v. United States,
    952 F.2d 611 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

Sampson v. Murray,
    415 U.S. 61 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    9, 10, 32

Sanjour v. EPA,
   56 F.3d 85 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Shalala v. Illinois Council on Long Term Care, Inc.,
   529 U.S. 1 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

Signorelli v. Evans,
   637 F.2d 853 (2nd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 24

Smith v. Ehrlich,
   430 F. Supp. 818 (D.D.C. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

Spagnola v. Mathis,
   859 F.2d 223 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 14

Steadman v. Governor, U.S. Soldiers' and Airmen's Home,
   918 F.2d 963 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Steel Co. v. Citizens for a Better Environment,
   523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Suarez v. Dep't of Housing and Urban Development,
   96 M.S.P.R. 213 (M.S.P.B. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

Tao v. Freeh,
   27 F.3d 635 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 21

U.S. Civil Service Comm'n. v. Nat'l Assoc. of Letter Carriers,
   413 U.S. 548 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

U.S. Term Limits, Inc. v. Thornton,
   514 U.S. 779 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

U.S. v. Granderson,
   511 U.S. 39 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

U.S. v. Nat'l Treasury Employees Union,
   513 U.S. 454 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 26

U.S. v. Philip Morris USA, Inc.,
   449 F. Supp. 2d 988 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 34

United States v. Fausto,
     484 U.S. 439 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 10

United States v. Mississippi Valley Generating Co.,
     364 U.S. 520 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26, 31

Varicon Int'l v. OPM,
     934 F. Supp. 440 (D.D.C. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

Virginia Petroleum Jobbers Ass'n v. FTC,
     259 F.2d 921 (D.C. Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Wagner v. Taylor,
     836 F.2d 566 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

Washington Metropolitan Area Transit Comm'n v. Holiday Tours,
     559 F.2d 841 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

Waters v. Churchill,
     511 U.S. 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

Weaver v. U.S. Information Agency,
     87 F.3d 1429 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Wisconsin Gas Co. v. FERC,
     758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32, 33

## **STATUTES**

5 U.S.C. app. 4  §§ 101-505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

5 U.S.C. App. 4 § 402(b)(1), (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

5 U.S.C. § 1214 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15, 16

5 U.S.C. § 2301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

5 U.S.C. § 2302 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14, 15

5 U.S.C. § 7103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 16

5 U.S.C. § 7121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16, 17

5 U.S.C. § 7122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5 U.S.C. § 7301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

5 U.S.C. § 7321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Civil Service Reform Act of 1978, Pub. L. No. 95-454, 92 Stat. 1111 . . . . . . . . . . . . . . . passim

## REGULATIONS

5 C.F.R. § 734.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5 C.F.R. § 2635.802 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Final Rule, "Standards of Ethical Conduct for Employees of the Executive Branch," 57
      Fed. Reg. 35006, 35008 (August 7, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Standards of Ethical Conduct for Employees of the Executive Branch,
      5 C.F.R. § 2635.101 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 27, 28

## EXECUTIVE & LEGISLATIVE MATERIALS

Executive Order No. 12674 (April 12, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Executive Order No. 12731 (October 17, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

H.R. Rep. No. 1717, 95th Cong., 2d Sess. 131 (1978), reprinted in 1978 U.S.C.C.A.N. 2723,
      2853 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

S. Rep. No. 96-170 (1978), reprinted in 1978 U.S.C.C.A.N. 4216, 4217 . . . . . . . . . . . . . . . . . 4

## MISCELLANEOUS

Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D,
      (West 1995 & Supp.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

**INTRODUCTION**

Plaintiff Jaime Ramirez is a federal law enforcement officer with U.S. Customs and Border Protection ("CBP") who inspects vehicles, cargo, and individuals seeking to enter the United States from Mexico at the Port of Presidio, Texas.  Plaintiff is also an elected member of the Presidio City Council, relying for political support on the same individuals whose vehicles he inspects at the international border and serving as part of a legislative body engaged in ongoing negotiations with CBP over the disposition of seized property.  Because of the appearance of a conflict of interest between plaintiff's two positions, CBP has instructed him to choose between them.  In response, plaintiff asks this Court for the extraordinary remedy of an emergency injunction against CBP's personnel order because, he argues, it violates his First Amendment rights.  This Court should deny plaintiff's request for a preliminary injunction because it meets none of the standards for such relief.

As a threshold matter, plaintiff cannot establish he is likely to succeed on the merits of his claim because he has failed to show that this Court has jurisdiction over that claim.  Plaintiff cannot establish subject matter jurisdiction in this Court because he has not raised his claim through the procedures set forth in the Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, as amended, codified throughout 5 U.S.C., ("CSRA"), let alone exhausted those administrative remedies, as the Court of Appeals for the D.C. Circuit requires federal employees to do before raising constitutional claims over personnel actions in district court.  Under the CSRA's comprehensive remedial framework, plaintiff could pursue his claim either by bringing a complaint to the U.S. Office of Special Counsel or by raising a grievance under the collective bargaining agreement with the government that covers him.  He has done neither, and so his

claim is not properly before this Court at this time. Plaintiff's motion for preliminary injunction should be denied for that reason alone.

Even if this Court had jurisdiction over plaintiff's First Amendment claim, that claim lacks merit: as numerous courts have held, restrictions on the ability of civil servants to serve in elective office do not offend the First Amendment. Here, CBP's order does not prevent plaintiff from expressing himself on any matter of public concern, influencing any public debate, or even seeking or occupying political office; rather, it reasonably requires plaintiff to choose between his federal law enforcement job and an outside political position. Such "resign-to-run" or "resign-to-serve" requirements have been consistently upheld, as CBP's order should be here. Nor is it of great moment that plaintiff's elected position is nonpartisan, and therefore permissible under the Hatch Act. While the Hatch Act is designed to avoid political party or machine dominance of the civil service, CBP's action regarding plaintiff furthers the United States' compelling interest in protecting the public's confidence in its representative government by restricting conduct by federal employees that would create even the appearance of a conflict of interest.

As the accompanying declaration of a CBP official explains, CBP has reasonably determined that plaintiff's dual service as a CBP Officer at the Port of Presidio and as a Presidio City Council member creates the appearance of a conflict of interest. Plaintiff's incentive to curry favor with the constituents and Presidio businesses seeking to move cargo across the border, for example, may lead reasonable minds to question the impartiality of plaintiff's law enforcement decisions. Such a threat to the public trust is precisely what the Office of Government Ethics' binding Standards of Ethical Conduct for Employees of the Executive

-2-

Branch are intended to prevent, and CBP has properly applied those standards along with its own supplemental regulations here.

Plaintiff also cannot establish a certain, actual and imminent threat of irreparable injury to an interest sufficient to justify the extraordinary, emergency relief he seeks. Plaintiff argues that violation of his First Amendment rights is *per se* irreparable harm, and so his claim of injury rests entirely on his fatally flawed merits arguments. Therefore, because plaintiff cannot show that CBP's order impermissibly infringes on his First Amendment rights, his invocation of those rights forms an insufficient basis for his claim of irreparable injury.

Finally, the balance of equities favors defendants. While plaintiff has failed to identify any cognizable harm he will suffer in the absence of emergency relief, the government and the public will continue to suffer from the appearance of a conflict of interest that plaintiff's conduct creates.

For all of these reasons, this Court should deny plaintiff's Motion for a Preliminary Injunction.

## BACKGROUND

### I.    Statutory and Regulatory Background

#### A.    The Standards of Ethical Conduct for Employees of the Executive Branch

Congress and the Executive Branch have legislated and regulated ethical standards for government employees since 1789. Ex parte Curtis, 106 U.S. (16 Otto) 371, 372-3 (1882). In 1978, Congress adopted the Ethics in Government Act ("EIGA") to codify a heightened level of ethical standards applicable to all three branches of the federal government. See 5 U.S.C. app. 4 §§ 101-505. Largely a reaction to public concerns over perceptions of ethical impropriety in

government, the purpose of the EIGA was to "preserve and promote the accountability and

integrity of public officials and of the institutions of the federal government and to invigorate the

constitutional separation of powers between the three branches of government." S. Rep. No. 96-

170, at 1 (1978), reprinted in 1978 U.S.C.C.A.N. 4216, 4217.

EIGA created the Office of Government Ethics ("OGE") and charged that Office with

developing rules and regulations "pertaining to conflicts of interest and ethics in the executive

branch," and "to the identification and resolution of conflicts of interest." 5 U.S.C. App. 4

§ 402(b)(1), (2).[1]  Pursuant to this authority, the OGE adopted the Standards of Ethical Conduct

for Employees of the Executive Branch ("Standards of Conduct"), 5 C.F.R. § 2635.101 et seq.

As the Standards of Conduct state,

> Public service is a public trust. Each employee has a responsibility to the United States
> Government and its citizens to place loyalty to the Constitution, laws and ethical
> principles above private gain. To ensure that every citizen can have complete confidence
> in the integrity of the Federal Government, each employee shall respect and adhere to the
> principles of ethical conduct set forth in this section, as well as the implementing
> standards contained in this part and in supplemental agency regulations.

5 C.F.R. § 2635.101(a).  The standards include general principles that apply to every federal

employee, id. § 2635.101(b), such as the principle that federal "[e]mployees shall not engage in

outside employment or activities, including seeking or negotiating for employment, that conflict

with official Government duties and responsibilities," id. § 2635.101(b)(10), and that

"[e]mployees shall endeavor to avoid any actions creating the appearance that they are violating

---

[1]    See also 5 U.S.C. § 7301 ("The President may prescribe regulations for the
conduct of employees in the executive branch."); Executive Order No. 12674 (April 12, 1989),
"Principles of Ethical Conduct for Government Officers and Employees" (3 C.F.R., 1989
Compilation, pp. 215-218), as modified by Executive Order No. 12731 (October 17, 1990) (3
C.F.R., 1990 Compilation, pp. 306-311) (delegating to OGE the President's statutory authority to
regulate the conduct of executive branch personnel).

the law or the ethical standards set forth in this part" as "determined from the perspective of a reasonable person with knowledge of the relevant facts." Id. § 2635.101(b)(14).

As to "[o]utside employment and other outside activities of an employee," the Standards of Conduct require that such activities must also comply with the Standards and supplemental agency regulations, "includ[ing] the principle that an employee shall endeavor to avoid actions creating an appearance of violating any of the ethical standards. . . ." Id. § 2635.101(c).

The OGE Standards of Conduct also require employees to abide by any supplemental agency regulations that mandate employees seek approval before engaging in outside employment and other activities. Id. § 2635.803. Such requirements are contained in Department of Homeland Security ("DHS") Management Directive 480.1 ("M.D. 480.1") (attached hereto as Exhibit A), and the CBP Standards of Conduct, CBP Directive 51735-013 (attached to plaintiff's motion for preliminary injunction as Exhibit E). All DHS employees, including CBP employees, are required to "[e]ndeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this directive", including the standard that employees should "[n]ot engage in outside employment or activities . . . that conflict with official Government duties and responsibilities", as "determined from the perspective of a reasonable person with knowledge of the relevant facts." DHS M.D. 480.1 §§ VI.A.10, 14. The CBP Standards of Conduct similarly requires CBP employees to "avoid any action, whether or not specifically prohibited by [the CBP] Standards of Conduct, which might . . . reasonably create the appearance of . . . conflict with official government duties and/or responsibilities." CBP Directive 51735-013 § 6.2; see also id. at § 6.15.1 (requiring employees to request approval before entering into any outside employment).

B.    **The Civil Service Reform Act**

The Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111,

regulates federal employment, from personnel practices and adverse actions to labor relations and

employee grievances.  The CSRA provides a "comprehensive" scheme of protections and

remedies for federal employment disputes and "prescribes in great detail the protections and

remedies applicable . . ., including the availability of . . . judicial review."  United States v.

Fausto, 484 U.S. 439, 448, 443 (1988).  The CSRA generally "precludes district courts from

taking jurisdiction over CSRA-related claims."  Steadman v. Governor, U.S. Soldiers' and

Airmen's Home, 918 F.2d 963, 967 (D.C. Cir. 1990) (citing Karahalios v. Nat'l Federation of

Federal Employees, 489 U.S. 527, 536 (1989); Fausto, 484 U.S. 439, 445).  The provisions of the

CSRA that govern whether and when this Court has jurisdiction over plaintiff's claims are

discussed in Part IV.A., infra.

II.    **Factual Background**

Jaime Ramirez is a U.S. Customs and Border Protection Officer in Presidio, Texas.

Declaration of Patricia Duffy ("Duffy Decl."), filed as Exhibit B hereto, ¶  8; Pl. Mem. 1.  As a

CBP Officer, plaintiff "performs the full range of inspection, intelligence analysis, examination,

and law enforcement activities relating to arrival and departure of persons, conveyances, and

merchandise at Ports of Entry ['Ports,']" such as the Port at the U.S. - Mexico border in Presidio.

See GS-11 CBP Officer Position Description (attached as Exhibit A to the Duffy Decl.) at 1.

