## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| | ) | |
| JAIME RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-65 (GK) |
| | ) | |
| UNITED STATES CUSTOMS | ) | |
| AND BORDER PROTECTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

COME NOW the defendants, U.S. Customs and Border Protection, et al., and respectfully move this Court to dismiss plaintiff's Amended Complaint for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, to grant summary judgment for defendants on all of plaintiff's claims pursuant to Federal Rule of Civil Procedure 56, for the reasons more fully set forth in defendants' accompanying Memorandum of Points and Authorities.

//

//

//

//

//

//

//

Dated: June 22, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

      /s/ Steven Y. Bressler
STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAIME RAMIREZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-65 (GK) |
| | ) |
| UNITED STATES CUSTOMS | ) |
| AND BORDER PROTECTION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANTS' STATEMENT OF FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Federal Rule of Civil Procedure 56[*] and Local Rule of Civil Procedure 56.l, defendants respectfully submit the following material facts as to which there is no genuine issue to be tried:

1.      Jaime Ramirez is a U.S. Customs and Border Protection Officer in Presidio, Texas.  See, e.g., A.R. 46-48; Declaration of Luis Garcia ¶ 9.

2.      As a CBP Officer, plaintiff  "performs the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to arrival and departure of persons, conveyances, and merchandise at Ports of Entry ['Ports,']" such as the Port at the U.S. - Mexico border in Presidio.  See GS-11 CBP Officer Position Description at 1, A.R. 22.  Plaintiff's job includes prevention of the entry into the United States of terrorists and instruments of terror, harmful pests and diseases, illegal drugs and contraband, and illegal aliens.  Id.

---

[*]      Defendants respectfully submit that this action should be entirely resolved by their motion to dismiss plaintiff's amended complaint for lack of subject matter jurisdiction and, accordingly, they seek summary judgment only in the alternative.

3.      Presidio is a town of approximately 5,000 residents.  Garcia Decl. ¶ 10.  The CBP

Port and crossing facility have a great impact on Presidio:

> People cross from Presidio to its "sister city" of Ojinaga across the Rio Grande on a daily
> basis: people visit family members on the other side of the border, people cross to places
> of employment, people cross for daily errands and shopping, and children often cross to
> attend school.  Over 700,000 personal and commercial vehicles cross the border at
> Presidio each year.

Id.  As a CBP Officer, plaintiff inspects the people and vehicles that seek to cross the border and

enter the United States and determines whether the people, cargo or conveyance in question may

be immediately admitted to the country or referred for further examination.  Id.; CBP Officer

Position Description at 2, A.R. 23.

4.      In 2004, plaintiff sought permission from CBP to serve as a member of the

Presidio City Council – the governing political and legislative body of Presidio – for a two-year

term beginning in 2004.  May 14, 2004 Memorandum for CBPO Jaime Ramirez, A.R. 38; Garcia

Decl. ¶ 11.

5.      Plaintiff's request was initially denied because CBP found his "work as a

councilmember would create at least an apparent conflict of interest."  Garcia Decl. ¶ 13, citing

May 14, 2004 Memorandum for CBPO Jaime Ramirez, A.R. 38.  Upon reconsideration,

plaintiff's request for permission to serve a single, two-year term was orally granted by Director

of Field Operations Luis Garcia when plaintiff pledged "to recuse himself "from consideration of

all matters by the City Council that concern the Presidio Port of Entry, U.S. Customs and Border

Protection (including Border Patrol), or any U.S. Customs and Border Protection facility or

property (including federally owned housing for CBP employees," and "to inform the Port

Director and the Assistant Chief Counsel if [he had] any question as to whether or not a matter

under consideration, or to be considered, by the City Council [would] require [him] to recuse

[himself]." Id., quoting A.R. 40.  Plaintiff agreed to make that pledge.  Id.

6.     Plaintiff never submitted a request for authorization to serve beyond his initial two-year term.  Garcia Decl. ¶ 15.

7.     In the fall of 2006, CBP learned that plaintiff had continued serving as an elected official beyond the authorized, single two-year term.  See id. ¶ 15.  On behalf of CBP, DFO Garcia "determined that an indefinite continuation of [plaintiff's] maintaining dual roles beyond the single, two-year term [CBP] had authorized presents an unacceptable appearance of a conflict of interest as viewed by a reasonable person with knowledge of all the facts."  Id. ¶ 16.

8.     DFO Garcia determined, inter alia, that "while service for a single term, without possibility of reelection, would not implicate concerns as to the propriety of personal political activity by a CBPO who would be inspecting his potential voters, such service with the indefinite need for reelection and political support does implicate those concerns."  Id.

9.     As a CBP Officer, plaintiff inspects individuals including the residents and workers of the City of Presidio, their vehicles and cargo when they seek to enter the United States from Mexico at the Presidio Port of Entry.  Id.

10.    On December 22, 2006, CBP issued a memorandum to plaintiff informing him that he was required to resign from his city council position due to the appearance of a conflict of interest with his official duties.  A.R. 46-47.  The memorandum noted one reason for the appearance of a conflict of interest was ongoing negotiations between, among others, CBP and the Presidio City Council over disposition of and leasing arrangements over federally-seized property within Presidio.  Id.  The memorandum also noted the ongoing relationship between CBP and the city of Presidio concerning normal business issues, which include the leasing by Presidio of land to CBP for provision of homes to CBP Officers and employees.  Id.

11.    On January 5, 2007, CBP issued another memorandum to plaintiff requiring him to choose between his federal civil service law enforcement provision and his city council position within 30 days, or face further action by CBP up to and including removal.  <u>See</u> A.R. 48.

Dated: June 22, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

_____/s/ Steven Y. Bressler_____
STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*                                      *Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JAIME RAMIREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-65 (GK) |
| | ) | |
| UNITED STATES CUSTOMS | ) | |
| AND BORDER PROTECTION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF SUBJECT MATTER JURISDICTION OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*

*Counsel for Defendants*

# TABLE OF CONTENTS

Page(s)

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.       Statutory and Regulatory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          A.      The Standards of Ethical Conduct for Employees of the
                Executive Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          B.      The Civil Service Reform Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    II.      Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    III.     Plaintiff Cannot Establish Subject Matter Jurisdiction Over His
           Claims In This Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          A.      Plaintiff's Claim Falls Within the CSRA Framework. . . . . . . . . . . . . . 10

          B.      Plaintiff's Statutory Claim is Barred by the CSRA . . . . . . . . . . . . . . . 12

          C.      This Court Lacks Jurisdiction Over Plaintiff's Constitutional
                Claim Unless and Until Plaintiff Exhausts His Administrative
                Remedies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    IV.     The Challenged CBP Order Does Not Impermissibly Infringe on
           Plaintiff's First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          A.      The Challenged CBP Order Does Not Infringe on Plaintiff's
                 First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

          B.      The Government Has a Legitimate and Compelling Interest in
                 Precluding Plaintiff From Creating an Actual or Apparent
                 Conflict of Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>CASES</u>

<u>Asociacion De Empleados Del Area Canalera v. Panama Canal Com'n</u>,
  329 F.3d 1235 (11th Cir. 2003) ..................................................................... 14

<u>Block v. Community Nutrition Inst.</u>,
  467 U.S. 340 (1984) ..................................................................................... 9

<u>Broadrick v. Oklahoma</u>,
  413 U.S. 601 (1973) ........................................................................... 15, 17, 19

<u>Brown v. Glines</u>,
  444 U.S. 348 (1980) ..................................................................................... 16

<u>Buckley v. Valeo</u>,
  424 U.S. 1 (1976) ........................................................................................ 19

<u>Bullock v. Carter</u>,
  405 U.S. 134 (1972) ..................................................................................... 16

<u>Bush v. Lucas</u>,
  462 U.S. 367 (1983) ............................................................................... 13, 14

<u>Camp v. Pitts</u>,
  411 U.S. 138 (1973) ..................................................................................... 24

<u>Carducci v. Regan</u>,
  714 F.2d 171 (D.C. Cir. 1983) ..................................................................... 12

<u>Citizens Against Rent Control v. Berkeley</u>,
  454 U.S. 290 (1981) ..................................................................................... 19

<u>City of San Diego v. Roe</u>,
  543 U.S. 77 (2004) ...................................................................................... 16

<u>Clements v. Fashing</u>,
  457 U.S. 957 (1982) ............................................................................... 18, 19

<u>Commonwealth ex rel. Specter v. Moak</u>,
  452 Pa. 482, 307 A.2d 884 (Pa. 1973) ......................................................... 17

Compare with Mudge v. U.S.,
    308 F.3d 1220 (Fed. Cir. 2002) ................................................................. 14

Connecticut Dep't of Human Resources v. MSPB,
    718 F. Supp. 125 (D. Conn. 1989) ............................................................. 17

Connick v. Myers,
    461 U.S. 138 (1983) ............................................................................. 16, 18

Coons v. Dep't of the Navy,
    15 M.S.P.R. 1 (M.S.P.B. 1983) .................................................................. 22

Crandon v. U.S.,
    494 U.S. 152 (1990) ...................................................................... 21, 22, 27

Ex parte Curtis,
    106 U.S. (16 Otto) 371 (1882) ............................................................. 3, 22

Doe v. Goss,
    Civ. No. 04-2122-GK, 2007 WL 106523 (D.D.C. January 12, 2007) ........................... 10

Dyer v. Blue Cross & Blue Shield Ass'n,
    848 F.2d 201 (D.C. Cir. 1988) ................................................................... 24

Esch v. Yeutter, 876 F.2d 976 (D.C. Cir. 1989) ................................................... 24

Filebark v. U.S. Dep't of Transportation,
    468 F. Supp. 2d 3 (D.D.C. 2006) ............................................................... 14

Fischer v. Dep't of Treasury,
    69 M.S.P.R. 614 (M.S.P.B. 1996) .............................................................. 23

Fletcher v. Marino,
    882 F.2d 605 (2d Cir. 1989) ..................................................................... 15

Fontes v. Dep't of Transp.,
    51 M.S.P.R. 655 (M.S.P.B. 1991) ......................................................... 23, 24

Harrison v. Bowen,
    815 F.2d 1505 (D.C. Cir. 1987) ................................................................. 12

Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,
    505 U.S. 672 (1992) .............................................................................. 17

-ii-

Johnson v. State Civil Service Dept.,
    280 Minn. 61, 157 N.W.2d 747 (Minn. 1968) ..................................................... 17

Jenness v. Fortson,
    403 U.S. 431 (1971) ........................................................................................... 20