Plaintiff's job includes prevention of the entry into the United States of terrorists and instruments

of terror, harmful pests and diseases, illegal drugs and contraband, and illegal aliens.  Id.

Presidio is a town of approximately 5,000 residents.[2]  The CBP Port and crossing facility

have a great impact on Presidio:

> People cross from Presidio to its "sister city" of Ojinaga across the Rio Grande on a daily
> basis: children cross the border for school, people visit family members on the other side
> of the border, people cross to places of employment, and people cross for daily errands
> and shopping.  Over 700,000 vehicles containing legal cargo as well as smuggled and
> illegal substances or aliens cross the border at Presidio each year.

Duffy Decl. ¶ 10.  As a CBP Officer, plaintiff inspects the people and vehicles that seek to cross

the border and enter the United States and determines whether the people, cargo or conveyance in

question may be immediately admitted to the country or referred for further examination.  Id.;

CBP Officer Position Description at 2.

In 2004, plaintiff sought permission from CBP to serve as a member of the Presidio City

Council – the governing political and legislative body of Presidio – for a two-year term beginning

in 2004.  Duffy Decl. ¶ 8; Pl. Mem. 3.  His request was initially denied and then, upon

reconsideration, granted.  Duffy Decl. ¶ 8.  Plaintiff never submitted a request for authorization

to serve beyond his initial two-year term.  Id.  On December 22, 2006, CBP issued a

memorandum to plaintiff informing him that he was required to resign from his city council

position due to the appearance of a conflict of interest with his official duties.  See Exhibit 3 to

Ramirez Decl., filed with Pl. Mem.  The memorandum noted one reason for the appearance of a

conflict of interest was ongoing negotiations between, among others,  CBP and the Presidio City

Council over disposition of and leasing arrangements over federally-seized property within

---

[2]        According to data available at www.census.gov, the U.S. Census Bureau estimates
that the 2005 population of the City of Presidio was 4,775.  See also Declaration of Jaime
Ramirez, Exhibit A to plaintiff's Motion for Preliminary Injunction, ¶ 3 (estimating between
5,000 and 6,000 residents).

Presidio.  Id.; Duffy Decl. ¶ 14.  The memorandum also noted the ongoing relationship between CBP and the city of Presidio concerning normal business issues, which include the leasing by Presidio of land to CBP for provision of homes to CBP Officers and employees.  Id.

On January 5, 2007, CBP issued another memorandum to plaintiff requiring him to choose between his federal civil service law enforcement provision and his city council position within 30 days, or face further action by CBP up to and including removal.  See Exhibit B to Duffy Decl.; Duffy Decl. ¶ 16.  On January 12, 2007, plaintiff commenced this litigation with filing of his Complaint.  See Compl.  CBP subsequently agreed, through counsel, not to take action against plaintiff concerning the ongoing appearance of a conflict of interest between his two positions until March 8, 2007, which, upon information and belief, is the date of the next scheduled Presidio City Council meeting.

## ARGUMENT

### III.    Standard of Review

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  Mazurek v. Armstrong, 520 U.S. 968, 972 (1997); see also Cobell v. Norton, 391 F.3d 251, 258 (D.C. Cir. 2004) (preliminary injunction is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."); Dorfmann v. Boozer, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (the power to issue such an injunction "should be sparingly exercised") (quotation marks omitted).  For a plaintiff to prevail in a motion for a preliminary injunction, he "must demonstrate:  1) a substantial likelihood of success on the merits, 2) that [he] would suffer irreparable injury if the injunction is not granted, 3) that an

injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995); see also, e.g., Washington Metropolitan Area Transit Comm'n v. Holiday Tours, 559 F.2d 841, 842 (D.C. Cir. 1977); Virginia Petroleum Jobbers Ass'n v. FTC, 259 F.2d 921, 925 (D.C. Cir. 1958).[3] While courts may balance weakness in one or more prongs against strong showings in others, CityFed Financial Corp., 58 F.3d at 747, two prongs of the familiar four-part inquiry – the likelihood of success on the merits and irreparable harm – must be established. See District 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am., 412 F.2d 165, 167 (D.C. Cir. 1969).

Although the preliminary injunction standard creates significant obstacles to the issuance of extraordinary relief in any case, the Supreme Court has made clear that an even higher standard applies in cases involving requests by government employees to prevent adverse employment actions. In Sampson v. Murray, 415 U.S. 61 (1974), the Supreme Court, citing the "obvious disruptive effects" preliminary judicial intervention would have on internal governmental affairs, id. at 83-84, held that a preliminary injunction to prevent discharge of a

---

[3]      Plaintiff suggests he is entitled to extraordinary emergency relief upon a showing that "a 'serious legal question' is at issue." Pl. Mem. 10 (quoting Holiday Tours, 559 F.2d at 844). Plaintiff is quoting, in part, the Court of Appeals' holding that, no matter how likely or serious irreparable harm may be in the absence of the requested relief, the movant must also demonstrate, at the least, "'serious legal questions going to the merits, so serious, substantial, difficult as to make them a fair ground of litigation and thus for more deliberate investigation.'" See Population Institute v. McPherson, 797 F.2d 1062, 1078 (1986) (quoting Holiday Tours, 559 F.2d at 844). In any event, where an action sought to be preliminarily enjoined is taken pursuant to a statutory or regulatory scheme, courts should find an actual "likelihood of success on the merits" before granting relief. See Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2nd Cir. 1989). Here, as discussed infra, plaintiff is not entitled to preliminary relief under any standard because he has failed to establish irreparable harm under, subject matter jurisdiction in this Court over, or a likelihood of success on his constitutional claim.

government employee would be warranted only in a "genuinely extraordinary situation," id. at 92
n.68.

## II.    Plaintiff Has Failed to Establish a Likelihood of Success on the Merits of His Claims

### A.    Plaintiff Cannot Establish Subject Matter Jurisdiction Over His Claims In This Court At This Time

Plaintiffs virtually ignores his burden to establish this Court's subject matter jurisdiction
to review Plaintiff's claims, though that is, of course, a threshold question.  "Without jurisdiction
the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it
ceases to exist, the only function remaining to the court is that of announcing the fact and
dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The Court, of
course, "always [has] jurisdiction to determine [its] jurisdiction." Nestor v. Hershey, 425 F. 2d
504, 511 (D.C. Cir. 1969); accord Steel Co. v. Citizens for a Better Environment, 523 U.S. 83,
93-94 (1998) (federal court may not decide merits before determining whether it has jurisdiction
over a case).  Here, because plaintiff has so far failed to raise his constitutional claims through
the administrative procedures set forth in the Civil Service Reform Act, Pub. L. No. 95-454, 92
Stat. 1111, as amended, codified throughout 5 U.S.C. ("CSRA") – a comprehensive statutory
scheme designed to address the personnel-related complaints of federal employees – this Court
lacks jurisdiction over those constitutional claims.

In United States v. Fausto, the Supreme Court found that "[a] leading purpose of the
CSRA was to replace the haphazard arrangements for administrative and judicial review of
personnel action, part of the 'outdated patchwork of statutes and rules built over almost a
century' that was the civil service system."  484 U.S. 439, 444 (1988) (quoting S. Rep. No. 969,

95th Cong., 2d Sess. 3 (1978)).  "Congress responded to this situation by enacting the CSRA,

which replaced the patchwork system with an integrated scheme for administrative and judicial

review . . . ."  Id. at 445.  Even the total exclusion of a class of employees from the protections of

the CSRA does not leave them free to pursue pre-CSRA judicial remedies.  Id. at 447.  On the

contrary, the CSRA generally "precludes district courts from taking jurisdiction over CSRA-

related claims."  Steadman, 918 F.2d 963, 967 (citing Karahalios, 489 U.S. at 536; Fausto, 484

U.S. 439, 445)).  The D.C. Circuit, sitting en banc, has made clear that, when judging the

preclusive effect of the CSRA, "it is the comprehensiveness of the statutory scheme involved, not

the 'adequacy' of specific remedies extended thereunder, that counsels judicial restraint."

Spagnola v. Mathis, 859 F.2d 223, 227 (D.C. Cir. 1988); see id. at 228 ("the [Supreme] Court

regards a case-by-case examination of the particular administrative remedies available to a given

plaintiff as unnecessary").  Instead, the CSRA must be given preclusive effect if the claims

advanced by a federal employee are "within CSRA's ambit."  Id. at 229.

   Accordingly, this Court has held that "[i]n assessing whether the CSRA precludes

[plaintiff's] claims, the determinative question is whether they fall within its purview."  Doe v.

Goss, Civ. No. 04-2122-GK, 2007 WL 106523, *8 (D.D.C. January 12, 2007) (Kessler, J.)

(citing National Treasury Employees Union v. Devine, 577 F. Supp. 738, 745 (D.D.C. 1983),

aff'd 733 F.2d 114 (D.C. Cir. 1984)).  And "[c]onstitutional challenges to Agency action, such as

the First Amendment claims raised by petitioner, are fully cognizable within the CSRA system."

Bush v. Lucas, 462 U.S. 367, 386 (1983).  For that reason, the Court of Appeals for the D.C.

Circuit has held that it is only "if a constitutional claim survives an unsuccessful journey through

the administrative process [that] the federal courts are open."  Steadman, 918 F.2d at 968; accord

Weaver v. U.S. Information Agency, 87 F.3d 1429, 1433 (D.C. Cir. 1996) (federal court review over a constitutional claim may be available "at the end of the line. . . . But first the plaintiff must exhaust administrative remedies."). This is because the federal judiciary should not "improperly interject [itself], at a premature stage into the CSRA's carefully developed system of administrative review."[4] Steadman, 918 F.2d at 966. Accordingly, Steadman established that it is only the "unsuccessful" complainant who may bring a constitutional cause of action to federal court once his journey though the administrative process is completed. 918 F.2d at 968. Similarly, in Weaver, the Court of Appeals clearly articulated the requirement that, although constitutional claims for injunctive relief[5] might be heard by a federal court, administrative remedies must be exhausted "first." 87 F.3d at 1433. This exhaustion requirement is jurisdictional. See Weaver, 87 F.3d at 1433 ("under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit") (citing Steadman, 918 F.2d at 966-68).

---

[4]    As this Court has explained,

The exhaustion requirement exists because it serves four important purposes. First, it prevents litigants from circumventing Congress' carefully crafted remedial scheme. Second, it gives agencies the opportunity to correct their own mistakes or to exercise the discretion they have been granted. Third, it eases the burden on the federal judiciary by allowing the parties and the agency to develop the facts in an administrative forum. Finally, it will either focus the issues for judicial review or settle the dispute so that judicial review will become unnecessary.

Martin v. EPA, 271 F. Supp. 2d 38, 45 (D.D.C. 2002).

[5]  Claims arising under the constitution but seeking money damages are wholly precluded. See, e.g., Bush, 462 U.S. 368, 388 (declining to create a Bivens remedy for a claim cognizable under the CSRA because "such claims arise out of an employment relationship that is governed by comprehensive procedural and substantive provisions giving meaningful remedies against the United States" and to "creat[e] . . . a new judicial remedy . . . would disrupt the elaborate remedial system that has been constructed [by Congress]. . . .").

-12-

The fact that plaintiff's claims at issue here come within the CSRA's broad remedial scheme is made clear by reference to the Act's merit system principles, which require that all federal employees "should receive fair and equitable treatment in all aspects of personnel management . . . and with proper regard for their privacy and constitutional rights."  5 U.S.C. § 2301(b)(2).  Prohibited personnel practices actionable under the CSRA include the taking of any "personnel action" in violation of the Act's merit system principles.  5 U.S.C. § 2302(b)(11).  Thus, plaintiff's claim that the CBP instruction that plaintiff either resign from the City Council or resign from CBP violates his constitutional rights is a claim cognizable under the CSRA, since "it is a 'prohibited personnel practice' to take a personnel action that unconstitutionally burdens an employee's speech."  Weaver, 87 F.3d at 1432 (citing Suzal v. Director, U.S. Information Agency, 32 F.3d 574, 580 (D.C. Cir. 1994); Spagnola, 859 F.2d at 225 & n. 3); see also Ferry v. Hayden, 954 F.2d 658, 661 (11th Cir. 1992) (plaintiff's "allegation that [his supervisor] violated his freedom of association fell within the CSRA's 'catch-all' prohibition on personnel actions violating the CSRA's merit system principles") (citing 5 U.S.C. § 2302(b)(11)); McIntosh v. Turner, 861 F.2d 524, 526 (8th Cir. 1988) (violation of an employee's constitutional rights is a "prohibited personnel practice" under the CSRA) (cited in id.); Kalil v. Johanns, 407 F. Supp. 2d 94, 101 (D.D.C. 2005) ("The definition of 'prohibited personnel actions' includes those actions which violate the Merit Systems Principles."); H.R. Rep. No. 1717, 95th Cong., 2d Sess. 131 (1978), reprinted in 1978 U.S.C.C.A.N. 2723, 2853 (observing that "prohibited personnel practices" include violations of employees' constitutional rights).  As is discussed in more detail below, the plaintiff's claims also constitute a "grievance" subject to the remedial scheme of Chapter 71 of the CSRA.  See 5 U.S.C. §§ 7103(a)(9)(A) (grievance includes a complaint

-13-

"concerning any matter relating to the employment of the employee") & 7103(a)(9)(C)(ii)

(grievance includes a complaint regarding "any claimed violation, misinterpretation, or

misapplication of any law, rule, or regulation affecting conditions of employment").