Joyner v. Mofford,
    706 F.2d 1523 (9th Cir.), cert. denied, 464 U.S. 1002 (1983) ........................... 20

Karahalios v. Nat'l Federation of Federal Employees,
    489 U.S. 527 (1989) ....................................................................................... 5, 11

Keeffe v. Library of Congress,
    777 F.2d 1573 (D.C. Cir. 1985) .................................................................... 22, 25

Lane v. Department of the Army,
    19 M.S.P.R. 161 (1984) ...................................................................................... 23

Magill v. Lynch,
    560 F.2d 22 (1st Cir. 1977) ................................................................................ 18

Martin v. EPA,
    271 F. Supp. 2d 38 (D.D.C. 2002) ..................................................................... 13

Ex parte McCardle,
    74 U.S. (7 Wall.) 506 (1868) ............................................................................... 8

Merle v. U.S.,
    351 F.3d 92 (3rd Cir. 2003) ............................................................................... 20

Michigan Steel Box Co. v. United States, 49 Ct. Cl. 421, 439 (Ct. Cl. 1914) ............................ g1

Morial v. Judiciary Commission of State of La.,
    565 F.2d 295 (5th Cir. 1977), cert. denied, 435 U.S. 1013 (1978) ................... 18

Muniz v. United States,
    972 F.2d 1304 (Fed. Cir. 1992) .......................................................................... 11

Nestor v. Hershey,
    425 F. 2d 504 (D.C. Cir. 1969) ............................................................................ 8

New York Times Co. v. Sullivan,
    376 U.S. 254 (1964) ........................................................................................... 19

Otten v. Schicker,
    655 F.2d 142 (8th Cir. 1981) ........................................................................... 17

Pickering v. Board of Education,
    391 U.S. 563 (1968) ................................................................. 17, 18, 19, 22

Public Workers v. Mitchell,
    330 U.S. 75 (1947) ....................................................................... 16, 19

Ricks v. Department of State Civil Service,
    200 La. 341, 8 So. 2d 49 (La. 1942) ............................................. 17

Sanjour v. EPA,
    56 F.3d 85 (D.C. Cir. 1995) ......................................................... 22

Seafarers Int'l Union of North America v. U.S.,
    891 F. Supp. 641 (D.D.C. 1995) ................................................. 24

Signorelli v. Evans,
    637 F.2d 853 (2nd Cir. 1980) .................................................. 20, 21

Smith v. Ehrlich,
    430 F. Supp. 818 (D.D.C. 1976) ................................................. 19

Spagnola v. Mathis,
    859 F.2d 223 (D.C. Cir. 1988) ................................................. 9, 10,12

Steadman v. Governor, U.S. Soldiers' and Airmen's Home,
    918 F.2d 963 (D.C. Cir. 1990) ..................................... 5, 9, 13, 14

Steel Co. v. Citizens for a Better Environment,
    523 U.S. 83 (1998) ........................................................................ 8

Suarez v. Dep't of Housing and Urban Development,
    96 M.S.P.R. 213 (M.S.P.B. 2004) ............................................. 22

Tao v. Freeh,
    27 F.3d 635 (D.C. Cir. 1994) .................................................. 16, 18

Thunder Basin Coal Co. v. Reich,
    510 U.S. 200 (1994) ..................................................................... 14

U.S. Civil Service Comm'n. v. Nat'l Assoc. of Letter Carriers,
    413 U.S. 548 (1973) ..................................................................... 16, 17, 20, 21

U.S. Term Limits, Inc. v. Thornton,
    514 U.S. 779 (1995) ........................................................................... 20

U.S. v. Nat'l Treasury Employees Union,
    513 U.S. 454 (1995) ....................................................................... 16, 21

United States v. Fausto,
    484 U.S. 439 (1988) .......................................................................... 5, 9

United States v. Mississippi Valley Generating Co.,
    364 U.S. 520 (1961) ..................................................................... 1, 15, 21

Wachsman v. City of Dallas,
    704 F.2d 160 (5th Cir. 1983) ............................................................ 20

Waters v. Churchill,
    511 U.S. 661 (1994) ..................................................................... 18, 27, 28

Weaver v. U.S. Information Agency,
    87 F.3d 1429 (D.C. Cir. 1996) ........................................................ 13, 14

Whitman v. Dep't of Transportation,
    382 F.3d 938 (9th Cir. 2004), vacated and remanded on other grounds,
    126 S.Ct. 2014 (2006) ........................................................................ 14

## STATUTES

The Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111 ....... passim

5 U.S.C. §§ 7103(a)(9)(A) .......................................................................... 11

5 U.S.C. § 7121 .............................................................................. 10, 11, 12

5 U.S.C. § 7122(a) .................................................................................. 11

5 U.S.C. § 7301 ..................................................................................... 3

5 U.S.C. App. 4 §§ 101-505 ................................................................ 3

5 U.S.C. App. 4 § 402(b)(1), (2) ........................................................ 3

## **MISCELLANEOUS**

Standards of Ethical Conduct for Employees of the Executive Branch ("Standards
    of Conduct"), 5 C.F.R. § 2635.101 ................................................ 3, 4, 22, 23

Executive Order No. 12674 (April 12, 1989), "Principles of Ethical Conduct
    for Government Officers and Employees" ........................................ 3

Executive Order No. 12731 (October 17, 1990) ........................................ 3

Final Rule, "Standards of Ethical Conduct for Employees of the Executive Branch," 57
    Fed. Reg. 35006, 35008 (August 7, 1992) ...................................... 23

S. Rep. No. 96-170, at 1 (1978), reprinted in 1978 U.S.C.C.A.N. 4216, 4217 .......................... 3

S. Rep. No. 969, 95th Cong., 2d Sess. 3 (1978) ........................................ 9

**INTRODUCTION**

"'[N]o man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of . . . trust relations, but includes within its purpose the removal of any temptation to violate them. . . .'" <u>Mississippi Valley Generating Co.</u>, 364 U.S. at 550 n.14 ((quoting <u>Michigan Steel Box Co. v. United States</u>, 49 Ct. Cl. 421, 439 (Ct. Cl. 1914)). In this case, plaintiff Jaime Ramirez asks this Court to permit him to attempt to serve two masters. Plaintiff is a federal law enforcement officer with U.S. Customs and Border Protection ("CBP") who inspects vehicles, cargo, and individuals seeking to enter the United States from Mexico at the Port of Presidio, Texas. Plaintiff is also an elected member of the Presidio City Council, relying for political support on the same individuals whose vehicles he inspects at the international border and serving as part of a legislative body engaged in ongoing negotiations with CBP over the disposition of seized property. Because of the appearance of a conflict of interest between plaintiff's two positions, CBP has instructed him to choose between them. Claiming this order violates his First Amendment rights, plaintiff has asked this Court to permanently enjoin it.

As a threshold matter, this Court lacks jurisdiction over plaintiff's claims. Plaintiff cannot establish subject matter jurisdiction in this Court because he has not raised his claim through the procedures set forth in the Civil Service Reform Act, Pub. L. No. 95-454, 92 Stat. 1111, as amended, <u>codified</u> <u>throughout</u> 5 U.S.C., ("CSRA"), let alone exhausted those administrative remedies, as the Court of Appeals for the D.C. Circuit requires federal employees to do before raising constitutional claims over personnel actions in district court. Under the CSRA's comprehensive remedial framework, plaintiff was required to pursue his claim by

raising a grievance under the collective bargaining agreement with the government that covers him.  Because he has failed to do so, his claim is not properly before this Court at this time.

Even if this Court had jurisdiction over plaintiff's claim, that claim lacks merit: as numerous courts have held, restrictions on the ability of civil servants to serve in elective office do not offend the First Amendment.  Here, CBP's order reasonably requires plaintiff to choose between his federal law enforcement job and an outside political position.  Such "resign-to-run" or "resign-to-serve" requirements have been consistently upheld, as CBP's requirement should be upheld here.

As the accompanying administrative record, amplified by the declaration of the deciding CBP official, establishes, CBP has reasonably determined that plaintiff's dual service as a CBP Officer at the Port of Presidio and as a Presidio City Council member creates the appearance of a conflict of interest.  Plaintiff's incentive to curry favor with the constituents and Presidio businesses seeking to move cargo across the border, for example, may lead reasonable minds to question the impartiality of plaintiff's law enforcement decisions.  Such a threat to the public trust is precisely what the Office of Government Ethics' binding Standards of Ethical Conduct for Employees of the Executive Branch are intended to prevent, and such protection of the public confidence is a compelling government interest sufficient to overcome plaintiff's interest in his outside activity.

For all of these reasons, this Court should grant defendants' motion and dismiss plaintiff's Complaint for lack of subject matter jurisdiction or, in the alternative, enter judgment for defendants on the merits.

# BACKGROUND

## I.    Statutory and Regulatory Background

### A.    The Standards of Ethical Conduct for Employees of the Executive Branch

Congress and the Executive Branch have legislated and regulated ethical standards for government employees since 1789.  Ex parte Curtis, 106 U.S. (16 Otto) 371, 372-3 (1882).  In 1978, Congress adopted the Ethics in Government Act ("EIGA") to codify a heightened level of ethical standards applicable to all three branches of the federal government.  See 5 U.S.C. app. 4 §§ 101-505.  Largely a reaction to public concerns over perceptions of ethical impropriety in government, the purpose of the EIGA was to "preserve and promote the accountability and integrity of public officials and of the institutions of the federal government and to invigorate the constitutional separation of powers between the three branches of government."  S. Rep. No. 96-170, at 1 (1978), reprinted in 1978 U.S.C.C.A.N. 4216, 4217.

EIGA created the Office of Government Ethics ("OGE") and charged that Office with developing rules and regulations "pertaining to conflicts of interest and ethics in the executive branch," and "to the identification and resolution of conflicts of interest." 5 U.S.C. App. 4 § 402(b)(1), (2).[1]  Pursuant to this authority, the OGE adopted the Standards of Ethical Conduct for Employees of the Executive Branch ("Standards of Conduct"), 5 C.F.R. § 2635.101 et seq.

---

[1]    See also 5 U.S.C. § 7301 ("The President may prescribe regulations for the conduct of employees in the executive branch."); Executive Order No. 12674 (April 12, 1989), "Principles of Ethical Conduct for Government Officers and Employees" (3 C.F.R., 1989 Compilation, pp. 215-218), as modified by Executive Order No. 12731 (October 17, 1990) (3 C.F.R., 1990 Compilation, pp. 306-311) (delegating to OGE the President's statutory authority to regulate the conduct of executive branch personnel).