"The types of personnel action which can constitute a prohibited personnel practice claim

are extremely broad, if not exhaustive." Carducci v. Regan, 714 F.2d 171, 174 (D.C. Cir. 1983)

(Scalia, J.). See also Spagnola, 859 F.2d at 225 n.1 (noting that Congress broadly defined

"prohibited personnel actions"). In addition to other "personnel actions" such as demotions,

promotions, appointments, job reassignments, performance evaluations, and decisions relating to

pay and benefits, the statutory term also encompasses "other disciplinary or *corrective action*." 5

U.S.C. § 2302(a)(2)(A)(iii) (emphasis added). "The corrective action category is a capacious

one, encompassing a wide variety of conduct affecting federal employees." Roth v. United

States, 952 F.2d 611, 614 (1st Cir. 1991).[6]

The letter instructing plaintiff to resign either his political office or his CBPO position

"sought to change the [plaintiff]'s behavior and did, therefore, constitute corrective action," and

therefore a "personnel action," under the CSRA. Johnson v. Dep't of Health and Human

Services, 93 M.S.P.R. 38, 45 (M.S.P.B. 2002).[7] Cf. Weaver, 87 F.3d at 1432-33 (letter of

_____

[6]        The plaintiff in Roth brought damage claims against her Division Manager at the
FAA complaining of "slanderous utterances" relating to plaintiff's job performance. 952 F.2d at
614. The court rejected adopting a "cramped construction of 'personnel action,'" and found that
plaintiff's defamation claim easily came within the meaning of this term, thereby setting forth an
alleged "prohibited personnel action" in violation of the Act's merit system principles.

[7]        On the question of what qualifies as a "personnel action" under the CSRA, "[t]he
MSPB's interpretation is entitled to deference." Weaver, 87 F.3d at 1433 (citing Lovshin v.
Dep't of the Navy, 767 F.2d 826, 840 (Fed. Cir. 1985)). Moreover, because "Congress has
vested the MSPB with substantial responsibility for enforcing the [CSRA]," Lovshin, 767 F.2d at
(continued...)

admonishment constituted a "personnel action" under 5 U.S.C. § 2302(a)(2) (citing Cochran v. Dep't of Veterans Affairs, 67 M.S.P.R. 167, 174 (M.S.P.B. 1995)).  The CBP order that plaintiff choose between his civil service law enforcement position and his position on the Presidio City Council thus qualifies as a "personnel action" that may constitute a prohibited personnel practice and fits within the CSRA remedial framework.  See 5 U.S.C. § 2302(a)(2)(A)(iii).  Specifically, it is the sort of "specified minor personnel action[ allegedly] infected by . . . disregard of law" that is subject to "review by the Office of Special Counsel[.]"  Carducci, 714 F.2d at 175 (citation omitted).  OSC is required to "investigate the allegation to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken."  See 5 U.S.C. § 1214(a)(1)(A).[8]

---

[7](...continued)
840, it is particularly appropriate that plaintiff must first channel his claim through the CSRA remedial scheme as long as there exists a colorable argument that the alleged agency action in question qualifies as a "personnel action."  "Proceeding through the agency in this way provides the agency the opportunity to reconsider its policies, interpretations, and regulations in light of those challenges."  Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 24 (2000) (requiring constitutional claims to be channeled through the Medicare Act's administrative review procedures before jurisdiction may be found in district court).  The exhaustion requirement also affords responsible decisionmakers an opportunity to address the matter in the first instance and grant relief on non-constitutional grounds, perhaps informed by principles of constitutional avoidance, thereby obviating any occasion for addressing a constitutional claim in court.

[8]     OSC is further required to notify a person who makes an allegation of a prohibited personnel practice that the allegation was received, and to update the person periodically on the status of the investigation.  5 U.S.C. § 1214(a)(1)(B) and (C).  If OSC finds the allegation meritorious, it must report its findings along with the recommendations for corrective action to the agency.  5 U.S.C. § 1214.  Should the agency fail to implement the recommended corrective action, the OSC may request the Merit System Promotion Board (MSPB) to consider the matter, and the MSPB may order such corrective action as it deems necessary.  Id. § 1214(b)(2)(C).  Alternatively, if OSC decides to terminate an investigation, it must report its proposed findings of fact and legal conclusions to the person who made the allegation, who may in turn submit

(continued...)

-15-

Plaintiff also appears to have recourse to a separate avenue of relief under the CSRA remedial scheme, the grievance procedure under the Collective Bargaining Agreement ("CBA") covering plaintiff.  5 U.S.C. § 7121(g).  CBP employees such as plaintiff who were transferred to CBP at its inception from jobs with the former U.S. Immigration and Naturalization Service are represented by the American Federation of Government Employees, Council 117, d/b/a National Homeland Security Council (formerly the National Immigration and Naturalization Service Council), and covered by Agreement 2000 Between U.S. Immigration and Naturalization Service and National Immigration and Naturalization Service Council ("Agreement 2000") (available at http://www.nhsc117.org/images/Agreement_2000.doc).  Under Chapter 71 of the CSRA, every collective bargaining agreement is required to contain a procedure for "the settlement of grievances."  5 U.S.C. § 7121(a)(1).

The CSRA's broad definition of "grievance" is broad and plainly encompasses the CBP order that plaintiff challenges here.  See 5 U.S.C. §§ 7103(a)(9)(A) (grievance includes a complaint "concerning any matter relating to the employment of the employee") & 7103(a)(9)(C)(ii) (grievance includes a complaint regarding "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment"); see also Agreement 2000 Art. 47(B) (including same definition of grievance).  Thus, a CBP employee covered by a CBA can contest an allegedly improper personnel action through the grievance procedures established by the CBA.  Under 5 U.S.C. § 7121(g), plaintiff

---

[8](...continued)
written comments to OSC.  Id. § 1214(a)(1)(D).  OSC must then notify the person of the termination of the investigation, and provide a summary of relevant facts, the reasons for termination, and a response to any comments submitted.  Id. § 1214(a)(2)(A).

may elect to challenge a personnel action under the negotiated grievance procedure, or he may elect to pursue available administrative remedies by, e.g., seeking corrective action from OSC in the case of a prohibited personnel practice.[9]

Because plaintiff has available avenues of relief under the CSRA's remedial scheme, his claim for injunctive relief against CBP's corrective action must be administratively exhausted through one of those avenues before there is subject matter jurisdiction in this Court.   Under Steadman, it is only where a plaintiff raises a claim that is "totally unrelated" to the personnel actions that form the basis for administrative review under the CSRA that he may proceed in federal court without exhausting administrative remedies.  918 F.2d at 967.  Plaintiff, however, brings no such claim.  He makes no facial challenge to any law or regulation governing himself or CBP.  He makes no claim of unconstitutionality with respect to any established government policy.  And he makes no effort to forestall enforcement of any law, regulation, or policy. Instead, plaintiff's constitutional claim is based wholly on his allegation that an allegedly improper *corrective personnel action* was taken against him, and that further such action will be

---

[9]       If the negotiated grievance procedures under the CBA do not resolve an employee's grievance, either the union or the agency may invoke binding arbitration, 5 U.S.C. § 7121(b)(1)(C)(iii), with subsequent review of the arbitrator's decision by the Federal Labor Relations Authority ("FLRA"), 5 U.S.C. § 7122(a).  The FLRA may "take such action and make such recommendations concerning the [arbitral] award as it considers necessary, consistent with applicable laws, rules, or regulations."  5 U.S.C. § 7122(a)(2).  That structure reflects "the Congressionally unambiguous and unmistakable preference for exclusivity of arbitration[, which] is a central part of the comprehensive overhaul of the civil service system provided by the CSRA."  Muniz v. United States, 972 F.2d 1304, 1309 (Fed. Cir. 1992).  "To hold that the district courts must entertain such cases in the first instance would seriously undermine what [the Court] deem[s] to be the congressional scheme."  Karahalios, 489 U.S. at 536-37.  The CSRA precludes employees subject to an agency's grievance procedures from bypassing those procedures and first seeking judicial consideration of their grievances.  Carducci, 714 F.2d at 172-75.

taken.  See, e.g., Compl. at ¶ 26 & Prayer for Relief.

The exhaustion requirement mandated by the Court of Appeals for this Circuit thus

applies squarely to plaintiff's constitutional claims.  See Weaver, 87 F.3d at 1434 (where

constitutional claim is intertwined with claims that fall within the scope of the CSRA, or are

"premised on the same facts," exhaustion is required).  As discussed above, this is not the

"unusual case in which the constitutional claim raises issues *totally unrelated* to the CSRA

procedures."  Steadman, 918 F.2d at 967 (emphasis added); see also Andrade v. Lauer, 729 F.2d

1475, 1493 (D.C. Cir. 1984) (exhaustion is not required where there is a "*complete divergence*

between the issues presented by the constitutional and personnel/statutory claims") (emphasis

added).  This Court thus lacks subject matter jurisdiction over plaintiffs' constitutional claims

unless and until they have exhausted the carefully designed procedures of the CSRA.

See Weaver, 87 F.3d at 1434-35; Steadman, 918 F.2d at 968.

**B.    Even if This Court Had Jurisdiction Over Plaintiff's Claims, He Has Also Failed to Establish a Likelihood of Success on the Merits of Those Claims Because the Challenged CBP Order Does Not Impermissibly Infringe on His First Amendment Rights**

**1.    The Challenged CBP Order Does Not Infringe on Plaintiff's First Amendment Rights**

It is well-settled that "[a] governmental employer may subject its employees to such

special restrictions on free expression as are reasonably necessary to promote effective

government,"[10] Brown v. Glines, 444 U.S. 348, 356, n. 13 (1980), and that those restrictions may

include "restraints that would be unconstitutional if applied to the general public," City of San

---

[10]    As discussed infra, preventing the appearance of a conflict of interest in federal employees is a plainly legitimate government interest.

Diego v. Roe, 543 U.S. 77, 80 (2004).  "When a court is required to determine the validity of

such a restraint, it must 'arrive at a balance between the interests of the [employee], of a citizen,

in commenting upon matters of public concern and the interest of the [government], as an

employer, in promoting the efficiency of the public services it performs through its employees.'"

U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 465-66 (1995) ("NTEU") (quoting

Pickering v. Board of Education, 391 U.S. 563, 568 (1968)).  This balancing test is not even

required, however, where the government restraint on its employee's conduct does not impact the

employee's *speech* on a *matter of public concern* – such restrictions do not burden the First

Amendment at all.  See Connick v. Myers, 461 U.S. 138, 142 (1983); Tao v. Freeh, 27 F.3d 635,

639 (D.C. Cir. 1994).

In Public Workers v. Mitchell, 330 U.S. 75 (1947), the Supreme Court first upheld

provisions of the Hatch Act which prohibit certain political activities by federal employees.  The

Mitchell Court held that "the [political] act regulated" need only be "reasonably deemed by

Congress to interfere with the efficiency of the public service" for the restriction to pass muster

under the First Amendment.  330 U.S. at 101.  The Supreme Court "unhesitatingly" reaffirmed

Mitchell in U.S. Civil Service Comm'n. v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 556

(1973) ("NALC"), over a dissent that argued against application of this relaxed standard for

regulation of government employees' expression.  Id. at 597 (Douglas, J., dissenting).  In

Broadrick v. Oklahoma, 413 U.S. 601 (1973), the Supreme Court upheld restrictions on the

political activity of state employees, though directed "at political expression which if engaged in

by private persons would plainly be protected by the First and Fourteenth Amendments."  Id. at

616.  As one court has noted, "[t]he clear consequence of these opinions is that infringements

-19-

upon the ability of government employees, be they federal or state, to be candidates for elective

office do not violate the First Amendment." <u>Connecticut Dep't of Human Resources v. MSPB</u>,

718 F. Supp. 125, 131 (D. Conn. 1989).[11]  <u>Cf.</u> <u>Int'l Soc'y for Krishna Consciousness, Inc. v. Lee</u>,

505 U.S. 672, 678 (1992) ("Where the government is acting as a proprietor, managing its internal

operations, rather than acting as a lawmaker with power to regulate or license, its action will not

be subjected to the heightened review to which its actions as a lawmaker may be subject.").

Plaintiff, ignoring binding precedent such as <u>Brown</u>, <u>Mitchell</u>, <u>NALC</u> and <u>Broadrick</u>,

argues that CBP's order that plaintiff choose between his service as a CBPO and as a Presidio

City Council member impermissibly infringes on plaintiff's "core First Amendment rights."

Plaintiff relies on eloquent language from decades of Supreme Court opinions (and dissents[12]),

but he fails to explain how such language controls the situation at hand.  <u>See</u> <u>generally</u> Pl. Mem.