As the Standards of Conduct state,

> Public service is a public trust. Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.

5 C.F.R. § 2635.101(a). The standards include general principles that apply to every federal employee, id. § 2635.101(b), such as the principle that federal "[e]mployees shall not engage in outside employment or activities, including seeking or negotiating for employment, that conflict with official Government duties and responsibilities," id. § 2635.101(b)(10), and that "[e]mployees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part" as "determined from the perspective of a reasonable person with knowledge of the relevant facts." Id. § 2635.101(b)(14).

As to "[o]utside employment and other outside activities of an employee," the Standards of Conduct require that such activities must also comply with the Standards and supplemental agency regulations, "includ[ing] the principle that an employee shall endeavor to avoid actions creating an appearance of violating any of the ethical standards. . . ." Id. § 2635.101(c).

The OGE Standards of Conduct also require employees to abide by any supplemental agency regulations that mandate employees seek approval before engaging in outside employment and other activities. Id. § 2635.803. Such requirements are contained in Department of Homeland Security ("DHS") Management Directive 480.1 ("M.D. 480.1") (attached hereto as Exhibit A), and the CBP Standards of Conduct, CBP Directive 51735-013 (attached to plaintiff's motion for preliminary injunction as Exhibit E). All DHS employees,

including CBP employees, are required to "[e]ndeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this directive", including the standard that employees should "[n]ot engage in outside employment or activities . . . that conflict with official Government duties and responsibilities", as "determined from the perspective of a reasonable person with knowledge of the relevant facts." DHS M.D. 480.1 §§ VI.A.10, 14. The CBP Standards of Conduct similarly requires CBP employees to "avoid any action, whether or not specifically prohibited by [the CBP] Standards of Conduct, which might . . . reasonably create the appearance of . . . conflict with official government duties and/or responsibilities." CBP Directive 51735-013 § 6.2; see also id. at § 6.15.1 (requiring employees to request approval before entering into any outside employment).

**B.    The Civil Service Reform Act**

The Civil Service Reform Act of 1978 ("CSRA"), Pub. L. No. 95-454, 92 Stat. 1111, regulates federal employment, from personnel practices and adverse actions to labor relations and employee grievances. The CSRA provides a "comprehensive" scheme of protections and remedies for federal employment disputes and "prescribes in great detail the protections and remedies applicable . . ., including the availability of . . . judicial review." United States v. Fausto, 484 U.S. 439, 448, 443 (1988). The CSRA generally "precludes district courts from taking jurisdiction over CSRA-related claims." Steadman v. Governor, U.S. Soldiers' and Airmen's Home, 918 F.2d 963, 967 (D.C. Cir. 1990) (citing Karahalios v. Nat'l Federation of Federal Employees, 489 U.S. 527, 536 (1989); Fausto, 484 U.S. 439, 445). The provisions of the CSRA that govern whether and when this Court has jurisdiction over plaintiff's claims are discussed in Part IV.A., infra.

-5-

II.    **Factual Background**

Jaime Ramirez is a U.S. Customs and Border Protection Officer in Presidio, Texas. <u>See</u>, <u>e.g.</u>, A.R. 46-48; Declaration of Luis Garcia ¶ 9. As a CBP Officer, plaintiff "performs the full range of inspection, intelligence analysis, examination, and law enforcement activities relating to arrival and departure of persons, conveyances, and merchandise at Ports of Entry ['Ports,']" such as the Port at the U.S. - Mexico border in Presidio. <u>See</u> GS-11 CBP Officer Position Description at 1, A.R. 22. Plaintiff's job includes prevention of the entry into the United States of terrorists and instruments of terror, harmful pests and diseases, illegal drugs and contraband, and illegal aliens. <u>Id.</u>

Presidio is a town of approximately 5,000 residents. Garcia Decl. ¶ 10. The CBP Port and crossing facility have a great impact on Presidio:

> People cross from Presidio to its "sister city" of Ojinaga across the Rio Grande on a daily basis: people visit family members on the other side of the border, people cross to places of employment, people cross for daily errands and shopping, and children often cross to attend school. Over 700,000 personal and commercial vehicles cross the border at Presidio each year.

<u>Id.</u> As a CBP Officer, plaintiff inspects the people and vehicles that seek to cross the border and enter the United States and determines whether the people, cargo or conveyance in question may be immediately admitted to the country or referred for further examination. <u>Id.</u>; CBP Officer Position Description at 2, A.R. 23.

In 2004, plaintiff sought permission from CBP to serve as a member of the Presidio City Council – the governing political and legislative body of Presidio – for a two-year term beginning in 2004. May 14, 2004 Memorandum for CBPO Jaime Ramirez, A.R. 38; Garcia Decl. ¶ 11. Plaintiff's request was initially denied because his "work as a councilmember would create at

least an apparent conflict of interest."  Garcia Decl. ¶ 13, citing May 14, 2004 Memorandum for

CBPO Jaime Ramirez, A.R. 38.  Following that decision, CBP was contacted by the political

head of Presidio County and the county prosecutor, who urged reconsideration of the decision for

the good of Presidio County.  Id.  In part out of concern for CBP's relationship with these local

government officials, the deciding official, Director of Field Operations ("DFO") Luis Garcia,

> determined it would be in the agency's and public's interest to authorize Mr. Ramirez's
> city council service for a single, two-year term beginning in 2004, as he had requested, if
> he would agree to pledge to recuse himself "from consideration of all matters by the City
> Council that concern the Presidio Port of Entry, U.S. Customs and Border Protection
> (including Border Patrol), or any U.S. Customs and Border Protection facility or property
> (including federally owned housing for CBP employees," and "to inform the Port Director
> and the Assistant Chief Counsel if [he had] any question as to whether or not a matter
> under consideration, or to be considered, by the City Council [would] require [him] to
> recuse [himself]."

Id., quoting A.R. 40.  Plaintiff agreed to make that pledge, and so DFO Garcia orally authorized

his outside employment for the two-year term requested.  Id.  Plaintiff never submitted a request

for authorization to serve beyond his initial two-year term.  Garcia Decl. ¶ 15.

In the fall of 2006, CBP learned, in part through another employee who had been denied

permission to serve in a political office, that plaintiff had continued serving as an elected official

beyond the authorized, single two-year term.  See id. ¶ 15; Second Declaration of Patricia Duffy

¶ 3.  On behalf of CBP, DFO Garcia

> determined that an indefinite continuation of [plaintiff's] maintaining dual roles beyond
> the single, two-year term [CBP] had authorized presents an unacceptable appearance of a
> conflict of interest as viewed by a reasonable person with knowledge of all the facts.  In
> particular, while service for a single term, without possibility of reelection, would not
> implicate concerns as to the propriety of personal political activity by a CBPO who would
> be inspecting his potential voters, such service with the indefinite need for reelection and
> political support does implicate those concerns.

Garcia Decl. ¶ 16.  On December 22, 2006, CBP issued a memorandum to plaintiff informing

him that he was required to resign from his city council position due to the appearance of a conflict of interest with his official duties. A.R. 46-47. The memorandum noted one reason for the appearance of a conflict of interest was ongoing negotiations between, among others, CBP and the Presidio City Council over disposition of and leasing arrangements over federally-seized property within Presidio. Id. The memorandum also noted the ongoing relationship between CBP and the city of Presidio concerning normal business issues, which include the leasing by Presidio of land to CBP for provision of homes to CBP Officers and employees. Id.

On January 5, 2007, CBP issued another memorandum to plaintiff requiring him to choose between his federal civil service law enforcement provision and his city council position within 30 days, or face further action by CBP up to and including removal. See A.R. 48. On January 12, 2007, plaintiff commenced this litigation with filing of his Complaint. See Compl. Pursuant to the Order of this Court, CBP has taken no further action to enforce its December 22, 2006, and January 5, 2007 Orders. See Garcia Decl. ¶ 21.

## ARGUMENT

### III.    Plaintiff Cannot Establish Subject Matter Jurisdiction Over His Claims In This Court

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868). The Court, of course, "always [has] jurisdiction to determine [its] jurisdiction." Nestor v. Hershey, 425 F. 2d 504, 511 (D.C. Cir. 1969); accord Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-94 (1998) (federal court may not decide merits before determining

whether it has jurisdiction over a case).  Here, because plaintiff has so far failed to raise his

claims through the administrative procedures set forth in the Civil Service Reform Act, Pub. L.

No. 95-454, 92 Stat. 1111, as amended, <u>codified</u> <u>throughout</u> 5 U.S.C. ("CSRA") – a

comprehensive statutory scheme designed to address the personnel-related complaints of federal

employees – this Court lacks jurisdiction over those constitutional claims.

In <u>United States v. Fausto</u>, the Supreme Court found that "[a] leading purpose of the

CSRA was to replace the haphazard arrangements for administrative and judicial review of

personnel action, part of the 'outdated patchwork of statutes and rules built over almost a

century' that was the civil service system."  484 U.S. 439, 444 (1988) (quoting S. REP. NO. 969,

95th Cong., 2d Sess. 3 (1978)).  "Congress responded to this situation by enacting the CSRA,

which replaced the patchwork system with an integrated scheme for administrative and judicial

review . . . ."  <u>Id.</u> at 445.  Even the total exclusion of a class of employees from the protections of

the CSRA does not leave them free to pursue pre-CSRA statutory remedies.  <u>Id.</u> at 447.  On the

contrary, the CSRA generally "precludes district courts from taking jurisdiction over CSRA-

related claims."  <u>Steadman</u>, 918 F.2d 963, 967 (citing <u>Karahalios</u>, 489 U.S. at 536; <u>Fausto</u>, 484

U.S. 439, 445)); <u>see also</u> <u>Block v. Community Nutrition Inst.</u>, 467 U.S. 340, 349 (1984) ("[T]he

presumption favoring judicial review of administrative action may be overcome by inferences of

intent drawn from the statutory scheme as a whole."); id. at 349-350 (discussing <u>Morris v.

Gressette</u>, 432 U.S. 491 (1977)).  The D.C. Circuit, sitting <u>en</u> <u>banc</u>, has made clear that, when

judging the preclusive effect of the CSRA, "it is the comprehensiveness of the statutory scheme

involved, not the 'adequacy' of specific remedies extended thereunder, that counsels judicial

restraint."  <u>Spagnola v. Mathis</u>, 859 F.2d 223, 227 (D.C. Cir. 1988); <u>see id.</u> at 228 ("the

[Supreme] Court regards a case-by-case examination of the particular administrative remedies available to a given plaintiff as unnecessary"). Instead, the CSRA must be given preclusive effect if the claims advanced by a federal employee are "within CSRA's ambit." Id. at 229.