---

[11]    <u>Cf.</u> <u>Otten v. Schicker</u> 655 F.2d 142 (8th Cir. 1981) (under Missouri law, a regulation prohibiting police department employees from running for elective public office served valid and important state interests, including ensuring the impartial execution of the laws, and therefore did not violate the employees' First Amendment rights); <u>Commonwealth ex rel. Specter v. Moak</u>, 452 Pa. 482, 307 A.2d 884 (Pa. 1973) (city charter provision prohibiting city officers or employees from becoming candidates for public office unless they resigned served legitimate government interests, and therefore did not violate employees' First Amendment rights); <u>Johnson v. State Civil Service Dept.</u>, 280 Minn. 61, 157 N.W.2d 747 (Minn. 1968) (statute providing that certain state employees must resign upon filing as a candidate for public office served public interest by protecting the efficiency, integrity, and morale of state employees, and therefore did not violate the employees' First Amendment rights); <u>Ricks v. Department of State Civil Service</u>, 200 La. 341, 8 So. 2d 49 (La. 1942) (statute forbidding civil service employees from, <u>inter</u> <u>alia</u>, becoming a candidate for any public office would promote efficiency and integrity in the discharge of employees' official duties and, therefore, did not violate state free speech guarantees.).

[12]    Plaintiff quotes the concurrence in part and dissent in part of Justice Thomas in <u>McConnell v. Federal Election Com'n</u>, 540 U.S. 93, 264 (2003), without noting that the language cited was not part of a majority opinion.  Pl. Mem. 11.  Plaintiff does, however, note in his citation that Justice Thomas was quoting, in turn, his own dissent in <u>Nixon v. Shrink Missouri Government PAC</u>, 528 U.S. 377 (2000).  Pl. Mem. 11.

11-14.  Cf. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n.5 (1984)

(plaintiff bears the burden of demonstrating that First Amendment protections apply to his

conduct).

  In Pickering v. Board of Education, which involved neither elective office nor the federal

government, the Supreme Court again recognized that, although public employees may not be

compelled to entirely relinquish their First Amendment rights, the government can regulate the

speech of its employees differently than that of private citizens.  391 U.S. at 568; see also Waters

v. Churchill, 511 U.S. 661, 668 (1994); Connick, 461 U.S. 138; Magill v. Lynch, 560 F.2d 22, 27

(1st Cir. 1977).  "Thus, only where the employee's speech touches on a matter of public concern,

and only where the employee's First Amendment interest is not outweighed by any disruption

that the speech may cause to the efficiency of the public enterprise, is that speech constitutionally

protected."  Tao, 27 F.3d at 639.  Here, contrary to plaintiff's heated rhetoric, CBP has placed no

more than an "insignificant," "de minimis" restriction on his First Amendment activity.  See

Clements v. Fashing, 457 U.S. 957, 971-72 (1982).  Plaintiff retains a wide range of means to

exercise his First Amendment rights – for example, he can express his views upon matters of

public concern and vote as he wishes.

  The requirement that plaintiff choose between serving as a CBP Officer and serving as a

Presidio City Council member thus does not restrict his speech on matters of public concern (or

otherwise) either directly or indirectly by interposing a significant disincentive to speaking, and it

poses no threat to the public and private goods that the First Amendment exists to protect.  The

First Amendment "was designed to secure the widest possible dissemination of information from

diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing

about of political and social changes desired by the people." Buckley v. Valeo, 424 U.S. 1, at 48-49 (1976) (internal quotations omitted). It was incorporated in the Bill of Rights because of the founders' view that "debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964). CBP's action poses no cognizable threat to these values. Here, the "marketplace for the clash of different views and conflicting ideas" is not diminished in the slightest as a result of CBP's application of the Standards of Conduct. See Citizens Against Rent Control, 454 U.S. at 295. The debate on public issues, by plaintiff or others, remains unrestrained. Accord New York Times Co., 376 U.S. at 270.

Plaintiff, indeed, is unrestrained from speaking out on *any* matter of concern by CBP's corrective action. He simply cannot remain a CBP Officer while engaging in outside activity that creates the appearance of a conflict of interest with his official duties. That minimal burden on plaintiff's expressive *conduct* (as opposed to his actual *speech* on a matter of public concern) poses no First Amendment problem under Pickering, Mitchell, and NALC. See Clements, 457 U.S. at 971-72 (law prohibiting sitting state judges from running for partisan office presented only an "insignificant," "*de minimis*" burden on judges' First Amendment interests); Broadrick, 413 U.S. at 615 (discussing facial overbreadth adjudication and noting that courts' ability to strike down a purported restriction on First Amendment activities "attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from 'pure speech' toward conduct . . .").[13] Moreover, CBP's order is essentially an order that plaintiff resign his civil

---

[13]    In Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999), the Supreme Court identified as "core political speech" the right to circulate and sign petitions, and in Meyer v. Grant, 486 U.S. 414 (1988), the Court concluded that petition circulation is "core political speech" for which First Amendment protection is "at its zenith." Id.

(continued...)

service job if he wishes to continue in his position as a City Council member.  The corrective action plaintiff challenges here is, therefore, indistinguishable from the so-called "resign to run" and "resign to serve" laws that courts have consistently upheld.[14]

CBP's goal is not the invidious one of deciding who may serve in public office, as plaintiff implies (Pl. Mem. 11-13), but instead the constitutionally legitimate one of regulating outside activities by a government law enforcement employee and thereby furthering "th[e] great end of Government – the impartial execution of the laws" by employees who have earned the public trust.  See NALC, 413 U.S. at 565.  The CBP order plaintiff challenges "'plac[es] no obstacle between [plaintiff] and the ballot or his nomination or his election.  He is free to run and the people are free to choose him.'"  U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 835 n.48 (1995) (bracketing modified from original), quoting with approval Signorelli v. Evans, 637 F.2d 853, 858 (2ⁿᵈ Cir. 1980).  "'The burden on [political officeholding] . . . is indirect and attributable to a desire to regulate'" a federal employee, "'not to impose additional qualifications to serving" in elected office.'"  See id., quoting with approval Joyner v. Mofford, 706 F.2d 1523, 1528 (9ᵗʰ Cir.), cert. denied, 464 U.S. 1002 (1983); see also Merle v. U.S., 351 F.3d 92, 97 (3ʳᵈ Cir. 2003) ("A 'resign to run' law may force [plaintiff] to choose between remaining as an employee of the federal government and running for elected office, but forcing him to make that decision is not an

---

[13](...continued)
at 422, 425.  No such "core political" First Amendment speech or conduct is at issue here, however.  As discussed supra, plaintiff's expression on matters of public concern is not being significantly burdened.  Rather, his ability to hold two offices – a civil service law enforcement job and an elected local job – is being burdened, without regard to plaintiff's expression.

[14]    Plaintiff has not been prohibited from *seeking*, as opposed to *serving in*, the political office of Presidio Councilmember, and so the question of whether he could properly be ordered to "resign to run," as opposed to "resign to serve," is not before this Court.

additional qualification for the [elective] office. . .").  Contra Pl. Mem. 12 (asserting the CBP

order is a "disqualification of a candidate for public office").  The CBP order at issue in this case

is thus constitutionally indistinguishable from the statutory provisions sustained in Signorelli and

Joyner.[15]  Just as resign-to-run laws find their justification in a state's "fundamental interests" in

"protecting the integrity of a branch of state government," Signorelli, 637 F.2d at 861, 863, so is

the CBP order justified by the fundamental interests of the United States in protecting the

integrity of and public confidence in its functions.  See Crandon v. U.S., 494 U.S. 152, 164-65

(1990) (discussing important government interest in avoiding the appearance of a government

employee's conflict of interest); NALC, 413 U.S. at 565 (same).

      Plaintiff argues that CBP nonetheless cannot restrict service in a nonpartisan political

office because the Hatch Act permits nonpartisan political activity among federal employees, and

that is "'Congress's considered judgment'" as to what is permissible.  Pl. Mem. 15 (citation

omitted).  Plaintiff is mistaken.  As an initial matter, Congress could constitutionally go further

than it has in the Hatch Act; indeed, it has done so in other legislation.  See Smith v. Ehrlich, 430

F. Supp. 818, 822 (D.D.C. 1976) (three-judge district court) (upholding the Legal Services

Corporation Act restriction on nonpartisan or partisan political activity by legal services staff

---

[15]      For that reason, plaintiff's argument that the CBP order violates the First
Amendment rights of "the voters who have selected him as their representative" also fails.  Pl.
Mem. 13 & 13 n.2.  Cf. Merle v. U.S., 351 F.3d 92, 97 (3rd Cir. 2003) ("The [Hatch] Act allows a
citizen a choice.  It does not disqualify any individual from running for public office, but rather
provides for the removal or suspension from public employment of any federal employee who
runs" for partisan office).  In asserting his claim on behalf of voters, plaintiff relies prominently
on the First Circuit's opinion in Mancuso v. Taft, 476 F.2d 187 (1st Cir. 1973), but plaintiff fails
to note that Mancuso was effectively overruled by NALC, 413 U.S. 548, as the First Circuit itself
recognized in Magill v. Lynch, 560 F.2d 22, 27 (1st Cir. 1977).  See also Fernandez v. State
Personnel Bd., 175 Ariz. 39, 41, 852 P.2d 1223, 1225 (Ariz .App. Div. 2 1992) (noting that
"Mancuso was effectively overruled by Letter Carriers.").

against a First Amendment challenge and noting the apparent "judgment of Congress that the

distinction between partisan and nonpartisan politics is often one without a difference.").

Moreover, the "considered judgment" that the Hatch Act reflects responds to different policy

concerns than those animating the OGE Standards of Conduct which support the CBP order.  The

Hatch Act seeks to maintain public confidence in a representative government, but it is primarily

designed to prevent creation of a political machine using "federal employees, paid for at public

expense to man its political structure and political campaigns," to respond to the "concern" that

"employment and advancement in the Government service not depend on political performance,"

and to protect federal employees from coercion in exercising their right to vote.  NALC, 413 U.S.

at 564-66; see also Mitchell, 330 U.S. at 96-100.  As discussed in greater detail infra, regulation

of federal employees' ethics – including conflict of interest regulation such as that at issue here –

is animated primarily by the government's "legitimate interest in maintaining the public's

confidence in the integrity of the federal service." Crandon, 494 U.S. at 164-65.[16]  Accordingly,

the conflict of interest rules were "designed to prohibit and to avoid *potential* conflicts of interest

---

[16]        As plaintiff points out, the CBP Standards of Conduct, CBP Directive 51735-013,
follow the Hatch Act and its implementing regulations note that, as a general matter, plaintiffs
may "[s]tand as candidates for public office in nonpartisan elections."  Id., Exhibit E to Pl. Mem.,
§ 6.16.1.  Plaintiffs fail to note that, here, the operative provision is id. at § 6.2, which requires
CBP employees to "avoid any action, *whether or not specifically prohibited by these Standards
of Conduct,* which might . . . reasonably create the appearance of . . . conflict with official
government duties and/or responsibilities."  (Emphasis supplied.)  By the same token, the Hatch
Act encourages federal employees' political participation only to the extent not otherwise
prohibited by applicable law.  See 5 U.S.C. § 7321; 5 C.F.R. § 734.202.  Plaintiff's service as a
Presidio City Council member at the same time he is a CBP Officer at the Port of Presidio is
prohibited, as discussed infra, by the applicable Standards of Ethical Conduct.  In any event, as
noted supra, CBP has not instructed plaintiff to choose between *standing for* his political office
and remaining in his civil service law enforcement position, it has ordered him to choose
between *serving in* that political office and remaining a CBP Officer.  See supra note 14.

in the performance of government service," id. (emphasis added), based on the legitimate

government interest in regulating activity that "might generate [an] . . . appearance of improper

influence." NTEU, 513 U.S. at 473. While the connection of partisan activity to an organized

political group is closely related to the Hatch Act concern that such an organized political group

not be permitted to commandeer the civil service, it is plainly not dispositive of whether an

outside activity will pose an actual or apparent conflict of interest with a federal employee's

official duties.[17]

> **2.     The Government Has a Legitimate and Compelling Interest in
> Precluding Plaintiff From Creating an Actual or Apparent Conflict of
> Interest**

The regulation of employee conduct that creates actual or apparent conflicts of interest is

well within the power of the federal government, and is justified by legitimate government

interest. As the Supreme Court has recognized, "a democracy is effective only if people have

faith in those who govern." United States v. Mississippi Valley Generating Co., 364 U.S. 520,

562 (1961). Accordingly, proscriptions "designed to prohibit and to avoid potential conflicts of

interest in the performance of government service [are] supported by the legitimate interest in

maintaining the public's confidence in the integrity of the federal service." Crandon, 494 U.S. at

164-65; see also U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 473 (1995) ("NTEU")

(the government has a legitimate interest in regulating activity that "might generate [an] . . .