### A. Plaintiff's Claim Falls Within the CSRA Framework.

"In assessing whether the CSRA precludes [plaintiff's] claims, the determinative question is whether they fall within its purview." Doe v. Goss, Civ. No. 04-2122-GK, 2007 WL 106523, *8 (D.D.C. January 12, 2007) (Kessler, J.) (citing National Treasury Employees Union v. Devine, 577 F. Supp. 738, 745 (D.D.C. 1983), aff'd 733 F.2d 114 (D.C. Cir. 1984)). And Plaintiff's claim is "within CSRA's ambit," Spagnola, 859 F.2d at 229, because it is redressable under the grievance procedure of the Collective Bargaining Agreement ("CBA") covering plaintiff. See 5 U.S.C. § 7121(g). At the time of the challenged agency action, CBP employees such as plaintiff who were transferred to CBP at its inception from jobs with the former U.S. Immigration and Naturalization Service were represented by the American Federation of Government Employees, Council 117, d/b/a National Homeland Security Council (formerly the National Immigration and Naturalization Service Council), and covered by Agreement 2000 Between U.S. Immigration and Naturalization Service and National Immigration and Naturalization Service Council ("Agreement 2000") (available at http://www.nhsc117.org/images/Agreement_2000.doc). Under Chapter 71 of the CSRA, every collective bargaining agreement is required to contain a procedure for "the settlement of grievances." 5 U.S.C. § 7121(a)(1).[2]

---

[2]        On May 18, 2007, following a disputed election, the Federal Labor Relations Authority certified the National Treasury Employees' Union ("NTEU") as exclusive representative of, inter alia, certain CBP employees who were formerly employed by INS such as plaintiff. Until NTEU and CBP negotiate a new CBA, plaintiff may still avail himself of the

(continued...)

The CSRA's definition of "grievance" is broad and plainly encompasses the CBP order that plaintiff challenges here. See 5 U.S.C. §§ 7103(a)(9)(A) (grievance includes a complaint "concerning any matter relating to the employment of the employee") & 7103(a)(9)(C)(ii) (grievance includes a complaint regarding "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment"); see also Agreement 2000 Art. 47(B) (including same definition of grievance). Thus, a CBP employee covered by a CBA can contest an allegedly improper personnel action through the grievance procedures established by the CBA.

If the negotiated grievance procedures under the CBA do not resolve an employee's grievance, either the union or the agency may invoke binding arbitration, 5 U.S.C. § 7121(b)(1)(C)(iii), with subsequent review of the arbitrator's decision by the Federal Labor Relations Authority ("FLRA"), 5 U.S.C. § 7122(a). The FLRA may "take such action and make such recommendations concerning the [arbitral] award as it considers necessary, consistent with applicable laws, rules, or regulations." 5 U.S.C. § 7122(a)(2). That structure reflects "the Congressionally unambiguous and unmistakable preference for exclusivity of arbitration[, which] is a central part of the comprehensive overhaul of the civil service system provided by the CSRA." Muniz v. United States, 972 F.2d 1304, 1309 (Fed. Cir. 1992). "To hold that the district courts must entertain such cases in the first instance would seriously undermine what [the Court] deem[s] to be the congressional scheme." Karahalios, 489 U.S. at 536-37. Accordingly, the CSRA precludes employees subject to an agency's grievance procedures from bypassing

---

[2](...continued)
Agreement 2000 grievance procedure. Since May 18, he has had the right to be represented by NTEU in such a grievance.

those procedures and first seeking judicial consideration of their grievances.  Carducci v. Regan,

714 F.2d 171, 172-5 (D.C. Cir. 1983).[3]

> **B.    Plaintiff's Statutory Claim is Barred by the CSRA.**

Plaintiff's Amended Complaint purports to raise a constitutional challenge for alleged

violation of the First Amendment, discussed below, as well as an Administrative Procedure Act

challenge based on the same alleged First Amendment violation.  Amen. Compl. ¶ 28.  Unlike

plaintiff's constitutional claim, this statutory claim is completely barred by the CSRA regardless

of whether plaintiff exhausts administrative remedies.  Spagnola, 809 F.2d at 30 (CSRA

precludes statutory claims in district court for federal employees against their employers);

Harrison v. Bowen, 815 F.2d 1505, 1514-15 (D.C. Cir. 1987) (the CSRA "had the effect of

depriving employees of a right of judicial review under the APA that they probably had prior to

enactment of the CSRA.").  As explained supra, plaintiff's claim is cognizable under the

Collective Bargaining Agreement ("CBA") that covers him within the CSRA framework.

Accordingly, this Court lacks jurisdiction over his APA claim.

---

[3]    Under 5 U.S.C. § 7121(g), a plaintiff who may raise a grievance under a CBA may instead elect to pursue other available administrative remedies by, e.g., seeking corrective action from the Office of Special Counsel ("OSC").  Here, plaintiff consulted OSC after defendants filed their opposition to plaintiff's Motion for Preliminary Injunction.  According to OSC's response, it determined plaintiff has no administrative remedy with OSC under the CSRA.  See OSC Letter, Exhibit B to Plaintiff's Reply Memorandum in Support of Motion for a Preliminary Injunction (Docket Entry No. 5).  Because plaintiff apparently has no administrative remedy with OSC for the actions of defendants that plaintiff challenges here, his only administrative remedy in the CSRA remedial scheme is the negotiated grievance procedure under Agreement 2000.  Plaintiff may not bypass that administrative remedy by taking a claim to OSC any more than he may ignore the CSRA structure and its deadlines entirely; indeed, if a plaintiff could "exhaust" his administrative remedies by electing a non-existent path for relief, or waiting until his time to seek administrative relief had lapsed, it would render the exhaustion requirement meaningless.

C.    **This Court Lacks Jurisdiction Over Plaintiff's Constitutional Claim Unless and Until Plaintiff Exhausts His Administrative Remedies.**

"Constitutional challenges to Agency action, such as the First Amendment claims raised by petitioner, are fully cognizable within the CSRA system." Bush v. Lucas, 462 U.S. 367, 386 (1983). For that reason, the Court of Appeals for the D.C. Circuit has held that it is only "if a constitutional claim survives an unsuccessful journey through the administrative process [that] the federal courts are open." Steadman, 918 F.2d at 968; accord Weaver v. U.S. Information Agency, 87 F.3d 1429, 1433 (D.C. Cir. 1996) (federal court review over a constitutional claim may be available "at the end of the line. . . . But first the plaintiff must exhaust administrative remedies."). This is because the federal judiciary should not "improperly interject [itself], at a premature stage into the CSRA's carefully developed system of administrative review."[4] Steadman, 918 F.2d at 966. Accordingly, Steadman established that it is only the "unsuccessful" complainant who may bring a constitutional cause of action to federal court once his journey though the administrative process is completed. 918 F.2d at 968. Similarly, in Weaver, the Court of Appeals clearly articulated the requirement that, although constitutional claims for

---

[4]    As another judge of this Court explained,

> The exhaustion requirement exists because it serves four important purposes. First, it prevents litigants from circumventing Congress' carefully crafted remedial scheme. Second, it gives agencies the opportunity to correct their own mistakes or to exercise the discretion they have been granted. Third, it eases the burden on the federal judiciary by allowing the parties and the agency to develop the facts in an administrative forum. Finally, it will either focus the issues for judicial review or settle the dispute so that judicial review will become unnecessary.

Martin v. EPA, 271 F. Supp. 2d 38, 45 (D.D.C. 2002).

-13-

injunctive relief[5] might be heard by a federal court, administrative remedies must be exhausted "first." 87 F.3d at 1433.  This exhaustion requirement is jurisdictional.  See Weaver, 87 F.3d at 1433 ("under the CSRA, exhaustion of administrative remedies is a jurisdictional prerequisite to suit") (citing Steadman, 918 F.2d at 966-68).  As to plaintiff's constitutional claim, accordingly, "Congress has allocated initial review to an administrative body," and has "preclude[d] initial judicial review."  Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1994).

At a minimum, therefore, plaintiff must exhaust his administrative remedies under the relevant CBA before his constitutional claims are cognizable in this Court.  See Weaver, 87 F.3d at 1434 (where constitutional claim is intertwined with claims that fall within the scope of the CSRA, or are "premised on the same facts," exhaustion is required); cf. Filebark v. U.S. Dep't of Transportation, 468 F. Supp. 2d 3, 6 & n.3 (D.D.C. 2006) (Leon, J.) (following Johnson v. Peterson, 996 F.2d 397, 401 (D.C. Cir. 1993) to hold district court lacks jurisdiction to resolve a grievance that is subject to CBA procedures).[6]  This Court thus lacks subject matter jurisdiction over plaintiff's constitutional claim at least unless and until he has exhausted the carefully designed procedures of the CSRA.  See Weaver, 87 F.3d at 1434-35; Steadman, 918 F.2d at 968.

--------

[5]    Claims arising under the constitution but seeking money damages are wholly precluded.  See, e.g., Bush, 462 U.S. at 388.

[6]    Compare with Mudge v. U.S., 308 F.3d 1220, 1227 (Fed. Cir. 2002) (holding federal employee can seek a judicial remedy for a grievance subject to CBA where such a remedy isn't abrogated by the CBA); Asociacion De Empleados Del Area Canalera v. Panama Canal Com'n, 329 F.3d 1235, 1238 (11th Cir. 2003) (following id.); and Whitman v. Dep't of Transportation, 382 F.3d 938 (9th Cir. 2004) (disagreeing with Mudge), vacated and remanded on other grounds, 126 S.Ct. 2014 (2006) (holding the CSRA "does not confer jurisdiction," id. at 2015, and noting that "the CSRA as a whole" may, contrary to Mudge, "remove[ ] the jurisdiction [otherwise] given to the federal courts" over a claim concerning a grievance subject to a CBA).