---

[17]     Put another way, plaintiff essentially argues that the Standards of Conduct should
be read *in pari materia* with the Hatch Act, but such a construction is not proper where, as here,
the underlying purposes of the respective rules differ. See, e.g., U.S. v. Granderson, 511 U.S. 39,
50-51 (1994) (rejecting *in pari materia* argument where underlying purposes of two statutes
differ); Erlenbaugh v. United States, 409 U.S. 239, 245 (1972) (*in pari materia* reading "might
be a sensible construction of the two statutes if they were intended to serve the same function,
but plainly they were not").

appearance of improper influence"); NALC, 413 U.S. at 565 ("it is not only important that the

government and its employees in fact avoid practicing political justice, but it is also critical that

they appear to the public to be avoiding it, if confidence in the system of representative

Government is not to be eroded to a disastrous extent"); Ex Parte Curtis, 106 U.S. at 372-73

(listing numerous conflict of interest laws beginning with those enacted in 1789); Sanjour v.

EPA, 56 F.3d 85, 96 (D.C. Cir. 1995) (legitimate government interest in avoiding appearance of

"accommodating third-party interests external and potentially adverse to agency").

      Thus, the federal government "appropriately enacts prophylactic rules that are intended to

prevent even the appearance of wrongdoing."  Crandon, 494 U.S. at 164; Pickering v. Board of

Education, 391 U.S. 563, 568 (1968) (government has an interest in regulating the conduct as

well as the speech of its employees).  Such rules include the Standards of Conduct promulgated

by OGE and described supra, which apply to all federal employees.  See 5 C.F.R. § 2635.101(b).

The OGE standards require "[e]mployees [to] endeavor to avoid any actions creating the

appearance that they are violating the law or the [OGE] ethical standards" as "determined from

the perspective of a reasonable person with knowledge of the relevant facts."  Id.

§ 2635.101(b)(14).  Accordingly, federal employees are required to avoid engaging in "outside

employment or activities" that reasonably appear to "conflict with official Government duties

and responsibilities."  Id. §§ 2635.101(b)(10), (14).

      That requirement exists because, as discussed supra, "[c]reating the appearance of a

conflict of interest constitutes a serious breach of trust [and t]he Government clearly has an

interest in prohibiting such conduct[.]"  Coons v. Dep't of the Navy, 15 M.S.P.R. 1, 5 (M.S.P.B.

1983); Suarez v. Dep't of Housing and Urban Development, 96 M.S.P.R. 213, 230 (M.S.P.B.

2004) (same).  And law enforcement officers such as plaintiff are held to an even higher

standard.  See Fischer v. Dep't of Treasury, 69 M.S.P.R. 614, 618 (M.S.P.B. 1996) (penalizing

Customs supervisor for appearance of a conflict of interest).  As CBP has properly determined,

plaintiff's continued service as a Presido City Council member would not meet that standard.

 "To prove the existence of an appearance of a conflict of interest, an agency must show

that the individual's interests or duties in one capacity would 'reasonably create an appearance' of

having an effect on his interests or duties in the other capacity."  Fontes v. Dep't of Transp., 51

M.S.P.R. 655, 663-64 (M.S.P.B. 1991) (quoting Lane v. Department of the Army, 19 M.S.P.R.

161, 162-63 (1984)); see also 5 C.F.R. § 2635.101(b)(14) ("Employees shall endeavor to avoid

any actions creating the appearance that they are violating the law or the ethical standards set

forth in this part" as "determined from the perspective of a reasonable person with knowledge of

the relevant facts.").  An appearance problem need not even be "substantial" in order to be

problematic:  in promulgating the Standards of Conduct, OGE specifically rejected a suggestion

that the standards should require employees to avoid only "substantial" appearance problems.

See Final Rule, "Standards of Ethical Conduct for Employees of the Executive Branch," 57 Fed.

Reg. 35006, 35008 (August 7, 1992).  As CBP official Patricia Duffy explains in her Declaration

submitted herewith, plaintiff's service as a Presidio City Council member reasonably creates the

appearance of affecting his interests in his capacity as a CBP Officer at the international border in

Presidio while he carries out his core CBP job functions.  See generally Duffy Decl.

 "As a CBP Officer, Mr. Ramirez is likely to make decisions during the regular course of

his official duties that will affect the interests of the city and citizens of Presidio.  In addition, at

Presidio City Council meetings, Mr. Ramirez is likely to make decisions that will ultimately

affect the port and CBP, including the CBP Officers located at the port." Duffy Decl. ¶ 9.

Accordingly, each of plaintiff's dual roles "reasonably create an appearance of having an effect

on his interests or duties in the other capacity." Fontes, 51 M.S.P.R. at 663-64 (quotation marks

omitted). This is in part because "[t]he CBP port and the crossing facility have an enormous

impact on the economy of Presidio." As Ms. Duffy explains:

> [p]eople cross from Presidio to its "sister city" of Ojinaga across the Rio Grande on a
> daily basis: people visit family members on the other side of the border, people cross to
> places of employment, people cross for daily errands and shopping, and children often
> cross to attend school. Over 736,000 personal vehicles and commercial vehicles cross the
> border at Presidio each year. As a CBPO, Mr. Ramirez is responsible for inspecting the
> people and vehicles, identifying violators, and interdicting contraband and illegal aliens
> that attempt to cross the border and enter the United States. As a public figure in the
> small town of Presidio, Mr. Ramirez also has a responsibility to the city and his
> constituents. Every day he is inspecting the vehicles and property of the same people
> who elected him to his position on the City Council, as well as inspecting those
> constituents themselves. Whether a CBPO such as Mr. Ramirez allows particular goods,
> other cargo or individuals to enter Presidio from Mexico will often have a great impact on
> the businesses and residents of Presidio. Those individuals and businesses may on
> occasion have a strong interest in seeing particular individuals or items allowed into the
> United States, even where such entry would be inappropriate under United States customs
> laws and regulations and, accordingly, where such entry is not in the interests of the
> United States.

Duffy Decl. ¶ 10. "Those competing interests reasonably lead to the appearance of a conflict of

interest in Mr. Ramirez's dual roles in Presidio as CBPO and councilmember, and could

disqualify him from carrying out some of his core law enforcement job functions." Id. Accord 5

C.F.R. § 2635.802 (an outside activity presents a conflict of interest with government

employment when it would require employee's disqualification from matters "central or critical

to the performance of his official duties"). For example, plaintiff's potential for a conflict of

interest in seeing contraband admitted to the country for the benefit of a Presidio business could

disqualify him from inspecting vehicles at the Port.[18]  There is, similarly, an appearance of a

conflict of interest in plaintiff's access to electronic investigative systems that may contain

information about his constituents and his serving, and seeking political support from, those

same constituents.  Id. ¶ 11.  One with access to such law enforcement information could, for

example, seek to use it improperly to leverage the political support of someone discussed in

investigative files.[19]

As CBP indicated in its December 2006 memorandum to plaintiff, ongoing negotiations

between CBP, the U.S. Drug Enforcement Administration ("DEA") and the town of Presidio

concerning property seized in Presidio by DEA also creates the appearance of a conflict of

interest in plaintiff's dual roles as representative of Presidio and its citizens, and as a law

enforcement employee and, therefore, representative of CBP.  Duffy Decl. ¶ 14; see also

December 22, 2006 Memorandum, attached as Exhibit 3 to Ramirez Decl.   As a CBP Officer at

the Presidio Port of Entry, plaintiff may be in a position to admit cargo destined for Presidio that

could otherwise be subject to seizure by the United States.  There is an appearance of a conflict

of interest between plaintiff's roles where Presidio may later seek to obtain federally seized

property, as well as where cargo that cannot legally enter the United States may, nonetheless,

---

[18]     Plaintiff admits that "[i]t would, of course, raise an appearance of a conflict if a
CBP Officer worked for an international carrier shipping goods that are inspected by CBP
employees."  Pl. Mem. 20.  Here, plaintiff is, as their elected representative, working for the
citizens of Presidio, including those who ship goods that are inspected by – and who are
themselves inspected by – CBP employees such as plaintiff.

[19]     Defendants make no suggestion that plaintiff has ever engaged in unethical
conduct in the performance of his duties; rather, CBP is concerned by the appearance of a
conflict of interest between plaintiff's roles as federal law enforcement officer and local city
councilman.

benefit a Presidio business if it is allowed to enter without regard to the law.  It is not a sufficient answer to these concerns to say that plaintiff can recuse himself from Presidio City Council votes involving CBP.  The need for recusal from some votes underscores, but does not ameliorate, the appearance of a conflict when plaintiff is serving as a locally elected official.  Of much greater concern to defendants, however, is the appearance of a conflict of interest when plaintiff is serving as a federal law enforcement officer, in CBP uniform, at our Southern border.  Plaintiff cannot recuse himself from his core, day-to-day job functions, such as inspection of vehicles. But the appearance of divided loyalty may lead reasonable citizens to question his impartiality in performance of those job duties, thus harming "the public's confidence in the integrity of the federal service."  Crandon, 494 U.S. at 164-65.

As the Supreme Court has recognized, "'no man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of . . . trust relations, but includes within its purpose the removal of any temptation to violate them. . . .'" Mississippi Valley Generating Co., 364 U.S. at 550 n.14 ((quoting Michigan Steel Box Co. v. United States, 49 Ct. Cl. 421, 439 (Ct. Cl. 1914)).  For all the reasons discussed above, and by Ms. Duffy in her declaration, CBP reasonably concluded that plaintiff's service as a city councilman in Presidio creates the appearance of a conflict of interest with his service as a CBP Officer at the Presidio Port of Entry.  The government's compelling interests in avoiding the appearance of a conflict of interest would, accordingly, justify even regulation of plaintiff's conflicting outside activity that significantly impacted his First Amendment rights, which CBP's order at issue here does not do.  See supra.

**III.    Plaintiff Has Failed to Establish He Will Suffer Irreparable Harm Absent Extraordinary, Emergency Relief**

Irreparable harm to the moving party is "the basis of injunctive relief in the federal courts." CityFed Financial Corp. v. Office of Thrift Supervision, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting Sampson v. Murray, 415 U.S. 61, 88 (1974)). Accordingly, a plaintiff's failure to meet his burden of establishing irreparable harm is sufficient, in itself, to deny emergency relief. CityFed Fin. Corp., 58 F.3d 738, 747. Moreover, it is plaintiff's burden to show that the threatened injury is not merely "remote and speculative." Milk Indus. Found. v. Glickman, 949 F. Supp. 882, 897 (D.D.C. 1996). Thus, proving "irreparable" injury is a considerable burden, requiring proof that the movant's injury is *certain, great and actual* - not theoretical - and *imminent*, creating a clear and present need for extraordinary equitable relief to prevent harm. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985); Varicon Int'l v. OPM, 934 F. Supp. 440, 447 (D.D.C. 1996).

Plaintiff here has fallen short of his burden to establish that certain, great, actual and imminent harm will result if the Court denies the "extraordinary" and "unusual" emergency injunctive relief he requests. Marine Transport Lines, Inc. v. Lehman, 623 F. Supp. 330, 334 (D.D.C. 1985); Role Models America, Inc. v. White, 193 F. Supp.2d 76, 80 (D.D.C. 2002). As an initial matter, plaintiff has failed to show that his dual avenues of relief under the CSRA, discussed supra, would not forestall or eliminate the harm he claims he will suffer under the CBP order. Plaintiff's failure to exhaust (or even explore) his administrative remedies therefore not only deprives this Court of jurisdiction over his claim, but counsels against finding there to be

certain, great, actual and imminent harm.[20]  Accord Martin, 271 F. Supp. 2d at 45 ("The

argument that an administrative remedy is ineffective, merely because an agency cannot provide

injunctive relief, has been summarily rejected by the D.C. Circuit.") (citing Weaver, 87 F.3d at

1434).

         The Court of Appeals for the D.C. Circuit has recognized that plaintiff faces "a high

standard for irreparable injury."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290,

297 (D.C. Cir. 2006) (citing Wisconsin Gas Co., 758 F.2d at 674).  Here, plaintiff fails to meet

that high standard because his claim of irreparable harm hinges entirely on his fatally flawed

merits argument, discussed supra.  See U.S. v. Philip Morris USA, Inc., 449 F. Supp. 2d 988, 991

n.5 (D.D.C. 2006) (Kessler, J.) (rejecting contention that deprivation of First Amendment rights

---

[20]         Nor should this Court permit plaintiff to now argue that it is too late for him to
pursue his one of his two avenues to administrative relief.  See Weaver, 87 F.3d at 1434; Martin,
271 F. Supp. 2d at 45. Even if that were true, the underlying delay is solely plaintiff's, and so any
such argument is also barred by laches.  See Kansas v. Colorado, 514 U.S. 673, 687 (1995)
(laches requires lack of diligence by the movant, and prejudice to the opponent).  Because
plaintiff did not pursue his claim with OSC or under his CBA, but rather waited several weeks to
seek emergency, equitable relief against CBP's personnel action in this Court, plaintiff acted
without reasonable diligence.

              Any unnecessary delay . . . may be viewed as inconsistent with a claim that plaintiff is
              asserting great injury or, in the case of preliminary injunctive relief, that there is an urgent
              need for immediate relief and that a judgment would be rendered ineffective unless some
              restraint is imposed on defendant pending an adjudication on the merits.