IV.    **The Challenged CBP Order Does Not Impermissibly Infringe on Plaintiff's First Amendment Rights.**

As defendants noted above, the Supreme Court has recognized that "'no man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of . . . trust relations, but includes within its purpose the removal of any temptation to violate them. . . .'" Mississippi Valley Generating Co., 364 U.S. at 550 n.14 ((quoting Michigan Steel Box Co., 49 Ct. Cl. at 439).  The good sense of the Court's observation is apparent from the facts of this case, in which CBP has reasonably determined that plaintiff's dual service as a CBP Officer at the Port of Presidio and as a Presidio City Council member creates the appearance of a conflict of interest.  That apparent conflict undermines the public's confidence in a critical government function and, therefore, provides the agency a compelling justification for its order that plaintiff choose between his competing roles.  For that reason, plaintiff's First Amendment challenge fails (as does his derivative APA challenge).  In any event, the challenged CBP order does not infringe on plaintiff's core First Amendment rights or activities.

A.    **The Challenged CBP Order Does Not Infringe on Plaintiff's First Amendment Rights.**

The Supreme Court has "explicitly endorsed outright prohibitions on government employees running for all elective offices." Fletcher v. Marino, 882 F.2d 605, 613 (2d Cir. 1989) (construing Broadrick v. Oklahoma, 413 U.S. 601 (1973)).  That is pursuant to the well-settled principle that "[a] governmental employer may subject its employees to such special restrictions

on free expression as are reasonably necessary to promote effective government,"[7] Brown v. Glines, 444 U.S. 348, 356, n. 13 (1980), and that those restrictions may include "restraints that would be unconstitutional if applied to the general public," City of San Diego v. Roe, 543 U.S. 77, 80 (2004).  Cf. Bullock v. Carter, 405 U.S. 134, 142-3 (1972) ("the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review.").

"When a court is required to determine the validity of such a restraint, it must 'arrive at a balance between the interests of the [employee], of a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees.'"  U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 465-66 (1995) ("NTEU") (quoting Pickering v. Board of Education, 391 U.S. 563, 568 (1968)).  This balancing test is not even required, however, where the government restraint on its employee's conduct does not impact the employee's *speech* on a *matter of public concern* – such restrictions do not burden the First Amendment at all.  See Connick v. Myers, 461 U.S. 138, 142 (1983); Tao v. Freeh, 27 F.3d 635, 639 (D.C. Cir. 1994).

In Public Workers v. Mitchell, 330 U.S. 75 (1947), the Supreme Court first upheld provisions of the Hatch Act which prohibit certain political activities by federal employees.  The Mitchell Court held that "the [political] act regulated" need only be "reasonably deemed by Congress to interfere with the efficiency of the public service" for the restriction to pass muster under the First Amendment.  330 U.S. at 101.  The Supreme Court "unhesitatingly" reaffirmed Mitchell in U.S. Civil Service Comm'n. v. Nat'l Assoc. of Letter Carriers, 413 U.S. 548, 556

---

[7]        As discussed infra, preventing the appearance of a conflict of interest in federal employees is a plainly legitimate government interest.

(1973) ("NALC"), over a dissent that argued against application of this relaxed standard for

regulation of government employees' expression. Id. at 597 (Douglas, J., dissenting). In

Broadrick, 413 U.S. 601, the Supreme Court upheld restrictions on the political activity of state

employees, though directed "at political expression which if engaged in by private persons would

plainly be protected by the First and Fourteenth Amendments." Id. at 616. As one court has

noted, "[t]he clear consequence of these opinions is that infringements upon the ability of

government employees, be they federal or state, to be candidates for elective office do not violate

the First Amendment." Connecticut Dep't of Human Resources v. MSPB, 718 F. Supp. 125, 131

(D. Conn. 1989).[8]  Cf. Int'l Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 678

(1992) ("Where the government is acting as a proprietor, managing its internal operations, rather

than acting as a lawmaker with power to regulate or license, its action will not be subjected to the

heightened review to which its actions as a lawmaker may be subject.").

    In Pickering v. Board of Education, which involved neither elective office nor the federal

government, the Supreme Court again recognized that, although public employees may not be

---

[8]     Cf. Otten v. Schicker 655 F.2d 142 (8th Cir. 1981) (under Missouri law, a
regulation prohibiting police department employees from running for elective public office
served valid and important state interests, including ensuring the impartial execution of the laws,
and therefore did not violate the employees' First Amendment rights); Commonwealth ex rel.
Specter v. Moak, 452 Pa. 482, 307 A.2d 884 (Pa. 1973) (city charter provision prohibiting city
officers or employees from becoming candidates for public office unless they resigned served
legitimate government interests, and therefore did not violate employees' First Amendment
rights); Johnson v. State Civil Service Dept., 280 Minn. 61, 157 N.W.2d 747 (Minn. 1968)
(statute providing that certain state employees must resign upon filing as a candidate for public
office served public interest by protecting the efficiency, integrity, and morale of state employees,
and therefore did not violate the employees' First Amendment rights); Ricks v. Department of
State Civil Service, 200 La. 341, 8 So. 2d 49 (La. 1942) (statute forbidding civil service
employees from, inter alia, becoming a candidate for any public office would promote efficiency
and integrity in the discharge of employees' official duties and, therefore, did not violate state
free speech guarantees.).

compelled to entirely relinquish their First Amendment rights, the government can regulate the speech of its employees differently than that of private citizens. 391 U.S. at 568; see also Waters v. Churchill, 511 U.S. 661, 668 (1994); Connick, 461 U.S. 138; Magill v. Lynch, 560 F.2d 22, 27 (1st Cir. 1977). "Thus, only where the employee's speech touches on a matter of public concern, and only where the employee's First Amendment interest is not outweighed by any disruption that the speech may cause to the efficiency of the public enterprise, is that speech constitutionally protected." Tao, 27 F.3d at 639. Here, CBP has placed no more than an "insignificant," "*de minimis*" restriction on plaintiff's First Amendment activity.[9] See Clements v. Fashing, 457 U.S. 957, 971-72 (1982). Plaintiff retains a wide range of means to exercise his First Amendment rights – for example, he can express his views upon matters of public concern and vote as he wishes. See Morial v. Judiciary Commission of State of La., 565 F.2d 295 (5th Cir. 1977) (en banc), cert. denied, 435 U.S. 1013 (1978) (holding a state requirement that certain officials resign their jobs before seeking election to another does not burden core First Amendment values such as the right to vote for the candidate of one's choice or to make statements regarding one's private opinions on public issues outside a campaign context, nor does it penalize belief in any particular idea).

The requirement that plaintiff choose between serving as a CBP Officer and serving as a Presidio City Council member thus does not restrict his speech on matters of public concern (or otherwise) either directly or indirectly by interposing a significant disincentive to speaking, and it poses no threat to the public and private goods that the First Amendment exists to protect. The

---

[9]    However it is described, the burden on plaintiff is outweighed by the government's interest in avoiding the appearance of a conflict of interest in its employees, discussed infra.

First Amendment "was designed to secure the widest possible dissemination of information from diverse and antagonistic sources, and to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Buckley v. Valeo, 424 U.S. 1, at 48-49 (1976) (internal quotations omitted).  It was incorporated in the Bill of Rights because of the founders' view that "debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964).  CBP's action poses no cognizable threat to these values.  Here, the "marketplace for the clash of different views and conflicting ideas" is not diminished in the slightest as a result of CBP's application of the Standards of Conduct.  See Citizens Against Rent Control, 454 U.S. at 295.  The debate on public issues, by plaintiff or others, remains unrestrained.  Accord New York Times Co., 376 U.S. at 270.

Plaintiff, indeed, is unrestrained from speaking out on *any* matter of concern by CBP's corrective action.  He simply cannot remain a CBP Officer while engaging in outside activity that creates the appearance of a conflict of interest with his official duties.  That, at most minimal burden poses no First Amendment problem under Pickering, Mitchell, and NALC.  See Clements, 457 U.S. at 971-72 (law prohibiting sitting state judges from running for partisan office presented only an "insignificant" burden on judges' First Amendment interests); Broadrick, 413 U.S. at 615.[10]  Moreover, CBP's order is essentially an order that plaintiff resign

---

[10]    Nor is it of great moment that plaintiff has been ordered to choose between his civil service law enforcement job and a *non*-partisan elected office.  As a three-judge panel of this Court recognized in upholding the Legal Services Corporation Act restriction on nonpartisan or partisan political activity by legal services staff against a First Amendment challenge, as that Act reflects it is a "judgment of Congress that the distinction between partisan and nonpartisan politics is often one without a difference." Smith v. Ehrlich, 430 F. Supp. 818, 822 (D.D.C. 1976) (three-judge district court).  Moreover, "significant operating relationships frequently exist within the geographical area of a city, between the city government, whether partisan or not, and

(continued...)

his civil service job if he wishes to continue in his position as a City Council member. The corrective action plaintiff challenges here is, therefore, indistinguishible from the so-called "resign to run" and "resign to serve" laws that courts have consistently upheld.[11]

CBP's goal is constitutionally legitimate: regulating outside activities by a government law enforcement employee and thereby furthering "th[e] great end of Government – the impartial execution of the laws" by employees who have earned the public trust. See NALC, 413 U.S. at 565. The CBP order plaintiff challenges "'plac[es] no obstacle between [plaintiff] and the ballot or his nomination or his election. He is free to run and the people are free to choose him.'" U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, 835 n.48 (1995) (bracketing modified from original), quoting with approval Signorelli v. Evans, 637 F.2d 853, 858 (2nd Cir. 1980). "'The burden on [political officeholding] . . . is indirect and attributable to a desire to regulate'" a federal employee, "'not to impose additional qualifications to serving" in elected office.'" See id., quoting with approval Joyner v. Mofford, 706 F.2d 1523, 1528 (9th Cir.), cert. denied, 464 U.S. 1002 (1983). The CBP order at issue in this case is thus constitutionally indistinguishable from the statutory provisions sustained in Signorelli and Joyner.[12] Just as resign-to-run laws find

---

[10](...continued)
the county, state, and federal governments. City politics, then, whether or not 'partisan,' cannot be viewed as wholly divorced from the politics, within the area of the city, of the local, state, and federal governments." Wachsman v. City of Dallas, 704 F.2d 160, 171 (5th Cir. 1983).

[11]    Plaintiff has not been prohibited from *seeking*, as opposed to *serving in*, the political office of Presidio Councilmember, and so the question of whether he could properly be ordered to "resign to run," as opposed to "resign to serve," is not before this Court.

[12]    Nor does the agency's action inflict a cognizable harm on Presidio voters. Cf. Jenness v. Fortson, 403 U.S. 431 (1971) ("Barriers standing in the path of potential candidates" do not automatically invoke the strict scrutiny standard.); Merle v. U.S., 351 F.3d 92, 97 (3rd Cir.
(continued...)

their justification in a state's "fundamental interests" in "protecting the integrity of a branch of state government," Signorelli, 637 F.2d at 861, 863, so is the CBP order justified by the fundamental interests of the United States in protecting the integrity of and public confidence in its functions. See Crandon v. U.S., 494 U.S. 152, 164-65 (1990) (discussing important government interest in avoiding the appearance of a government employee's conflict of interest); NALC, 413 U.S. at 565 (same).