11A Wright, Miller & Kane, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2946 (West 1995
& Supp.).  And CBP is prejudiced by plaintiff's unreasonable delay in seeking administrative
relief: it denies CBP the opportunity that Congress wished it to have under the CSRA to take a
second look at its own action, and to correct any mistakes it may have made, before any judicial
review.  See Martin, 271 F. Supp. 2d at 45.
         In the alternative, even if plaintiff's inaction does not, alone, bar him from seeking relief
here, it tips the balance of equities decidedly against him.  See Beacon Theatres, Inc. v.
Westover, 359 U.S. 500, 506-07 (1959) (request for injunctive relief speaks to equitable power of
court).

constituted irreparable harm where the court also rejected petitioner's argument that its First Amendment rights were being violated). Plaintiff relies on the three-justice plurality opinion in Elrod v. Burns, 427 U.S. 347, 373 (1976), that the loss of First Amendment freedom for short period of time constitutes irreparable injury. Pl. Mem. 22. Cf. NTEU v. United States, 927 F.2d 1253 (D.C. Cir. 1991) (Thomas, J.) (noting that despite plaintiffs' allegation of a First Amendment freedom of expression violation there was no irreparable harm, and stating that "the loss of First Amendment freedoms, for even minimal periods of time, *may* constitute irreparable injury" (citation & quotation marks omitted, emphasis added)). The D.C. Circuit, however, "has construed Elrod to require movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction frame-work." Chaplaincy of Full Gospel Churches, 454 F.3d at 301. That is because "the assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . . Rather the plaintiffs must show 'a chilling effect on free expression.'" Hohe v. Casey, 868 F.2d 69, 72-73 (3rd Cir. 1989) (quoting Dombrowski v. Pfister, 380 U.S. 479, 487 (1965)), cited with approval in Chaplaincy of Full Gospel Churches, 454 F.3d at 301.

Here, as explained above, the CBP order that plaintiff choose between his civil service law enforcement job and his elected City Council position does not affect plaintiff's ability to speak on matters of public concern in any material way, nor does it violate his First Amendment rights. Thus, because plaintiff has failed to demonstrate a likelihood of success on the merits, his invocation of First Amendment rights does not form the valid basis of a claim of irreparable injury. See, e.g., Laird v. Tatum, 408 U.S. 1, 13-14 (1972); Rendish v. City of Tacoma, 123 F.3d 1216, 1226 (9th Cir. 1997), cert. denied, 524 U.S. 952 (1998); American Postal Workers Union,

-34-

<u>AFL-CIO v. United States Postal Service</u>, 766 F.2d 715, 722 (2nd Cir. 1985); <u>Philip Morris USA, Inc.</u>, 449 F. Supp. 2d at 991 n.5.  <u>Cf.</u> <u>Wagner v. Taylor</u>, 836 F.2d 566, 577 n.76 (D.C. Cir. 1987) (to justify emergency injunctive relief, "[a] litigant must do more than merely allege the violation of First Amendment rights . . . .").

## IV.    The Balance of Interests Supports Denial of Emergency Injunctive Relief

As discussed above, the government has a legitimate and compelling interest in "prevent[ing] even the appearance of wrongdoing." <u>Crandon</u>, 494 U.S. at 164.  That is because "it is not only important that the government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent." <u>NALC</u>, 413 U.S. at 565.  The appearance of a conflict of interest between plaintiff's roles as a federal law enforcement officer at the Presidio Port and as a Presidio City Council member thus damages not only the government's interests each day plaintiff continues in those roles:  the harm of public confidence eroded also falls on the public.  <u>See</u> <u>id.</u>  On the other side of the scales, as explained <u>supra</u>, plaintiff has failed to demonstrate a cognizable interest harmed by the CBP order that he asks this Court to enjoin on an emergency basis.  <u>See also</u> <u>Clements</u>, 457 U.S. at 971-72.  The balance of interests and equities therefore favors defendants, and it supports denial of plaintiff's Motion for Preliminary Injunction.

## CONCLUSION

For all the foregoing reasons, the Court should deny plaintiff's motion for a preliminary injunction.

Dated: February 14, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

_____/s/ Steven Y. Bressler_____
STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*

*Counsel for Defendants*

-36-

*Ramirez v. U.S. Customs and Border Protection, et al.*,
   Civ. No. 07-65 (GK)

Exhibit A to Defendants' Opposition to Plaintiff's Motion for
Preliminary Injunction:
Department of Homeland Security Management Directive 480.1

**Department of Homeland Security**
**Management Directives System**
**MD Number: 0480.1**
**Issue Date: 03/01/2003**

# ETHICS/STANDARDS OF CONDUCT

## I. Purpose

This directive establishes the Department of Homeland Security (DHS) policy on the ethical conduct and responsibilities of employees, and outlines the duties and responsibilities of ethics officials.

## II. Scope

This DHS directive applies to all personnel employed by or detailed to all DHS organizational elements.  To the extent not inconsistent with the provisions of this directive, the structure and organization of the Standards of Conduct programs in organizational elements that transferred into DHS are continued except for the positions of "DAEO" and "Alternate DAEO" which are designated as DHS Deputy Ethics Officials with all authority not reserved to the DHS DAEO.

## III. Authorities

This directive is governed by Executive Orders and national policy, such as:

A.      Executive Order (E.O.) 12674, Principles of Ethical Conduct for Government Officers and Employees.

B.      5 CFR Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch.

## IV. Definitions

A.      ***Designated Agency Ethics Official (DAEO)***:  The Legal Advisor for Ethics, Office of the General Counsel, is designated as the DAEO.

B.      ***Alternate DAEO***:  An attorney in the DHS Office of the General Counsel recommended by the Legal Advisor for Ethics and designated by the Secretary.

C.      ***Deputy Ethics Officials***:  DHS employees designated by the DHS DAEO pursuant to 5 C.F.R. § 2638.204.

D.    ***Agency Designee***:  Within DHS that term as used in 5 C.F.R. Part 2635 shall refer to the first-line supervisor of the employee whose interests are at issue.

E.    ***Employee***:  For purposes of this directive, "employee" includes Federal personnel employed by or detailed to DHS.

# V.    Responsibilities

A.    ***Designated Agency Ethics Official***: shall coordinate and manage the Department's ethics program as outlined in 5 CFR § 2638.203.

B.    ***Alternate DAEO***: shall serve in an acting capacity in the absence of the DAEO.

C.    ***Deputy Ethics Officials*** shall:

1.    Administer the statutes, regulations, policies, and procedures governing the ethical conduct and responsibilities of employees within their components.

2.    Ensure that prompt and effective action is taken where violations or potential violations of the ethics statutes or regulations are found.

3.    Develop, implement, and disseminate policy and procedure on ethics matters.

4.    Coordinate and oversee the conduct of the annual financial disclosure filing cycle.

5.    Provide ethics advice to the officials and employees within their areas of responsibility.

6.    Provide initial ethics orientation to new employees.

7.    Provide mandatory annual ethics training to employees in covered positions.

D.    ***Supervisors*** shall:

1.    Permit new employees a minimum of 1 hour of official duty time for the purpose of reviewing Part I of EO 12674 and 5 CFR Part 2635.

2.    Ensure that employees who are responsible for filing financial disclosure reports receive at least 1 hour of annual ethics training.

MD # 0480.1

3.      Request assistance where needed from appropriate ethics counselors in advising employees on ethics and conduct issues.

4.      Review employee notifications of outside work or activities to assist in determining if there is any conflict of interest with their official duties and responsibilities or the appearance thereof.

5.      Forward employee requests to conduct outside work for a prohibited source to the appropriate servicing ethics counselor.

6.      Report any potential conflict of interest situations to the respective ethics official for resolution.

E.      ***Employees*** shall:

1.      Be familiar and complying with the Standards of Ethical Conduct for Employees of the Executive Branch contained in 5 CFR Part 2635 and generally outlined in section 6, below, as well as any supplemental Departmental conduct and ethics regulations.  Employees are encouraged to refer to the Office of Government Ethics' World Wide Web site, http://www.usoge.gov, for access to ethics statutes, regulations, forms, and helpful informational materials.

2.      Consult with their supervisors and ethics officials on general questions regarding the applicability of the standards of conduct regulations.  On specific matters, and for guidance on questions of conflict of interest, employees are strongly encouraged to seek the advice and guidance of their ethics officials.

# VI.  Policy & Procedures

A.      ***Policy***: All employees will maintain especially high standards of honesty, impartiality, character, and conduct to ensure the proper performance of Government business and the continual trust and confidence of the citizens of the United States.  The conduct of employees must reflect the qualities of courtesy, integrity, and loyalty to the United States; a deep sense of responsibility for the public trust; promptness in dealing with and serving the public; and a standard of personal behavior that reflects positively upon and will be a credit to both employees and the Department.

MD # 0480.1

These principles apply to official conduct as well as private conduct that affect in any way the ability of employees or the Department to effectively accomplish the work of the DHS.  To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each Federal employee must respect and adhere to the principles of ethical conduct set forth below; 5 CFR Part 2635, Standards of Ethical Conduct for Employees of the Executive Branch; and other applicable laws.

Employees should:

1.      Place loyalty to the Constitution, the laws, and ethical principles above private gain as public service is a public trust.

2.      Not hold financial interests that conflict with the conscientious performance of duty.

3.      Not engage in financial transactions using nonpublic Government information or allow the improper use of such information to further any private interests.

4.      Not, except pursuant to such reasonable exceptions as are provided by regulation, solicit or accept any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the Department, or whose interests may be substantially affected by the performance or nonperformance of the employees' duties.

5.      Put forth an honest effort in the performance of their duties.

6.      Not knowingly make unauthorized commitments or promises of any kind purporting to bind the Government.

7.      Not use public office for private gain.

8.      Act impartially and not give preferential treatment to any private organization or individual.

9.      Protect and conserve Federal property and not use it for other than authorized activities.

10.     Not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities.

11.     Disclose waste, fraud, abuse, and corruption to appropriate authorities.

- 4 -

MD # 0480.1

12.     Satisfy in good faith their obligations as citizens, including all just financial obligations, especially those such as Federal, state, or local taxes that are imposed by law.

13.     Adhere to all laws and regulations that provide equal opportunity for all Americans regardless of race, color, religion, sex, national origin, age, or handicap.

14.     Endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this directive. Whether particular circumstances create an appearance that the law or these standards have been violated will be determined from the perspective of a reasonable person with knowledge of the relevant facts.

B.      ***Procedures***:  Any behavior that reflects negatively upon DHS should be reported to the DAEO.

C.      ***Questions or Concerns Regarding the Process***:  Any questions or concerns regarding this directive should be addressed to the Legal Advisor for Ethics, Office of the General Counsel.

MD # 0480.1

UNITED STATES DISTRIC COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Jaime Ramirez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07-0065 |
| v. | ) | |
| | ) | |
| Michael Chertoff, Secretary, | ) | Judge Gladys Kessler |
| Department of Homeland Security, *et al.* | ) | |
| | ) | |
| Defendants | ) | |

## DECLARATION OF PATRICIA DUFFY

I, Patricia Duffy, hereby declare and affirm as follows:

1.    I am employed by U.S. Customs and Border Protection ("CBP"), an agency within the

Department of Homeland Security. I am the Executive Director of Field and Resources

Management ("FRM") in the Office of Field Operations ("OFO"). I began my career in

1979 as a Customs Inspector in Philadelphia, PA. From March 1999 to July 2000, I served

as Director of Field Operations, New Orleans, LA. From July 2000 to May 2003, I served

as a Supervisory Management and Program Analyst, Washington, DC. My current position

as Executive Director, FRM began May 2003.

2.    In my current position as Executive Director, I oversee eight divisions which include: Field

Liaison, Field Programs, Human Resources, Financial Management, Facilities, Strategic

Planning, Training, and Preclearance. I held those responsibilities at all times relevant to the

matters discussed in this declaration. At the present time, however, I am serving

temporarily as the Acting Executive Director, National Targeting and Security, OFO, and

overseeing three divisions: Border Targeting and Analysis, National Targeting Center, and Tactical Operations.

3.   I make this declaration based on my personal knowledge and knowledge that I have gained in my official capacity.

4.   CBP Directive No. 51735-001A requires that all employees obtain approval before entering into any outside employment or business activity.

5.   In addition to the requirement that CBP employees must obtain approval before entering into outside employment or activities, CBP Standards of Conduct, which are found in CBP Directive No. 51735-013, prohibit employees from engaging in any activities that may present a conflict of interest, or an appearance of a conflict of interest, with their official duties.

6.   According to CBP policy and Office of Government Ethics regulations, among other authorities, employees may not participate in outside employment or activities if it would create a conflict of interest or the appearance of a conflict of interest between their outside position or activity and their official duties as a CBP employee.