> **B.    The Government Has a Legitimate and Compelling Interest in Precluding Plaintiff From Creating an Actual or Apparent Conflict of Interest.**

The regulation of employee conduct that creates actual or apparent conflicts of interest is well within the power of the federal government, and justified by legitimate government interest that is sufficient to outweigh plaintiff's interest in continuing in his dual roles. As the Supreme Court has recognized, "a democracy is effective only if people have faith in those who govern." United States v. Mississippi Valley Generating Co., 364 U.S. 520, 562 (1961). Accordingly, proscriptions "designed to prohibit and to avoid potential conflicts of interest in the performance of government service [are] supported by the legitimate interest in maintaining the public's confidence in the integrity of the federal service." Crandon, 494 U.S. at 164-65; see also U.S. v. Nat'l Treasury Employees Union, 513 U.S. 454, 473 (1995) ("NTEU") (the government has a legitimate interest in regulating activity that "might generate [an] . . . appearance of improper influence"); NALC, 413 U.S. at 565 ("it is not only important that the government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the

---

[12](...continued)
2003) ("The [Hatch] Act allows a citizen a choice. It does not disqualify any individual from running for public office, but rather provides for the removal or suspension from public employment of any federal employee who runs" for partisan office).

public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent"); Ex Parte Curtis, 106 U.S. at 372-73 (listing numerous conflict of interest laws beginning with those enacted in 1789); Sanjour v. EPA, 56 F.3d 85, 96 (D.C. Cir. 1995) (legitimate government interest in avoiding appearance of "accommodating third-party interests external and potentially adverse to agency").

Thus, the federal government "appropriately enacts prophylactic rules that are intended to prevent even the appearance of wrongdoing." Crandon, 494 U.S. at 164; Pickering v. Board of Education, 391 U.S. 563, 568 (1968) (government has an interest in regulating the conduct as well as the speech of its employees). Such rules include the Standards of Conduct promulgated by OGE and described supra, which apply to all federal employees. See 5 C.F.R. § 2635.101(b). The OGE standards require "[e]mployees [to] endeavor to avoid any actions creating the appearance that they are violating the law or the [OGE] ethical standards" as "determined from the perspective of a reasonable person with knowledge of the relevant facts." Id. § 2635.101(b)(14). Accordingly, federal employees are required to avoid engaging in "outside employment or activities" that reasonably appear to "conflict with official Government duties and responsibilities." Id. §§ 2635.101(b)(10), (14).

That requirement exists because, as discussed supra, "[c]reating the appearance of a conflict of interest constitutes a serious breach of trust [and t]he Government clearly has an interest in prohibiting such conduct[.]" Coons v. Dep't of the Navy, 15 M.S.P.R. 1, 5 (M.S.P.B. 1983); Suarez v. Dep't of Housing and Urban Development, 96 M.S.P.R. 213, 230 (M.S.P.B. 2004) (same). A public servant "must show" "undivided loyalty and integrity" on behalf of the public, Keeffe v. Library of Congress, 777 F.2d 1573, 1580 (D.C. Cir. 1985), and law

-22-

enforcement officers such as plaintiff are held to an even higher standard. See Fischer v. Dep't of Treasury, 69 M.S.P.R. 614, 618 (M.S.P.B. 1996) (penalizing Customs supervisor for appearance of a conflict of interest). As CBP has properly determined, plaintiff's continued service as a Presido City Council member would not meet that standard.

"To prove the existence of an appearance of a conflict of interest, an agency must show that the individual's interests or duties in one capacity would 'reasonably create an appearance' of having an effect on his interests or duties in the other capacity." Fontes v. Dep't of Transp., 51 M.S.P.R. 655, 663-64 (M.S.P.B. 1991) (quoting Lane v. Department of the Army, 19 M.S.P.R. 161, 162-63 (1984)); see also 5 C.F.R. § 2635.101(b)(14) ("Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part" as "determined from the perspective of a reasonable person with knowledge of the relevant facts."). An appearance problem need not even be "substantial" in order to be problematic: in promulgating the Standards of Conduct, OGE specifically rejected a suggestion that the standards should require employees to avoid only "substantial" appearance problems. See Final Rule, "Standards of Ethical Conduct for Employees of the Executive Branch," 57 Fed. Reg. 35006, 35008 (August 7, 1992).

As CBP Director of Field Operations ("DFO") Luis Garcia explains in his Declaration submitted herewith, plaintiff's service as a Presidio City Council member reasonably creates the appearance of affecting his interests in his capacity as a CBP Officer at the international border in Presidio while he carries out his core CBP job functions. See generally Garcia Decl.[13] "As a

---

[13]    The declaration of DFO Garcia, who made CBP's administrative decision to order plaintiff to choose between his competing positions, properly serves to "to further explain the
(continued...)

CBPO, Mr. Ramirez is likely to make decisions during the regular course of his official duties

that will affect the interests of the city and citizens of Presidio.  In addition, at Presidio City

Council meetings, Mr. Ramirez is likely to make decisions that will ultimately affect the port and

CBP."  Garcia Decl. ¶ 13.  These dual roles "reasonably create an appearance of having an effect

on his interests or duties in the other capacity."  Fontes, 51 M.S.P.R. at 663-64 (quotation marks

omitted).  This result is in part because "[t]he CBP port has an enormous impact on the economy

of Presidio.  People cross from Presidio to its 'sister city' of Ojinaga across the Rio Grande on a

daily basis:  people visit family members on the other side of the border, people cross to places of

employment, people cross for daily errands and shopping, and children often cross to attend

school.  Over 700,000 personal and commercial vehicles cross the border at Presidio each year."

Garcia Decl. ¶ 10.  As DFO Garcia explains:

> as a CBPO, Mr. Ramirez is responsible for inspecting the people and vehicles, identifying
> violators, and interdicting contraband and illegal aliens that attempt to cross the border
> and enter the United States.  As a public figure in the small town of Presidio, Mr.
> Ramirez also has a responsibility to the city and his constituents.  Every day he is
> inspecting the vehicles and property of the same people who elected him to his position
> on the City Council, as well as inspecting those constituents themselves.  Whether a
> CBPO such as Mr. Ramirez allows particular goods, other cargo or individuals to enter
> Presidio from Mexico will often have a great impact on the businesses and residents of
> Presidio.  Those individuals and businesses may on occasion have a strong interest in
> seeing particular individuals or items allowed into the United States, even where such

---

[13](...continued)
administrative record and describe the background information that was available to the agency."
Seafarers Int'l Union of North America v. U.S., 891 F. Supp. 641, 647 (D.D.C. 1995).  See also
Camp v. Pitts, 411 U.S. 138, 143 (1973) (agency may provide "through affidavits or testimony,
such additional explanation of the reasons for the agency decision as may prove necessary" after
litigation has commenced); Dyer v. Blue Cross & Blue Shield Ass'n, 848 F.2d 201, 207 (D.C.
Cir. 1988) (following Camp v. Pitts; permitting supplementation of administrative record to
explain what the agency had considered at the time of the relevant decision).  Cf. Esch v. Yeutter,
876 F.2d 976, 991 (D.C. Cir. 1989) (providing examples of when supplementation of an
administrative record is appropriate).

> entry would be inappropriate under United States customs laws and regulations and,
> accordingly, where such entry is not in the interests of the United States.

Garcia Decl. ¶ 19.   "[P]articular restrictions on a government employee's outside activities may

be justified because of that person's official duties," Keeffe, 777 F.2d at 1580, and that is the

case here.  The "competing interests" between plaintiff's two positions "reasonably lead to the

appearance of a conflict of interest in Mr. Ramirez's dual roles in Presidio as CBPO and

councilmember, and could disqualify him from carrying out some of his core law enforcement

job functions."  Garcia Decl. ¶ 19.  Accord 5 C.F.R. § 2635.802 (an outside activity presents a

conflict of interest with government employment when it would require employee's

disqualification from matters "central or critical to the performance of his official duties").  For

example, plaintiff's potential for a conflict of interest in seeing contraband admitted to the

country for the benefit of a Presidio business could disqualify him from inspecting vehicles at the

Port.

As DFO Garcia explains, this apparent conflict in particular illustrates why "indefinite

continuation of [plaintiff] maintaining dual roles beyond the single, two-year term I had

authorized [in 2004] presents an unacceptable appearance of a conflict of interest as viewed by a

reasonable person with knowledge of all the facts."  Garcia Decl. ¶ 16.  That is because "while

service for a single term, without possibility of reelection, would not implicate concerns as to the

propriety of personal political activity by a CBPO who would be inspecting his potential voters,

such service with the indefinite need for reelection and political support does implicate those

concerns."  Id.

There is also an appearance of a conflict of interest in plaintiff's access to electronic investigative systems that may contain information about his constituents and his serving, and seeking political support from, those same constituents. Id. ¶ 20. One with access to such law enforcement information could, for example, seek to use it improperly to leverage the political support of someone discussed in investigative files.[14] Similarly, there is at least an apparent "conflict between the duties of a councilmember to make 'recommendations regarding city business and about issues involving city employees' and those of a CBPO who 'works closely with City of Presidio employees on various law enforcement issues[.]'" Id. ¶ 13, quoting May 14, 2004 Memorandum for CBPO Jaime Ramirez, A.R. 38.

As CBP indicated in its December 22, 2006 memorandum to plaintiff, ongoing negotiations between CBP, the U.S. Drug Enforcement Administration ("DEA") and the town of Presidio concerning property seized in Presidio by DEA also creates the appearance of a conflict of interest in plaintiff's dual roles as representative of Presidio and its citizens, and as a law enforcement employee and, therefore, representative of CBP. Garcia Decl. ¶ 17; see also December 22, 2006 Memorandum, A.R.46-47. As a CBP Officer at the Presidio Port of Entry, plaintiff may be in a position to admit cargo destined for Presidio that could otherwise be subject to seizure by the United States. There is an appearance of a conflict of interest between plaintiff's roles where Presidio may later seek to obtain federally seized property, as well as where cargo that cannot legally enter the United States may, nonetheless, benefit a Presidio

---

[14]    Defendants make no suggestion that plaintiff has ever engaged in unethical conduct in the performance of his duties; rather, CBP is concerned by the appearance of a conflict of interest between plaintiff's roles as federal law enforcement officer and local city councilman.

business if it is allowed to enter without regard to the law.  It is not a sufficient answer to these concerns to say that plaintiff can recuse himself from Presidio City Council votes involving CBP. The need for recusal from some votes underscores, but does not ameliorate, the appearance of a conflict when plaintiff is serving as a locally elected official.  Of much greater concern to defendants, however, is the appearance of a conflict of interest when plaintiff is serving as a federal law enforcement officer, in CBP uniform, at our Southern border.  Plaintiff cannot recuse himself from his core, day-to-day job functions, such as inspection of vehicles.  But the appearance of divided loyalty may lead reasonable citizens to question his impartiality in performance of those job duties, thus harming "the public's confidence in the integrity of the federal service."  Crandon, 494 U.S. at 164-65.