7.   Jaime Ramirez is a GS-11 CBPO in Presidio, Texas. The primary mission of CBP is to detect and prevent terrorists and instruments of terror from entering the United States, enforce applicable laws, and facilitate the orderly and efficient flow of legitimate trade and lawful travelers. As a GS-11 CBPO, Mr. Ramirez is a federal law enforcement officer who performs the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to arrival and departure of persons, conveyances, and merchandise at Ports of Entry. The CBPO's primary responsibility is to identify potential terrorists and instruments of terror and to perform layered enforcement activities relative to

counter-terrorism. These enforcement activities are to prevent the entry of terrorists and instruments of terror, harmful pests and diseases, illegal drugs and contraband, and illegal aliens and importations/exportations contrary to law and trade agreements, etc., from entering/exiting the United States. The CBPO interprets the laws and regulations of a broad range of Federal, state, and local agencies, relating to the admissibility of people, cargo and conveyances. See generally GS-11 CBPO Position Description, Exhibit A hereto.

8.  In 2006, it came to my attention that Mr. Ramirez had submitted a Customs Form 3031, "Request to Engage in Outside Employment or Business Activities," on February 22, 2004, seeking approval to serve as a member of the Presidio City Council for a two-year term beginning in 2004. It is my understanding that Mr. Ramirez did not submit a Customs Form 3031 or otherwise request approval to engage in the outside activity of serving a new two-year term beginning in 2006.

9.  Presidio is a town of approximately five thousand residents located on the border between the United States and Mexico. In examining Mr. Ramirez's case, I determined that his service as a CBPO in Presidio combined with his service as a City Councilmember in that small town would create at least the appearance of a conflict of interest, if not an actual conflict, as judged by a reasonable person. As a CBPO, Mr. Ramirez is likely to make decisions during the regular course of his official duties that will affect the interests of the city and citizens of Presidio. In addition, at Presidio City Council meetings, Mr. Ramirez is likely to make decisions that will ultimately affect the port and CBP, including the CBPOs located at the port.

10. The CBP port has an enormous impact on the economy of Presidio. People cross from Presidio to its "sister city" of Ojinaga across the Rio Grande on a daily basis: people visit

family members on the other side of the border, people cross to places of employment, people cross for daily errands and shopping, and children often cross to attend school. Over 736,000 personal vehicles and commercial vehicles cross the border at Presidio each year. As a CBPO, Mr. Ramirez is responsible for inspecting the people and vehicles, identifying violators, and interdicting contraband and illegal aliens that attempt to cross the border and enter the United States. As a public figure in the small town of Presidio, Mr. Ramirez also has a responsibility to the city and his constituents. Every day he is inspecting the vehicles and property of the same people who elected him to his position on the City Council, as well as inspecting those constituents themselves. Whether a CBPO such as Mr. Ramirez allows particular goods, other cargo or individuals to enter Presidio from Mexico will often have a great impact on the businesses and residents of Presidio. Those individuals and businesses may on occasion have a strong interest in seeing particular individuals or items allowed into the United States, even where such entry would be inappropriate under United States customs laws and regulations and, accordingly, where such entry is not in the interests of the United States. Those competing interests reasonably lead to the appearance of a conflict of interest in Mr. Ramirez's dual roles in Presidio as CBPO and councilmember, and could disqualify him from carrying out some of his core law enforcement job functions.

11.    As a CBPO, Mr. Ramirez has access to electronic investigative systems that may contain information about his constituents and fellow City Council members. That access also reasonably leads to the appearance of a conflict of interest between Mr. Ramirez's position as a CBPO and his position as a member of the Presidio City Council.

12.    On December 18, 2006, with the above concerns in mind my office instructed the Director of Field Operations in El Paso, Texas and the Office of Assistant Chief Counsel, El Paso to

review the outside activities of Mr. Ramirez, to determine whether his actions complied with the applicable standards of ethical conduct, and to evaluate the propriety of Mr. Ramirez's outside employment while he continues to serve as a CBPO.

13.   On December 22, 2006, informed by the concerns described above, the Director of Field Operations in El Paso issued a memorandum to Mr. Ramirez informing him that he must resign his position as a member of the Presidio City Council due to the presence of an appearance of a conflict of interest between his position on the City Council and his position as a CBPO.

14.   As an example of the appearance of a conflict of interest, the December 22, 2006 memorandum explained that CBP had entered into negotiations with the Drug Enforcement Agency ("DEA") concerning the disposition of seized property in Presidio.  As a result, the Presidio City Council is negotiating with both CBP and DEA to acquire the property and subsequently negotiate with CBP on leasing arrangements involving the Port of Presidio. The memorandum noted that the appearance of a conflict exists and will continue for the foreseeable future regarding this issue in particular.

15.   As another example of the appearance of a conflict of interest which would compromise Mr. Ramirez's effectiveness as a CBPO, the memorandum discussed the ongoing relationship between CBP and the city and county of Presidio over normal business issues, i.e., housing, zoning, municipal services, port operations, etc.  Presidio leases land to the federal government to provide homes to CBPOs located in Presidio.  The fact that Mr. Ramirez may be called upon to make a decision as a member of the City Council that will affect the land containing his home reasonably leads to at least the appearance of a conflict of interest.  In addition, the City Council, in an attempt to improve the town's economy, may seek to have

the size of the crossing increased, additional lanes installed, its hours extended, or other such changes. These decisions and issues directly impact Mr. Ramirez as a CBPO.

16.    On January 5, 2007, the Agency issued a follow-up memorandum to Mr. Ramirez requiring him to advise the Director of Field Operations, El Paso within 30 days that he has resigned his position as a member of the Presidio City Council or from his position as a CBPO. See January 5, 2007 memorandum, attached as Exhibit B hereto. The memorandum advised Mr. Ramirez that failure to do so will result in further action by CBP, up to and including removal from his position. We subsequently agreed not to take such action prior to March 8, 2007.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of February, 2007, in Washington, DC.

Patricia Duffy

*Ramirez v. U.S. Customs and Border Protection, et al.*,
   Civ. No. 07-65 (GK)

Exhibit A to the Declaration of Patricia Duffy:
GS-11 CBP Officer Position Description

GS=S1043a
GG=S1047a

**Customs and Border Protection Officer**
**GS/GG-1895-11**

**INTRODUCTION:**

The primary mission of U.S. Customs and Border Protection (CBP) is to detect and prevent terrorists and instruments of terror from entering the United States, enforce applicable laws, and facilitate the orderly and efficient flow of legitimate trade and lawful travelers.

The CBP Officer performs the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to arrival and departure of persons, conveyances, and merchandise at Ports of Entry (POE).  The Officer's primary responsibility is to identify potential terrorists and instruments of terror and to perform layered enforcement activities relative to counter-terrorism.  These enforcement activities are to prevent the entry of terrorists and instruments of terror, harmful pests and diseases, illegal drugs and contraband, and illegal aliens and importations/exportations contrary to law and trade agreements, etc., from entering/exiting the United States.  The Officer interprets the laws and regulations of a broad range of Federal, state, and local agencies, relating to the admissibility of people, cargo and conveyances.

This position is located in various POEs, to include land border, airport, seaport, and pre-clearance stations, and mission needs may require rotation of assignments and duty locations.

**MAJOR DUTIES:**

The enforcement and facilitation examination continuum is a process that typically includes preprimary/risk assessment, primary examination, secondary examination (including disposition for enforcement and compliance), outbound, registration, exit controls, and post disposition.  Significant judgments are made at every step on the continuum.

The work requires broad knowledge of laws and procedures, as well as changing initiatives and threats.  The Officer applies behavioral and cultural analysis, and decision-making skills in order to perform the risk assessment required to release travelers and shipments and to identify those requiring further scrutiny, especially those involving terrorist individuals and instruments of terror.  The Officer applies this broad range of knowledge in completing the initial interactions and a more specific application in increasingly complex determinations as examinations progress.

**Preprimary/Risk Assessment:**

Preprimary/risk assessment occurs prior to the arrival of persons, conveyances, or merchandise, as information about impending arrivals is received via automated

manifests, entries, or passenger/crew information systems and is analyzed via various databases and other information sources.

Gathers and analyzes information from all available sources such as intelligence reports, and various databases. Identifies known or potential terrorists and instruments of terror, criminals, smuggling patterns, trends, and methods, and other threats to U.S. borders and national security. Assesses threats and creates individual lookouts and develops and disseminates tactical information and intelligence.

Reviews and analyzes carriers', importers', and exporters' manifests, permits, certificates, entries, invoices, and associated documents to determine the admissibility of merchandise or cargo, and levels of risk for possible violations of laws and threats to national security, economic and agricultural interests. Identifies and targets high-risk shipments and conveyances for examination.

Develops, plans and participates in tactical operations, such as pre-primary blitzes, intensive boardings, and roving. Participates in enrollment of alternative inspection programs designed to facilitate low risk arrivals.

Interacts with carriers, other agencies and foreign entities to exchange information and provide guidance on admissibility/compliance.

Participates in and supports programs designed to secure supply chains and push the border outward.

**Primary Examination:**

Primary examination is the questioning and visual examination of travelers to determine alienage, citizenship, admissibility, and the need for further inspection as well as the physical and visual examination of cargo and conveyances to determine admissibility or the need for further inspection.

Inspects identity and travel documents presented during examination to determine validity and authenticity. Utilizes observational techniques and monitors behavior to assess risk for possible involvement in terrorism, criminal, or violation of status activities. Conducts a wide range of record checks using a variety of databases and systems and uses tactical intelligence to identify high-risk travelers. Determines whether traveler (citizen or alien), cargo, or conveyance may be immediately admitted or referred to secondary examination for further processing.

Analyzes a wide variety of commercial documents such as invoices, bill of lading and packing slips in order to identify anomalies attendant to the importation and exportation of commercial merchandise. Utilizes targeting systems to ascertain examination requirements. Enforces quarantines and coordinates with affected parties of interest to ensure the safe and timely adjudication of merchandise and/or packing materials in violation of entry requirements.

Employs a wide range of non-intrusive technology devices such as radiation monitors, portable and stationary X-ray machines, body scanners, density meters and fiberscopes when conducting examinations.  Troubleshoots technical problems with non-intrusive technology; determines the accuracy of readings and signals which result from the equipment and conducts required safety checks as mandated by established protocols.

**Secondary Examination:**

Secondary examination is the further intensified inspection of people, cargo, or conveyances not released or admitted upon primary examination.  Through interviews, document reviews, additional database queries, communication with other law enforcement agencies, observational techniques, heightened physical inspections, and the use of technology, the inspecting Officer performing the secondary examination continues to collect information, facts, and evidence necessary to properly assess risk. The purpose of the secondary examination is to determine eligibility and admissibility relative to applicable regulations and statutes and to determine the appropriateness, extent, and focus of further intensified examination.

Conducts visual and physical inspection of cargo, baggage, conveyances, packing materials and people using a wide array of non-intrusive technology such as density meters, laser range finders, stationary and portable X-ray machines, body scanners, radiation detection devices, vapor tracers, isotope identification devices, and biometrics collection units.  Based on assessed risks, further and progressively more complex and extensive physical examinations, interrogations and database queries may be required to identify and interdict highly sophisticated smuggling schemes and activities and instruments of terror.

Conducts re-boarding inspections on conveyances as necessary for the purpose of ensuring compliance with prescribed laws or regulations.

Compiles data, maintains logs, and prepares monthly/daily work accomplishment reports on inspection operations.  Accurately documents incident reports, prepares investigative reports and provides testimony in support of third party proceedings. Processes required documentation for other federal agencies.

**Outbound, Registration, and Exit Control Functions:**

The purpose of the outbound, registration, and exit control functions is to selectively identify, target, control and examine passengers, conveyances, and cargo leaving the United States or within the United States but under the jurisdictional oversight of CBP. This function is designed to detect terrorists and instruments of terror, to prevent departure of those aliens ordered to remain within the United States, to collect departure data on aliens leaving the United States, and to ensure compliance with agricultural and export requirements.

GS=S1043a
GG=S1047a

Identifies, targets, controls and examines passengers and cargo leaving the United States in order to ensure that the mission objectives of interdicting terrorists and instruments of terror, and compliance with export requirements are met.

Examines identity documents presented upon departure for validity and authenticity. Ensures compliance with required exit control programs to prevent departure of certain aliens, unreported currency and monetary instruments, individuals wanted by federal, state and local authorities and referrals to the Joint Terrorism Task Force.

Reviews commercial documents, inspects conveyances and examines cargo destined for export from the United States.  Ensures that rejected merchandise, such as tainted meat and commodities infested with pests, exits the United States under proper supervision.  Targets merchandise departing the United States for licensing requirements, especially items that have military application and/or can be used as instruments of terror.  Ensures that merchandise transiting the United States on transportation and exportation entries or other in-transit programs is exported in accordance with established requirements.

Performs other duties as assigned.

**Special Requirements:**

The incumbent is required to carry a firearm, must qualify with and maintain proficiency in the use of the firearm as well as non-deadly force, to protect and defend his or her own life or that of others.

Foreign language is required in some locations.

The incumbent must possess a valid state driver's license.

Must work on a shift and rotational basis and perform substantial amounts of overtime.

Must maintain ability to access all data systems.

May undergo security clearance investigation and may be granted a Secret level or higher.