Nor is it sufficient answer to argue that the apparent conflicts described above are merely speculative; *any* concern about the appearance of a conflict, as opposed to an actual conflict, will by its nature involve predictive discussions of possible harm, but that does not make the damage to public confidence involved any less grave.  See id.  Accordingly, the Supreme Court has "consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large."  See Waters, 511 U.S. at 673.[15]

_____

[15]    As the Supreme Court explained when it upheld government restrictions on public employees' speech in Waters:

> Few of the examples we have discussed involve tangible, present interference with the agency's operation.  The danger in them is mostly speculative.  One could make a respectable argument that political activity by government employees is generally not harmful. . . .  But we have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public

(continued...)

For all the reasons discussed above, by DFO Garcia in his declaration and by CBP official Patricia Duffy in her First Declaration, CBP reasonably concluded that plaintiff's service as a city councilman in Presidio creates the appearance of a conflict of interest with his service as a CBP Officer at the Presidio Port of Entry.  The government's compelling interests in avoiding the appearance of a conflict of interest would, accordingly, justify even regulation of plaintiff's conflicting outside activity that significantly impacted his First Amendment rights, which CBP's order at issue here does not do.  See supra.

---

[15](...continued)
concern. . . .

511 U.S. at 673 (internal citations omitted).

## CONCLUSION

For all the foregoing reasons, the Court should dismiss plaintiff's Complaint for lack of subject matter jurisdiction or, in the alternative, grant summary judgment for defendants.

Dated: June 22, 2007

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

SUSAN K. RUDY D.C. Bar # 369112
Assistant Branch Director

     /s/ Steven Y. Bressler
STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorney, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
Tel. No.:  (202) 514-4781
Fax No.: (202) 318-7609
Email:  Steven.Bressler@USDOJ.gov

JOHN P. HELM
Associate Chief Counsel
LINDSAY B. KAY
Attorney
Office of the Chief Counsel
U.S. Customs and Border Protection

*Of Counsel*

*Counsel for Defendants*

UNITED STATES DISTRIC COURT
FOR THE DISTRICT OF COLUMBIA

Jaime Ramirez, )
)
    Plaintiff, )
)    Case No. 07-0065
    v. )
)
Michael Chertoff, Secretary, )    Judge Gladys Kessler
Department of Homeland Security, *et al.* )
)
    Defendants )

## DECLARATION OF LUIS GARCIA

I, Luis Garcia, hereby declare and affirm as follows:

1.     I am employed by U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security. I am the Director of Field Operations ("DFO") in El Paso, Texas. I have been employed by CBP since March 1, 2003. I started my career with the U.S. Immigration and Naturalization Service ("INS") in 1970. I was the INS District Director in El Paso from August 1995 until February 28, 2003.

2.     In my current position, my priority mission is the detection, prevention, and deterrence of terrorists and terrorist weapons from getting into the U.S. through our ports of entry, while facilitating the orderly and efficient flow of legitimate trade and travel. I am responsible for approximately 1,200 employees assigned to 10 land border crossings and international airports in New Mexico, El Paso, and West Texas.

3.     I make this declaration based on my personal knowledge and knowledge that I have gained in my official capacity.

4.    One of my responsibilities as a DFO is approving my subordinates' Applications to Engage in Outside Employment (Customs Form 3031).

5.    Customs Directive No. 51735-001A requires that all employees obtain approval before entering into any outside employment or business activity.

6.    In addition to the requirement that CBP employees must obtain approval before entering into outside employment or activities, CBP Standards of Conduct, which are found in CBP Directive No. 51735-013, prohibit employees from engaging in any activities that may present a conflict of interest, or an appearance of a conflict of interest, with their official duties.

7.    Although both the Hatch Act and the CBP Standards of Conduct allow for employee participation in certain nonpartisan activities of a civic nature, the ability to engage in nonpartisan activities under the Hatch Act, its implementing regulations, and the CBP Standards of Conduct is not absolute. See 5 U.S.C § 7323; 5 C.F.R. §§ 734.202, 203(d); CBP Directive No. 51735013, 6.16, 6.16.1. Section 734.701 of the Hatch Act's implementing regulations states in pertinent part, "in addition to the provisions regulating political activity set forth in subparts A through G of this part, there are a number of statutes and Executive orders that establish standards to which political activity of an employee . . . must conform. The list set forth in § 734.702 references some of the more significant of those statutes." For example, § 734.702(t) makes clear that the prohibitions and requirements governing the conduct of federal employees established by the Ethics in Government Act of 1978, its implementing regulations, and Executive Order 12674, as modified by Executive Order 12731, may serve to prohibit a federal employee from engaging in certain nonpartisan activities.

8.      According to CBP policy and Office of Government Ethics regulations, among other
        authorities, employees may not participate in outside employment or activities if such
        employment or activities would create a conflict of interest or the appearance of a conflict of
        interest with their official duties as a CBP employee.

9.      Jaime Ramirez is a GS-11 CBPO in Presidio, Texas. As a GS-11 CBPO, Mr. Ramirez is a
        federal law enforcement officer who performs the full range of inspection, intelligence
        analysis, examination, and law enforcement activities relating to arrival and departure of
        persons, conveyances, and merchandise at Ports of Entry. The CBPO's primary
        responsibility is to identify potential terrorists and instruments of terror and to perform
        layered enforcement activities relative to counter-terrorism. These enforcement activities
        are to prevent the entry of terrorists and instruments of terror, harmful pests and diseases,
        illegal drugs and contraband, and illegal aliens and importations/exportations contrary to law
        and trade agreements, etc., from entering/exiting the United States. The CBPO interprets
        the laws and regulations of a broad range of Federal, state, and local agencies, relating to the
        admissibility of people, cargo and conveyances. See generally GS-11 CBPO Position
        Description, Administrative Record ("A.R.") at 22-31.

10.     As DFO and, previously, as INS District Director, I have grown familiar with the Presidio
        Port of Entry and surrounding community. I have visited Presidio on a number of
        occasions, including at least three since March 1, 2003, and I receive frequent reports on
        operational activities at the Presidio port. Presidio is a town of approximately five thousand
        residents located on the border between the United States and Mexico. The CBP port has an
        enormous impact on the economy of Presidio. People cross from Presidio to its "sister city"
        of Ojinaga across the Rio Grande on a daily basis: people visit family members on the other

side of the border, people cross to places of employment, people cross for daily errands and shopping, and children often cross to attend school. Over 700,000 personal and commercial vehicles cross the border at Presidio each year.

11.    Mr. Ramirez submitted a Memorandum dated February 27, 2004, to Acting Assistant Port Director ("(A)APD") Charlie Wright, along with a Customs Form 3031, "Request to Engage in Outside Employment or Business Activities," dated February 22, 2004, seeking approval to serve as a member of the Presidio City Council for a two-year term beginning in 2004.

12.    Under CBP procedure for consideration of such requests, (A)APD Wright reviewed Ramirez's completed Customs Form 3031. On February 27, 2004, (A)APD Wright indicated his approval of Mr. Ramirez's request, and then forwarded the request to me. As an INS District Director, when an employee requested approval to serve in a non-partisan political position, I (and the other District Directors) would make the determination whether to approve or deny such requests. There was no policy or practice at INS to refer such questions to agency ethics officials. When I became the Director of Field Operations for CBP, I learned that there was more opportunity on a day-to-day basis to receive advice and guidance from other agency entities and/or specialists, including designated ethics officials. In addition, I understood that under CBP policy ethics officials were available to answer questions concerning requests for permission to engage in outside employment or activity. Therefore, when I received Mr. Ramirez's 2004 request I forwarded the request to the local CBP ethics official for advice. Nonetheless, I have come to understand that other CBP managers frequently did not forward such requests to CBP ethics officials prior to December

2006, when CBP policy was changed to require consultation with ethics officials on such matters.

13.  On May 14, 2004, after consulting with the local CBP ethics official, I informed Mr. Ramirez that his request to serve as a city councilmember had been disapproved because his work as a councilmember would create at least an apparent conflict of interest. See May 14, 2004 Memorandum for CBPO Jaime Ramirez, A.R. 38. Among the reasons for this decision was the conflict between the duties of a councilmember to make "recommendations regarding city business and about issues involving city employees" and those of a CBPO who "works closely with City of Presidio employees on various law enforcement issues[.]" Id. In addition, I determined that Mr. Ramirez's dual service as a CBPO in Presidio and as a City Councilmember in that small town would create at least the appearance of a conflict of interest as judged by a reasonable person. As a CBPO, Mr. Ramirez is likely to make decisions during the regular course of his official duties that will affect the interests of the city and citizens of Presidio. In addition, at Presidio City Council meetings, Mr. Ramirez is likely to make decisions that will ultimately affect the port and CBP.

14.  Following my disapproval of Mr. Ramirez's 2004 request, the El Paso Office of Field Operations received telephone calls from Presidio County Attorney Theresa Todd and Presidio County Judge Jerry Agan, the political leader of Presidio County. Those Presidio County officials sought to persuade CBP to reconsider for the good of the Presidio community. Although I remained concerned about the appearance of a conflict of interest in Mr. Ramirez's dual service, I was also concerned that precluding Mr. Ramirez from serving on the Presidio City Council for a two-year term beginning in 2004 could adversely affect CBP's relationship with the Presidio county prosecutor and the county's elected leader.