**FACTOR EVALUATION:**

| | |
|---|---|
| Factor 1, Knowledge Required | Level 1-7, 1250 points |
| Factor 2, Supervisory Controls | Level 2-4, 450 points |
| Factor 3, Guidelines | Level 3-4, 450 points |
| Factor 4, Complexity | Level 4-4, 225 points |
| Factor 5, Scope and Effect | Level 5-3, 150points |
| Factor 6 & 7, Contacts and Purpose | Level 6-3&7-3, 180 points |
| Factor 8, Physical Demand | Level 8-2, 20 points |
| Factor 9, Work Environment | Level 9-2, 20 points |

GS=S1043a
GG=S1047a

**Total Points: 2745**          **Point Range: 2355-2750**
**Grade Conversion: GS/GG-11**

**Bargaining Unit:**                    **FLSA Status:**

## ADDENDUM

The following addendum is made to PD# ………   The supervisor should place an "X" in the appropriate box/boxes below in order to indicate the functional area(s) to which the incumbent is assigned.

**ENFORCEMENT AND SPECIAL RESPONSE TEAMS**:

Each team member participates in joint task force operations with officers from other Federal, state and local law enforcement agencies.  Establishes effective working relationship with counterparts and may represent area of responsibility on committees and meetings.  Plans strategies to accomplish organizational and law enforcement goals or targets, and determines tactics to achieve intermediate objectives.  Trains and organizes other participants to carry out objectives.  Evaluates results, prepares and presents detailed reports to supervisors, as required, and makes recommendations on program improvement and future operations.  Specifically, teams are established to accomplish the following:

<u>Special Response:</u>

Highly mobile and fully trained to provide CBP with a rapid and organized response, while providing a law enforcement presence, during critical or significant incidents, personnel management (civil unrest), volatile and/or emergency situations at or near a Port of Entry (POE).  Team responses will be based on prior intelligence, trends or a reactive response to a critical incident or significant situation, in accordance with existing CBP policy and emergency preparedness plans.  Based on knowledge, training and experience; will conduct threat assessments, at the POEs.

On a national and/or regional basis may be required to coordinate with other law enforcement or military entities, in response to intelligence reports, protests or other disruptive events (e.g., securing bridges POEs or other CBP sites; providing assistance to local, state and federal law enforcement agencies, during time of national emergencies; securing event sites and major access points, in conjunction with CBP and DHS sanctioned events).

<u>Anti-Terrorism Contraband Enforcement Teams and Roving Teams</u>

GS=S1043a
GG=S1047a

Plans, coordinates, leads/participates to; apprehend, neutralize, secure and interview/interrogate potential or known terrorist suspect(s) or goods; performs a variety of intelligence gathering, analysis, targeting, and selectivity functions to identify persons, conveyances and cargo that require in-depth or special emphasis inspection actions due to high risk of illegal migration and narcotics, organized crime, smuggling activities, sale, use or production of fraudulent documents or other criminal activity; determines degree of examination needed, resolves problems, ensures proper release of cargo and conveyances and admission of people; conducts departure musters on high-risk vessels to ensure detained crewmembers have remained onboard; conducts patrols of isolated, high-risk facilities, security sweeps and enforcement boardings of conveyances arriving from high-risk locations and prevents the entry of terrorists and instruments of terror.

Each participates in joint task force operations with officers from other Federal, state and local law enforcement agencies. Establishes effective working relationship with counterparts and may represent area of responsibility on committees and meetings. Plans strategies to accomplish organizational and law enforcement goals or targets, and determines tactics to achieve intermediate objectives. Trains and organizes other participants to carry out objectives. Evaluates results, prepares and presents detailed reports to supervisors, as required, and makes recommendations on program improvement and future operations.

**TARGETING AND ANALYSIS TEAMS**

Participates in special enforcement teams (e.g., Manifest Review Units, Document Analysis Units, and Passenger Analysis Units) to collect and analyze advanced information and identify potential high-risk targets (people, merchandise, or conveyance) based on anomalies, emerging threats, lookouts, links analysis and/or other agency input. Creates lookouts and disseminates the list of targets to other CBP Officers and in some cases to the other agencies for examination.

Networks extensively with like targeting units throughout CBP and with the National Targeting Center on smuggling and other violation trends and threats. Disseminates this information to other CBP Officers.

Participates in established training sessions with program area.

**PORT SECURITY**

Acts as a lead CBP representative for maintaining a robust Federal Inspection Services (FIS) security program at all modes of transportation. Ensures port employees and employers have legitimate access to port security areas and strictly adhere to port security programs. Issues clearances for port caterers. Conducts background checks, reviews applications, and interviews questionable applicants. Documents and defends security access denials and revocations. Works in concert with all Port Authorities and the Transportation Security Administration.

GS=S1043a
GG=S1047a

## FACILITIES SECURITY

Participates in warehouse and cargo security programs that support C-TPAT and other transportation and supply chain security initiatives.  Audits carrier manifests to ensure accuracy.

## FIREARMS/NON-DEADLY FORCE

Responsible for re-qualifying Officers on a periodic basis and oversees and implements training techniques on officer mindset, semi-automatic weapon proficiency, advanced tactical exercises and tactics involving integrated/interactive training scenarios.

Periodically assesses the ports training program and implements necessary changes due to change in policy, new weapon issuance, and/or advanced training or new technology.

Must be able to teach the CBP use of force policy and the use of force continuum.

Must be able to explain the concept of non-deadly force and instruct in the proper use of non-deadly force weapons and tactics such as chemical spray and also be able to explain and demonstrate subject control, edge weapon defense, weapon retention and disarming.

Must have the knowledge required to conduct briefings on firearms safety and range rules prior to qualification and training, and ensure that all instruction is conducted effectively and in accordance with established firearms and range safety rules and procedures.

Must be able to explain and demonstrate the fundamentals of basic marksmanship in the classroom and at the firing range, and also observe, detect, explain and correct common shooting errors through the use of target analysis and corrective marksmanship training techniques.

Must be able to instruct on the basic handling skills for a firearm which include tactical reloading, combat reloading, primary malfunction clearing, secondary malfunction clearing and one handed reloading.

## NON-INTRUSIVE INSPECTION (NII)

The position is proficient with the operational aspects, detection capabilities, training, maintenance, radiations response protocols, NII policies, and Standard Operating Procedures of NII technology.  The incumbent will receive extensive in-house training as well as training from other government agencies such as the Department of Energy.

The incumbent is responsible for providing technical and administrative support for NII devices and for staying abreast of state-of-the-art detection systems technology.

The incumbent serves as a subject matter expert in all aspects of NII technology and is recognized as a leader and authority in the use of NII in port operations.  The incumbent provides technical guidance on the use of NII equipment and on enforcement duties involving NII equipment to officers and supervisors.  The officer oversees and is directly involved and responsible for all types of equipment and devices to include Vehicle and Cargo Inspections Systems, Truck X-ray, Mobile Sea Container Examinations Systems, Pallet Gamma-Ray, Radiation Portal Monitor, Personal Radiation Detector and Radiation Isotope Identifier Device.

**INTELLIGENCE**

The CBP Officer is responsible for the effective and efficient operation and maintenance of a tactical intelligence program that directly supports the risk assessment, robust targeting regimes, primary and secondary examination, and control functions at the port of entry.  The Officer also acts in direct support of CBP's mission to detect and prevent terrorists and their instruments and other activities detrimental to the security of the United States or in violation of regulation or statute by developing and providing tactical intelligence.  The Officer serves as the main point of contact and as the agency's liaison with other Federal, state, local, and foreign law enforcement offices and intelligence agencies.  The Officer reports to the Port Director.

Collects raw data on terrorism, smuggling, and other criminal activity from a wide variety of sources including informants, CBP Officers, Border Patrol Agents, sources in other Federal, state, local, and foreign law enforcement offices and intelligence agencies, court officials, schools, carriers, trade members and open sources.

Evaluates raw data to determine reliability and verifiable involvement in terrorism, smuggling or other criminal activities and to determine the effect on the mission of CBP as well as its impact on other law enforcement or intelligence agencies.

Prepares and disseminates reports from the finished intelligence that identifies tactical intelligence regarding possible criminal trends or suspected activities to CBP Officers.  Ensures dissemination to all affected and authorized parties through systems of control and monitoring.  Networks extensively with other CBP Officers in Passenger Analysis Units and Manifest Review Units, responsible for intelligence functions in an effort to promote and enhance collection, evaluation, and dissemination activities.  Provides guidance to Passenger Analysis Units as needed.   Serves as the link between the National Targeting Center and local CBP Officers.

Establishes and maintains liaison with appropriate officials, sharing in the mission of CBP, in foreign government agencies, Federal, state, and local law enforcement agencies, and the National Targeting Center as well as other CBP Officers. This liaison is established for the purpose of exchanging information and developing avenues for

GS=S1043a
GG=S1047a

obtaining information and law enforcement assistance.  The incumbent must be mindful of the need-to-know and right-to-know requirements attached to all communications between CBP and allied agencies.

**TRAINING**

Works in partnership with Port Directors, managers and numerous field contacts to provide the necessary guidance to accomplish CBP training goals and objectives. Provides technical advice on the development and implementation of CBP training programs, policies, and procedures.  Participates in the evaluation of training programs and activities to ensure that they meet CBP standards and to determine their impact on attendees' performance.  Attends meetings with potential contractors on training matters

Communicates national training policies and programs to Port Directors and managers and ensures that Officers are informed of current policies, procedures and regulations.

Incumbent is responsible for providing Pre and Post Academy training, continued training, and evaluating the training to provide feedback on any needed improvements. Ensures that assigned Officers receive the appropriate on-the-job (OJT) in order to meet the proficiency requirements.  Ensures that trainees receive feedback on their progress.

Provides guidance and assistance in training and developing CBP Officers.  Assistance given includes training problem identification and recommended solutions, e.g., analyzing and identifying the training and developmental needs of employees; establishing training priorities in accordance with CBP guidance; identifying possible solutions, inclusive of non-training solutions; and determining manpower and money requirements for training or non-training solutions.

Schedules and reports on the results of training activities.  The incumbent coordinates all logistics necessary to deliver distance learning.  Notifies employees of upcoming distance learning opportunities.  Schedules local facilities for use by employees' participating in OJT training or when attending training lectures and demonstrations.

Provides training or CBP overview to other Federal agencies, state, local and foreign law enforcement entities, or other stakeholders as required.

GS=S1043a
GG=S1047a

# COLLATERAL DUTIES

The following collateral duties are made to PD# ………   The supervisor should place an "X" in the appropriate box/boxes below in order to indicate the functional area(s) to which the incumbent is assigned.

## LIAISON/OUTREACH

Determines the need for, plans, prepares and carries out presentations or exhibits for and serves as CBP 's spokesperson during seminars, trade shows, public events, career days, and other public information initiatives.

When engaged as a first responder to public appearance or outreach requests, coordinates the routing of such outside requests with local management and chain of command, making recommendations to management when CBP program events warrant attention by the news media.  As appropriate, coordinates major activities with Public Affairs.

## HAZARDOUS MATERIALS

Makes internal risk assessment concerning the importation or exportation of dangerous cargo and/or on specific items of cargo.

May visit an importer's, exporter's, or shipper's premises to gain information about the nature of their importation/exportation and to determine the importer's/exporter's capability to provide samples upon request.

Serves as an on-call program expert in response to incidents, minor or major, including leaks, spills, explosions.  Plans and coordinates request for intrusive inspections of hazardous or dangerous cargo, and requests for sampling.

*Ramirez v. U.S. Customs and Border Protection, et al.*,
    Civ. No. 07-65 (GK)

Exhibit B to the Declaration of Patricia Duffy:
January 5, 2007, Memorandum from CBP to Jaime Ramirez

9400 Viscount Blvd., Suite 104
El Paso, TX 79925-7040



**U.S. Customs and
Border Protection**

07
**JAN 05 2006**

EPFO-PER-2

MEMORANDUM FOR:    CBPO JAIME RAMIREZ, PRESIDIO, TEXAS

FROM:              LUIS GARCIA
                   DIRECTOR, FIELD OPERATIONS

SUBJECT:           OUTSIDE EMPLOYMENT

Reference my December 22, 2006 memorandum to you concerning outside employment, specifically your service as an elected official in Presidio County. In that memorandum I required you to resign from your position as a member of the Presidio City Council. I require you advise this office within 30 days of the date of that memorandum that you have, in fact, resigned from said outside employment or from your position as a CBP Officer. Please be advised that failure to do so will result in further action by this agency, up to and including removal from your position.

LUIS GARCIA
DIRECTOR, FIELD OPERATIONS

Cc:    John Prewit, Port Director, Presidio
       Patricia Duffy, Executive Director, Field Resource Management, OFO

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| JAIME RAMIREZ, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | )    Civil Action No. 1:07-65 (GK) |
|  | ) |
| UNITED STATES CUSTOMS | ) |
| AND BORDER PROTECTION, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

---

## [PROPOSED] ORDER

On this _____ day of _____, 2007, IT IS HEREBY ORDERED that Plaintiff's

Motion for Preliminary Injunction (Docket Entry No. 3) is DENIED.

_____
Hon. GLADYS KESSLER
United States District Judge