Balancing all of these factors, I determined it would be in the agency's and public's interest

to authorize Mr. Ramirez's city council service for a single, two-year term beginning in

2004, as he had requested, if he would agree to pledge to recuse himself "from consideration

of all matters by the City Council that concern the Presidio Port of Entry, U.S. Customs and

Border Protection (including Border Patrol), or any U.S. Customs and Border Protection

facility or property (including federally owned housing for CBP employees," and "to inform

the Port Director and the Assistant Chief Counsel if [he had] any question as to whether or

not a matter under consideration, or to be considered, by the City Council [would] require

[him] to recuse [himself]." See A.R. 40. Mr. Ramirez agreed to make such a pledge, and so

I orally authorized his outside employment.

15.   In 2006, I learned that Mr. Ramirez had continued his city council service beyond the two-

year term I had authorized and without requesting additional authorization. I again

consulted with the designated agency ethics officials, consistent with CBP policy. The

Customs Directive on Outside Activities states that when a supervisor is reviewing a request

for outside employment, any questions regarding the application of Ethics rules to the

request should be directed to Customs Ethics Officials in the Office of Chief Counsel and

Associate and Assistant Chief Counsel offices. See Customs Directive 51735-001A, A.R.

1-2. In December of 2006, all of the Field Offices were instructed that requests for outside

employment to serve in a non-partisan political position necessarily raised a question

regarding the application of Ethics rules and therefore all such requests should be reviewed

by agency ethics officials before the supervisor made a decision to approve or deny the

request.

16. After consulting with agency ethics officials, I determined that Mr. Ramirez's continued dual service presented at least the appearance of a conflict of interest that could not be cured by Mr. Ramirez's earlier pledge, for reasons discussed below. Moreover, while I believed that permitting Mr. Ramirez to serve on the city council pursuant to his pledge had a positive impact on the agency's relations with Presidio County officials, I determined that an indefinite continuation of his maintaining dual roles beyond the single, two-year term I had authorized presents an unacceptable appearance of a conflict of interest as viewed by a reasonable person with knowledge of all the facts. In particular, while service for a single term, without possibility of reelection, would not implicate concerns as to the propriety of personal political activity by a CBPO who would be inspecting his potential voters, such service with the indefinite need for reelection and political support does implicate those concerns. Accordingly, on December 22, 2006, I instructed Mr. Ramirez via memorandum that he must resign his position as a member of the Presidio City Council or his CBPO position due to the appearance of a conflict of interest between those two roles. See A.R. 46-47. The final decision to disapprove Mr. Ramirez's dual service due to the appearance of a conflict of interest was mine.

17. As an example of the appearance of a conflict of interest, the December 22, 2006 memorandum explained that CBP had entered into negotiations with the Drug Enforcement Agency ("DEA") concerning the disposition of seized property in Presidio. As a result, the Presidio City Council is negotiating with both CBP and DEA to acquire the property and subsequently negotiate with CBP on leasing arrangements involving the Port of Presidio. The memorandum noted that the appearance of a conflict exists and will continue for the foreseeable future regarding this issue in particular.

18.    As another example of the appearance of a conflict of interest which would compromise Mr.
Ramirez's effectiveness as a CBPO, the memorandum discussed the ongoing relationship
between CBP and the city and county of Presidio over normal business issues, i.e., housing,
zoning, municipal services, port operations, etc.  For example, the City Council, in an
attempt to improve the town's economy, may seek to have the size of the crossing increased,
additional lanes installed, its hours for commercial traffic extended, or other such changes.
In fact, a bill proposed in the Texas State Senate provides that "[t]he City of Presidio and the
County of Presidio, in a joint cooperative effort, are working to gain ownership of the
United States (U.S.) portion of the Presidio International Bridge from the Texas Department
of Transportation (TxDOT) in order to initiate charging tolls for crossing to Mexico."  See
http://www.legis.state.tx.us/tlodocs/79R/analysis/html/SB01336I.htm.  These decisions and
issues directly impact Mr. Ramirez as a CBPO.

19.    In addition, as a CBPO, Mr. Ramirez is responsible for inspecting the people and vehicles,
identifying violators, and interdicting contraband and illegal aliens that attempt to cross the
border and enter the United States.  As a public figure in the small town of Presidio, Mr.
Ramirez also has a responsibility to the city and his constituents.  Every day he is inspecting
the vehicles and property of the same people who elected him to his position on the City
Council, as well as inspecting those constituents themselves.  Whether a CBPO such as Mr.
Ramirez allows particular goods, other cargo or individuals to enter Presidio from Mexico
will often have a great impact on the businesses and residents of Presidio.  Those individuals
and businesses may on occasion have a strong interest in seeing particular individuals or
items allowed into the United States, even where such entry would be inappropriate under
United States customs laws and regulations and, accordingly, where such entry is not in the

interests of the United States. Those competing interests reasonably lead to the appearance of a conflict of interest in Mr. Ramirez's dual roles in Presidio as CBPO and councilmember, and could disqualify him from carrying out some of his core law enforcement job functions.

20.   As a CBPO, Mr. Ramirez has access to electronic investigative systems that may contain information about his constituents, potential voters, and fellow City Council members. That access also reasonably leads to the appearance of a conflict of interest between Mr. Ramirez's position as a CBPO and his position as a member of the Presidio City Council.

21.   On January 5, 2007, I issued a follow-up memorandum to Mr. Ramirez requiring him to advise me within 30 days that he has resigned his position as a member of the Presidio City Council or from his position as a CBPO. See January 5, 2007 memorandum, A.R.48. The memorandum advised Mr. Ramirez that failure to do so will result in further action by CBP, up to and including removal from his position. We subsequently agreed not to take such action until a later date and, of course, have not taken any such action pursuant to the order of this Court.

22.   Mr. Ramirez is the only CBPO who has sought permission to serve on the Presidio City Council since the creation of CBP in 2003. CBP includes certain employees (such as Mr. Ramirez) whose positions were transferred from the former Immigration and Naturalization Service, which was a part of the Department of Justice, as well as former employees of the U.S. Customs Service, which was a part of the Department of Treasury. In the 1990s, four U.S. Customs Service, Department of Treasury employees were granted permission by their supervisors to serve on the Presidio City Council, and each of those four did serve a single, two-year term. Those terms commenced between 1993 and 1999. None of the deciding

officials in those instances consulted an agency ethics official, as I did in the case of Mr.

Ramirez, pursuant to CBP guidelines.  Other than Mr. Ramirez in 2004, no CBP employee

has received permission to serve on the Presidio City Council.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22nd day of

June, 2007, in El Paso, TX.

_____
Luis Garcia

UNITED STATES DISTRIC COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Jaime Ramirez, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07-0065 |
| v. | ) | |
| | ) | |
| Michael Chertoff, Secretary, | ) | Judge Gladys Kessler |
| Department of Homeland Security, *et al.* | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

## <u>SECOND DECLARATION OF PATRICIA DUFFY</u>

I, Patricia Duffy, hereby declare and affirm as follows:

1.  I am employed by U.S. Customs and Border Protection ("CBP"), an agency within the Department of Homeland Security. I am an Executive Director in the Office of Field Operations ("OFO"), and have been in that position since May 2003.

2.  I make this declaration based on my personal knowledge and knowledge that I have gained in my official capacity.

3.  In the Fall of 2006, my office learned, through an employee who had requested and been denied approval to serve in a political office, that there were other employees serving in similar public offices who may or may not have requested and/or received authorization to do so. The employee in question was not Mr. Ramirez.

4.  To obtain additional information, my office then contacted all the Directors of Field Operations (DFOs) around the country in early December of 2006 and asked them to provide a report on all employees under their supervision who are currently holding elected

or appointed public office, who have requested approval for running for or serving in such offices, who have requests pending for running for or serving in such offices, and who have held such positions at any time in the past.

5.    Before any additional requests for outside employment that involved public office were acted upon, I wanted to ensure I was aware of other situations where CBP employees were serving in public office. I also wanted to ensure that indistinguishable factual situations were evaluated in a consistent manner. Accordingly, in early December 2006 my office also informed the DFOs that all requests for outside employment that involve public office were to be forwarded to headquarters for review and approval until further notice.

6.    In late December, 2006, three weeks after suspending the outside employment approval authority of the DFOs for requests that involve public office, I returned that authority to the DFO level and implemented a streamlined process for outside employment requests involving public office that complied with the existing Customs Directive on Outside Activities. This streamlined process did not change the policy or procedure for reviewing requests for outside employment. The Customs Directive on Outside Activities states that when a supervisor is reviewing a request for outside employment, any questions regarding the application of Ethics rules to the request should be directed to Customs Ethics Officials in the Office of Chief Counsel and Associate and Assistant Chief Counsel offices. See Customs Directive 51735-001A, A.R. 2. That directive has been in effect since the creation of CBP. During our survey of the DFOs in early December 2006, however, we learned that requests for outside employment to serve in non-partisan political positions often had not been forwarded to or reviewed by CBP ethics officials. After consultation with Agency ethics officials, I instructed the DFOs that requests for outside employment to serve in a

non-partisan political position necessarily raised a question regarding the application of Ethics rules and, therefore, all such requests should be forwarded to CBP ethics officials for consultation before the supervisor made his or her final decision to approve or deny the request.

7.      I understand that, due to a misunderstanding, the office of DFO Luis Garcia disapproved Mr. Ramirez's outside employment and activity as a Presidio City Council member on December 22, 2006, before completing consultation on the matter from my office. As I detailed in my earlier Declaration in this matter, however, in December 2006 I concurred with and approved of DFO Garcia's decision.

8.      In my earlier Declaration, dated February 14, 2007, I stated that, "Presidio leases land to the federal government to provide homes to CBPOs located in Presidio" and that this land contains Mr. Ramirez's home. See 2/14/07 Duffy Decl. at ¶ 15. I have since learned that Mr. Ramirez bought the land on which his home is located in the 1980s and has lived there since 2002.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 22nd day of June, 2007, in Washington, DC.

Patricia Duffy

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
JAIME RAMIREZ,                      )
                                    )
                    Plaintiff,      )
                                    )
        v.                          )        Civil Action No. 1:07-65 (GK)
                                    )
UNITED STATES CUSTOMS               )
AND BORDER PROTECTION, *et al.*,    )
                                    )
                    Defendants.     )
_____)

## [PROPOSED] ORDER

AND NOW this _____ day of _____, 2007, it is hereby ORDERED that

defendants' Motion to Dismiss Plaintiff's Amended Complaint for Lack of Subject Matter

Jurisdiction or, in the Alternative, for Summary Judgment is GRANTED.  The Clerk is directed

to dismiss plaintiff's Amended Complaint with prejudice and enter judgment for defendants.


_____
Hon. GLADYS KESSLER
Senior U.S. District Judge