IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                )
JAIME RAMIREZ,                  )
                                )
         Plaintiff,             )
                                )
              v.                )    No. 07-cv-65 (GK)
                                )
U.S. CUSTOMS AND BORDER PROTECTION,)
et al.,                         )
                                )
         Defendants.            )
_____)


PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANTS' MOTION
TO DISMISS HIS SECOND AMENDED COMPLAINT

GREGORY O'DUDEN
General Counsel
D.C. Bar No. 254862

ELAINE KAPLAN
Senior Deputy General Counsel
D.C. Bar No. 292441

BARBARA A. ATKIN
Deputy General Counsel
D.C. Bar No. 225797

ROBERT H. SHRIVER, III
Assistant Counsel
D.C. Bar No. 456858

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, NW
Washington, DC 20006
(202) 572-5500

Date:  May 30, 2008          Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

<b>Page:</b>

BACKGROUND..................................................3

ARGUMENT....................................................4

    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER
    RAMIREZ'S COMPLAINT.......................................4

    I.   RAMIREZ WAS NOT REQUIRED TO EXHAUST ANY
       ADMINISTRATIVE PROCEDURE BEFORE SEEKING JUDICIAL
       REVIEW OF THE AGENCY'S DETERMINATION THAT HE
       CANNOT SERVE ON THE CITY COUNCIL.....................4

       A. No Administrative Procedure Was Available to
          Ramirez............................................5

       B. Even If Ramirez Could Have Grieved CBP's Denial
          of His Request for Authorization To Serve on the
          City Council, the CSRA Does Not Require That
          He Exhaust the Negotiated Grievance Process
          Before Initiating a Lawsuit........................8

       C. It Would Be Improper for the Court To Imply an
          Exhaustion Requirement............................15

    II.  RAMIREZ'S APA CLAIM IS NOT PRECLUDED.................21

       A. Ramirez's APA Claim Is Not Precluded Under the
          Reasoning of <u>United States v. Fausto</u> Because It
          Does Not Involve a "Personnel Action".............21

       B. The 1994 Amendments to the CSRA Eliminated
          Any Argument That Ramirez's APA Claim Is
          Precluded by 5 U.S.C. § 7121(a)(1).................24

    III. RAMIREZ'S CHALLENGE TO THE INITIAL ORDER
        DIRECTING HIM TO RESIGN HIS CITY COUNCIL
        SEAT IS NOT MOOT....................................32

CONCLUSION.................................................37

ATTACHMENTS 1-3

## TABLE OF AUTHORITIES

Page:

## Cases

ASEDAC v. Panama Canal Comm'n,
  329 F.3d 1235 (11th Cir. 2003)...............................26

Bivens v. Six Unknown Federal Narcotics Agents,
  403 U.S. 388 (1971)........................................15

Blue Chip Stamps v. Manor Drug Stores,
  421 U.S. 723 (1975)........................................26

Bosco v. United States, 976 F.2d 710,
  reh'g en banc denied,
  1992 U.S. App. LEXIS 33515 (Fed. Cir.) ...................22, 23

Burlington N. R.R. Co. v. STB,
  75 F.3d 685 (D.C. Cir. 1996)...............................35

Bush v. Lucas, 462 U.S. 367 (1983)........................15, 23

Butler v. West, 164 F.3d 634 (D.C. Cir. 1999).................10

Carducci v. Regan, 714 F.2d 171 (D.C. Cir. 1983)..............24

Carter v. Gibbs, 883 F.2d 1563 (Fed. Cir. 1989)..............27

Carter v. Gibbs, 909 F.2d 1452 (Fed. Cir. 1990)
  (en banc), cert. denied sub nom.
  Carter v. Goldberg, 498 U.S. 811 (1990)..................27, 30

Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
  467 U.S. 837, reh'g denied, 468 U.S. 1227 (1984).............26

Collins v. Bender, 195 F.3d 1076 (9th Cir. 1999)..............23

Comm. For GI Rights v. Callaway, 518 F.2d 466
  (D.C. Cir. 1975)........................................16–17

Darby v. Cisneros, 509 U.S. 137 (1993)..................5, 19, 20

Doe v. Goss, 2007 U.S. Dist. LEXIS 2708 (D.D.C.)..............23

Fargas v. United States, 2008 U.S. Dist. LEXIS 19634
   (D.D.C.) ....................................................5

Fund for Animals, Inc. v. Hogan,
   428 F.3d 1059 (D.C. Cir. 2005)..............................35

Garcia v. United States, 469 U.S. 70 (1984)...................29

Harrison v. Bowen, 815 F.2d 1505 (D.C. Cir. 1987).............23

Hughes Aircraft Co. v. Jacobson,
   525 U.S. 432 (1999)........................................26

Int'l Fed'n of Prof'l and Tech. Engineers and SSA,
   57 F.L.R.A. 915 (2002).....................................7

Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1623,
   489 U.S. 527 (1989)........................................13

Lawrence v. Blackwell, 430 F.3d 368 (6th Cir. 2005)...........35

Libertarian Party of Ohio v. Blackwell,
   462 F.3d 579 (6th Cir. 2006)...............................35

Lorillard v. Pons, 434 U.S. 575 (1978)........................28

MacDougal v. Green, 335 U.S. 281 (1948).......................35

Mansell v. Mansell, 490 U.S. 581 (1989).......................29

McCarthy v. Madigan,
   503 U.S. 140 (1992)...................4, 5, 11, 12, 17, 18, 19

McGhee v. United States, 402 U.S. 479 (1971)...................5

Miles v. Apex Marine Corp., 498 U.S. 19 (1990)................28

Moore v. Ogilvie, 394 U.S. 814 (1969).........................35

Mudge v. United States, 308 F.3d 1220 (2002),
   reh'g & reh'g en banc denied, 2003 U.S. App.
   LEXIS 3372 (Fed. Cir.).................................26, 32

Muniz v. United States,
   972 F.2d 1304 (Fed. Cir. 1992).............................27

Norman v. Reed, 502 U.S. 279 (1992)...........................34

Orsay v. Dep't of Justice,
  289 F.3d 1125 (9th Cir. 2002) ..............................23

Patsy v. Bd. of Regents, 457 U.S. 496 (1982)...................8

Pozo v. McCaughtry, 286 F.3d 1022 (7th Cir.),
  cert. denied, 537 U.S. 949 (2002)............................5

Ramirez v. U.S. Customs and Border Protection,
  477 F. Supp. 2d 150 (D.D.C. 2007)..................2, 3, 6, 33

Randolph-Sheppard Vendors of Amer. v. Weinberger,
  795 F. 2d (D.C. Cir. 1986).............................16, 17

Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994)..........32

Southern Pac. Terminal Co. v. ICC,
  219 U.S. 498 (1911) ...................................34, 35

Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988)
  (en banc) (per curiam).............................14, 15, 23

Steadman v. Governor, United States Soldiers'
  and Airmen's Home, 918 F.2d 963 (D.C. Cir. 1990).....12, 13, 14

Storer v. Brown, 415 U.S. 724 (1974).........................34

Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994)..........11

Toledo v. Jackson, 485 F.3d 836 (6th Cir. 2007)...............26

United States v. Emmons, 410 U.S. 396 (1973)..................32

United States v. Fausto, 484 U.S. 339 (1988)..........21, 22, 23

United States v. Ron Pair Enters., Inc.,
  489 U.S. 235 (1989).......................................26

Valentine-Johnson v. Roche,
  386 F.3d 800 (6th Cir. 2004) ..............................10

Weaver v. U.S. Information Agency,
  87 F.3d 1429 (D.C. Cir.), cert denied,
  520 U.S. 1251 (1996)..............................12, 13, 14

Weinstein v. Bradford, 423 U.S. 147 (1975)................34, 36

<u>Whitman v. Dep't of Transp.</u>,
  Case No. 3:02-cv-112-RRB (D. Ak.)............................18

<u>Whitman v. Dep't of Transp.</u>,
  382 F.3d 938 (9th Cir. 2004), <u>vacated and remanded by</u>
  547 U.S. 512 (2006).........................................26

<u>Whitman v. Dep't of Transp.</u>, 547 U.S. 512 (2006)..............26

<u>Woodford v. Ngo</u>, 126 S. Ct. 2378 (2006)........................5


**STATUTES**

Administrative Procedure Act

  5 U.S.C. § 702..............................................1

  5 U.S.C. § 704.............................................19

Civil Service Reform Act of 1978,
  Pub. L. No. 95-454, 92 Stat. 1111...........................1

  5 U.S.C. § 1214.........................................9, 14

  5 U.S.C. § 1214(a)(1)(A)....................................6

  5 U.S.C. § 1221.............................................9

  5 U.S.C. § 1221(h)(1)......................................10

  5 U.S.C. § 1221(h)(2)......................................10

  5 U.S.C. § 2302(a)(2)(A)(iii)...............................6

  5 U.S.C. § 2302(b).........................................9

  5 U.S.C. § 2302(b)(1)..................................10, 25

  5 U.S.C. § 2302(b)(8) ......................................9

  5 U.S.C. § 7103(a)(9)......................................24

  5 U.S.C. § 7118............................................11

  5 U.S.C. §§ 7118(a)(6)-(8).................................11

5 U.S.C. § 7121(a)(1)....................................<u>passim</u>

5 U.S.C. § 7121(a)(2)...................................12, 24

5 U.S.C. § 7121(d).....................................11, 25

5 U.S.C. § 7121(e).....................................11, 25

5 U.S.C. § 7121(e)(1)......................................9

5 U.S.C. § 7121(e)(2)......................................9

5 U.S.C. § 7121(f)......................................9, 11

5 U.S.C. § 7121(g)..................................11, 25, 32

5 U.S.C. § 7122(a)........................................18

5 U.S.C. § 7123(a)........................................11

5 U.S.C. § 7512........................................8, 21

5 U.S.C. § 7513(d).........................................9

5 U.S.C. § 7701...........................................9

5 U.S.C. § 7703(b)(1)...................................9, 22

Act of October 29, 1994,
 Pub. L. No. 103-424 (H.R. 2970),
 108 Stat. 4361 (1994)...........................28, 29, 31

7 U.S.C. § 608c (15)(A)....................................8

7 U.S.C. § 608c (15)(B)....................................8

15 U.S.C. §6765(b).........................................8

28 U.S.C. § 1295(a)(3)....................................22

28 U.S.C. § 1491.......................................21, 22

**REGULATIONS**

5 C.F.R. § 1810.1...........................................10

29 C.F.R. § 1614.407........................................10

**MISCELLANEOUS**

Federal Employee Fairness Act of 1994 (H.R. 2721),
   H. Rep. No. 103-599 (1994)...............................30-31

139 Cong. Rec. H6379 (daily ed. Aug. 6, 1993)..................29

140 Cong. Rec. H11422 (daily ed. Oct. 7, 1994)................31

140 Cong. Rec. S14670 (daily ed. Oct. 7, 1994)................31

To Reauthorize the Office of Special Counsel
   and To Make Amendments to the Whistleblower
   Protection Act:  Hearing on H.R. 2970 before
   the Subcomm. on the Civil Serv. of the Comm.
   on Post Office and Civil Serv.,
   103d Cong. 20-23 (1993)..................................29-30

Off. of Gov't Ethics, 99 X 5, Memo Re: OGE Regs.
   and an Agency's Duty To Engage in Coll. Barg.
   (Apr. 12, 1999) ..........................................7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
JAIME RAMIREZ,                  )
                                )
          Plaintiff,            )
                                )
          v.                    )    No. 07-cv-65 (GK)
                                )
U.S. CUSTOMS AND BORDER PROTECTION,)
et al.,                         )
                                )
          Defendants.           )
_____)
```

## <u>PLAINTIFF'S MEMORANDUM OPPOSING DEFENDANTS' MOTION<br>TO DISMISS HIS SECOND AMENDED COMPLAINT</u>

The government has moved to dismiss plaintiff Ramirez's second amended complaint for lack of subject matter jurisdiction.  It contends that Ramirez was required to exhaust the negotiated grievance process under the collective bargaining agreement that covers him before proceeding to court with his constitutional claim.  It further argues that his claim under the Administrative Procedure Act, 5 U.S.C. § 702 (APA), is precluded by the Civil Service Reform Act, Pub. L. No. 95-454, Stat. (1978) (CSRA).  Lastly, it contends that his claims are moot insofar as they concern the U.S. Customs and Border Protection (CBP) order of December 22, 2006, in which Ramirez was directed, under threat of removal from his position as a CBP Officer, to resign his unpaid seat on the nonpartisan City Council of Presidio, Texas.  These arguments are without merit.

First, there are no administrative procedures available for Ramirez to exhaust.  But even if procedures were available, Ramirez would not be required to exhaust them, either with respect to his constitutional claim or his claim under the APA. Indeed, in granting Ramirez's application for a preliminary injunction, the Court has already rejected a similar exhaustion argument.  See Ramirez v. U.S. Customs and Border Protection, 477 F. Supp. 2d 150, 155 (D.D.C. 2007).

Second, the government's argument that Ramirez's APA claim is precluded by the CSRA misconstrues the preclusion precedent. Because Ramirez's claim does not concern a "personnel action," it is not precluded by the CSRA.  Moreover, the 1994 amendments to the CSRA make clear that otherwise available judicial remedies are unaffected by the potential availability of a remedy under the negotiated grievance procedure.

Third, the controversy concerning the December 22, 2006 order directing Ramirez to resign his City Council seat under threat of removal remains live because it goes to the heart of a change in CBP policy regarding the service of CBP Officers on elected, non-partisan bodies.  In any event, the dispute arising from the December 22, 2006 order is capable of repetition, yet evading review.

## BACKGROUND

Plaintiff Jaime Ramirez is a CBP Officer. Ramirez, 477 F. Supp. 2d at 152. He also serves on the non-partisan volunteer City Council of Presidio, Texas. Id. In an order dated December 22, 2006, Luis Garcia, then-CBP Director of Field Operations (DFO) for El Paso, Texas, directed Ramirez to resign either his seat on the City Council or his position with CBP based on purported conflict of interests concerns. Id. Ramirez then initiated this action by filing a complaint on January 12, 2007. Id. He requested a preliminary injunction to block CBP from forcing him to choose between his job and his City Council seat. Id. This Court granted his request in an order dated March 12, 2007, and the preliminary injunction remains in force. Id. at 153.

In anticipation of the expiration of his City Council term, Ramirez submitted a Request To Engage in Outside Employment or Business Activities to CBP On January 4, 2008, in which he requested CBP's approval to serve a new two-year term on the City Council, if re-elected, commencing in May 2008. See Att. 1, at 6. In a March 6, 2008 memorandum from Acting DFO Eugenio Garza, Jr. (Luis Garcia's successor), CBP denied Ramirez's request. See Att. 1, at 2-5. The memorandum notes the existence of the preliminary injunction entered in this matter, and states that CBP will take no action against Ramirez, at this

3

time, if he were to be elected for and serve a new term on the
City Council. Rather, it states CBP's intention to "review the
issue and consider its options upon issuance of, and in accord
with, the District Court's opinion in the pending civil action."
Att. 1, at 2-3.

Subsequently, Ramirez ran for and was elected to a new term
on the City Council, commencing on May 20, 2008. See Ramirez
Decl. at ¶ 2 (Att. 2). He has amended his complaint to include
a challenge to CBP's denial of his request for authorization to
serve a new term on the City Council. See Sec. Am. Compl.
(accepted by court on April 2, 2008). On May 1, 2008, the
government filed a motion to dismiss his amended complaint and a
supporting memorandum ("Gov't Memo") in which it argued that the
Court lacks subject-matter jurisdiction for the reasons
mentioned above. Ramirez offers this memorandum in opposition
to the government's motion.

## ARGUMENT

### THIS COURT HAS SUBJECT MATTER JURISDICTION OVER RAMIREZ'S COMPLAINT

**I.    RAMIREZ WAS NOT REQUIRED TO EXHAUST ANY ADMINSITRATIVE PROCEDURE BEFORE SEEKING JUDICIAL REVIEW OF THE AGENCY'S DETERMINATION THAT HE CANNOT SERVE ON THE CITY COUNCIL**

Exhaustion of administrative remedies is required only if
specifically mandated by Congress. McCarthy v. Madigan, 503

U.S. 140, 144 (1992).[1]  Where there is no specific congressional

mandate, exhaustion is a matter of "sound judicial discretion."

Id. (citing McGhee v. United States, 402 U.S. 479, 483 n.6

(1971)).  Accord, Darby v. Cisneros, 509 U.S. 137, 144-45

(1993).  Moreover, administrative remedies are to be exhausted

only when they are clearly specified in a sequential path to

judicial review.  See, e.g., Woodford v. Ngo, 548 U.S. 81, 90-91

(2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th

Cir.), cert. denied, 537 U.S. 949 (2002)).  Otherwise,

imposition of an exhaustion requirement would provide

insufficient notice and set an impermissible "trap for unwary

litigants."  Darby, 509 U.S. at 147; McCarthy, 503 U.S. at 153.

   In arguing for exhaustion, the government fails to come to

grips with the fact that there was no administrative procedure

available for Ramirez to exhaust.  But even if Ramirez could

have filed a grievance under his collective bargaining

agreement, as the government now suggests, he was not required

to pursue a remedy through that path, because the CSRA does not

expressly require exhaustion and neither the conditions under

which courts may impose an exhaustion requirement nor the policy

reasons for so doing are satisfied here.

---

[1] In response to the McCarthy decision, Congress amended the
statute at issue there to provide an express exhaustion
requirement.  See Fargas v. United States, 2008 U.S. Dist. LEXIS
19634, *5 (D.D.C.).

### A.   No Administrative Procedure Was Available to Ramirez

The government has contended that Ramirez was obligated to
pursue a remedy either with the Office of Special Counsel (OSC)
or by filing a grievance under his collective bargaining
agreement.  Thus, in opposing Ramirez's application for a
preliminary injunction, the government insisted that CBP's
direction that he resign his City Council seat constituted a
"personnel action" under 5 U.S.C. § 2302(a)(2)(A)(iii) that
could be challenged by filing a prohibited personnel practice
complaint with OSC under the procedures set forth at 5 U.S.C. §
1214(a)(1)(A).  See Memo. in Opp'n to Pl. Mot. for Prelim. Inj.,
at 14-17.  Ramirez showed that he was not challenging a
personnel action, but he nonetheless filed a complaint with OSC,
as the government had suggested.  OSC promptly dismissed the
complaint (Ramirez, 477 F. Supp. 2d at 155), determining that it
lacked jurisdiction because, as Ramirez had argued, CBP's order
that he resign his City Council seat is not a personnel action.

The government now focuses on the negotiated grievance
procedure available to Ramirez under the collective bargaining
agreement that covers him.  See Gov't Memo at 8-10.  Thus, it
argues, as it did in opposing Ramirez's request for a
preliminary injunction (Memo. in Opp'n to Pl. Mot. for Prelim.
Inj., at 16-17), that Ramirez had to file a grievance before he

6

could seek judicial relief.[2]  In so doing, however, it never even acknowledges--much less denies--plaintiff's response that the grievance procedure is not available to challenge agency denials of outside activity or employment requests, the agency action at issue in this case.  See Int'l Fed'n of Prof'l and Tech. Engineers and SSA, 57 F.L.R.A. 915 (2002) (grievance challenging agency's denial of outside employment request dismissed as non-arbitrable).  See also Off. of Gov't Ethics, 99 X 5, Memo. Re: OGE Regulations and an Agency's Duty To Engage in Coll. Barg. (Apr. 12, 1999), at 2 (agency decisions on requests for approval to engage in outside employment not subject to collective bargaining process).[3]  The government's conspicuous failure to come to grips with these authorities is telling.  Had such a grievance been filed, we have no doubt that the agency (or, failing it, the FLRA) would have denied it as not arbitrable.

Because there is no administrative procedure available for Ramirez to exhaust, there can be no exhaustion requirement.

_____

[2] Again, the government mistakenly characterizes the agency action at issue as a "personnel action."  See Gov't Memo, at 6 ("a CBP employee covered by a CBA can contest an allegedly improper personnel action through the grievance procedure established by the CBA") (emphasis added).  As OSC has ruled and Ramirez has shown, there is no personnel action at issue.

[3] Ramirez made this argument and cited these authorities in his reply brief in support of his application for a preliminary injunction (at 10-11).

7

**B.    Even If Ramirez Could Have Grieved CBP's Denial of His Request for Authorization To Serve on the City Council, the CSRA Does Not Require That He Exhaust the Negotiated Grievance Process Before Initiating a Lawsuit**

Even assuming Ramirez could have filed a grievance to challenge CBP's disapproval of his service on the City Council, there is no merit to the government's contention that the CSRA required him to seek a remedy under that process before pursuing judicial relief.  As shown below, the mere existence of an alternative administrative path to relief does not amount to an exhaustion requirement.

**1.**    In the exhaustion context, congressional intent is of "paramount importance."  <u>Patsy v. Bd. of Regents</u>, 457 U.S. 496, 501 (1982).  Congress clearly knows how to create an exhaustion requirement when it intends to do so.  The United States Code is filled with examples of explicit, statutorily mandated exhaustion requirements.  <u>See, e.g.</u>, 15 U.S.C. §6765(b) (requiring that persons aggrieved by certain insurance regulatory actions "shall be required to exhaust all available administrative remedies" before they may "seek judicial review"); 7 U.S.C. § 608c(15)(A), (B) (providing for judicial review of Secretary of Agriculture's order only after commodity handler first secures an adverse ruling from the Secretary through the administrative process).

Indeed, Congress has carefully constructed explicit exhaustion requirements within the CSRA for employees wishing to challenge certain "personnel actions." Thus, employees who challenge "adverse actions"--defined as removals, suspensions of more than 14 days, reduction in grade or pay, and furloughs of 30 days or less (5 U.S.C. § 7512)--must first file an appeal with the Merit Systems Protection Board (MSPB) or a grievance under their collective bargaining agreement. See id. at §§ 7513(d), 7701; see also id. at § 7121(e)(1), (2). The CSRA expressly provides that judicial review is available in the Federal Circuit after the MSPB or arbitrator issues a final decision. See id. at § 7121(f) (arbitrator decisions), § 7703(b)(1) (Board decisions).

Congress similarly established an exhaustion requirement for employees alleging that they have suffered an unwarranted personnel action in reprisal for whistleblowing activity. See id. at § 2302(b)(8). Reprisal against whistleblowers is one of twelve types of "prohibited personnel practices." See id. at § 2302(b). Whistleblowers alleging reprisal may file a complaint with OSC. See id. at § 1214. Alternatively, they may file a grievance under their collective bargaining agreement. See id. at § 7121(g). A third option is to pursue relief directly from the MSPB by filing an individual right of action. See id. at § 1221. Employees may seek review in the Federal Circuit of

unfavorable MSPB decisions on their whistleblower reprisal complaints.  See id. at § 1221(h)(1), (2).

It also constitutes a prohibited personnel practice to discriminate against federal employees based on race, color, religion, sex, national origin, age, disability, marital status, and political affiliation.  See id. at § 2302(b)(1). OSC, however, has a policy of deferring discrimination complaints concerning the equal employment opportunity (EEO) laws to the EEOC.  See 5 C.F.R. § 1810.1 (2007).  Thus, federal employees alleging EEO discrimination must file a complaint with the EEOC and then, after receiving a decision or after passage of a statutorily prescribed deadline, they may file a civil action in federal district court.  See 29 C.F.R. § 1614.407.  Congress has adopted a "complicated tapestry" for the special class of EEO discrimination cases that concern adverse actions, with judicial review available at the end of the multi-step administrative process, either in the district court or the Federal Circuit. See Butler v. West, 164 F.3d 634, 638-39 (D.C. Cir. 1999), quoted in Valentine-Johnson v. Roche, 386 F.3d 800, 805-06 (6th Cir. 2004).

It follows that when Congress wanted to create an exhaustion requirement for federal employees, it did so

expressly, in painstaking detail.[4]  And, when the grievance

procedure was to be considered part of the exhaustion

requirement, it expressly provided so.  See 5 U.S.C. § 7121(d),

(e), (f), (g) (providing the employees may elect to substitute

the grievance procedure for other available administrative

avenues of relief, with judicial review available to the same

extent it would be if the employee had chosen an alternative

administrative path).

Against this backdrop, the government's assertion that

Congress has "allocated initial review to an administrative

body" and "preclude[d] initial judicial review" of Ramirez's

non-personnel action constitutional claim is unsupportable.  See

Gov't Memo, at 9 (quoting Thunder Basin Coal Co. v. Reich, 510

U.S. 200 (1994)).  The CSRA simply requires that all collective

bargaining agreements include a negotiated grievance process,

and that, with the exceptions noted above, the negotiated

grievance procedures constitute the "exclusive administrative

procedures for resolving grievances which fall within its

---

[4] Another example of a CSRA exhaustion requirement arises in the
labor relations context.  Employees or unions who allege that
they have suffered an unfair labor practice (ULP) must file a
charge with the General Counsel of the Federal Labor Relations
Authority (FLRA) or a grievance.  See 5 U.S.C. § 7118.  The FLRA
then resolves any ULP complaints issued by its General Counsel
and any exceptions to ULP arbitration awards.  See id. at §§
7118(a)(6)-(8).  Judicial review of any FLRA decisions on the
ULP charge is expressly provided for in the courts of appeals.
See id. at § 7123(a).

coverage." <u>See</u> 5 U.S.C. § 7121(a)(1). Parties to the agreements remain free to exclude designated matters from the grievance process entirely, <u>see</u> 5 U.S.C. § 7121(a)(2), and the CSRA itself does not dictate the shape or scope of the negotiated process, or the allocation of review within that process. A "general grievance procedure . . . neither enacted nor mandated by Congress" fails to demonstrate congressional intent to require exhaustion. <u>See</u> <u>McCarthy</u>, 503 U.S. at 149. Had Congress intended to require exhaustion of the grievance procedure for constitutional claims unrelated to personnel actions, it would have stated so expressly, as it did with respect to the other exhaustion regimes it established in the CSRA.

**2.** The cases the government cites do not support its position. Rather, they confirm that the Court has jurisdiction over Ramirez's claims.

The government relies most heavily on <u>Steadman v. Governor, United States Soldiers' and Airmen's Home</u>, 918 F.2d 963 (D.C. Cir. 1990), and <u>Weaver v. U.S. Information Agency</u>, 87 F.3d 1429 (D.C. Cir.), <u>cert. denied</u>, 520 U.S. 1251 (1996). <u>See</u> Gov't Memo, at 8-10. <u>Steadman</u> involved a challenge brought by former employees alleging that they were removed in violation of their due process rights and their collective bargaining agreement. The court construed their complaint as alleging that their union

12

had violated its duty of fair representation, a claim cognizable as an unfair labor practice (ULP) under the CSRA. Steadman, 918 F.2d at 966. It viewed the due process claim as "intertwined" with the ULP charge. Because Congress has provided an exclusive remedy for ULP violations through the FLRA with judicial review expressly provided for in the courts of appeals (see, supra, at 11 n.4), the court ruled that the employees had to follow that procedure and could not bring their ULP claims directly in the district court. See also Karahalios v. Nat'l Fed'n of Fed. Employees, Local 1623, 489 U.S. 527 (1989) (employee lawsuit alleging that union violated its duty of fair representation was precluded by CSRA).

Steadman is distinguishable because, as shown above (at 6-8), there is no CSRA procedure that Ramirez could have exhausted. Ramirez's claims do not involve a personnel action or a ULP. Instead, they "raise issues totally unrelated to the CSRA procedures," and he therefore can "come directly to district court." Id. at 967.

Weaver bolsters Ramirez's right to come directly to court. There, an employee challenged a regulation requiring her to submit materials regarding matters of official concern for pre-publication review. She also challenged an oral admonishment she received for failing to abide by the regulation. The court, construing Steadman, ruled that Weaver had to exhaust

administrative remedies with respect to the oral admonishment claim, because it was a personnel action cognizable as a prohibited personnel practice and thus redressable through filing a complaint with OSC.  See 5 U.S.C. § 1214.  But it further ruled that Steadman did not require dismissal of her separate claim concerning the validity of the regulation.  That claim, seeking declaratory and injunctive relief, "stands independent of the admonishment."  Weaver, 87 F.3d at 1434.  Accordingly, Weaver stands for the proposition that an employee must exhaust available administrative procedures when challenging the constitutionality of a personnel action, but that an employee may bring his claim immediately in court when seeking equitable relief from agency action that does not constitute a personnel action (as Ramirez does here).

The government also relies on Bush v. Lucas, 462 U.S. 367 (1983), and Spagnola v. Mathis, 859 F.2d 223 (D.C. Cir. 1988) (en banc) (per curiam).  See Gov't Memo, at 5, 8.  Bush involved an employee seeking damages in an action alleging that he was demoted in violation of his First Amendment rights.  In Spagnola, an individual alleging that he was not promoted in retaliation for exercising his First Amendment rights also sought damages.  In each case, the Court ruled that it would not countenance a new type of federal litigation--i.e., an action against supervisors in their personal capacities under Bivens v.

14

Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971)--that would allow federal employees to bring constitutional actions for damages in the district courts when other remedies were available under the CSRA's scheme.  See Bush, 462 U.S. at 388-90; Spagnola, 859 F.2d at 228.  Neither case addressed exhaustion.  In any event, unlike the plaintiffs in Bush and Spagnola, Ramirez is not challenging a personnel action, there is no available avenue for relief under the CSRA, and he is seeking only equitable relief and not damages under Bivens.  The right to pursue equitable relief for constitutional violations has been affirmed by the D.C. Circuit "time and again." Spagnola, 859 F.2d at 229-30.

### C.   It Would Be Improper for the Court To Imply an Exhaustion Requirement

Because the CSRA does not require exhaustion of the grievance process before seeking equitable relief for a constitutional violation not involving a personnel action--either explicitly or as a function of the overall scheme--the government must rely on a theory of implied exhaustion.  But the conditions for implying exhaustion are not satisfied here.

The grievance procedure that the government contends is applicable to Ramirez consists of a three-step process.  See INS/NINSC Agreement 2000 ("Agreement 2000"), at Art. 47, § E(1)-(3) (Att. 3).  Grievances must initially be filed within 22 days

15

of the incident. Id. at Art. 47, § E(1). Appeals of initial grievance decisions must be filed within 10 workdays of the employee's receipt of the decision. Id. at Art. 47, § E(2). Appeals of second step grievance decisions must be filed within 10 workdays of the employee's receipt of the decision. Id. at Art. 47, § E(3). The union must then invoke arbitration within 15 days from the date it receives the agency's final decision on the grievance. Id. at Art. 48, § A; see also 5 U.S.C. § 7121(b)(1)(C)(iii) (union, not employee, must invoke arbitration). At each step of the grievance process, a meeting is held with the deciding official, who is the first level supervisor at step 1, the port director at step 2, and the DFO at step 3.[5] Id. at Art. 47, § E(1)-(3). There is no formal hearing and no opportunity for the grievant to call witnesses or to present documentary evidence. See id. Rather, following the meeting, the deciding official conducts his or her own inquiry and issues a decision. See id.

Requiring exhaustion of the grievance procedure would not advance the policy reasons underlying the exhaustion doctrine. See Randolph-Sheppard Vendors of Amer. v. Weinberger, 795 F.2d 90, 104-07 (D.C. Cir. 1986) (quoting Comm. For GI Rights v.

---

[5] Because INS has now been subsumed within CBP, the district director and regional director positions referenced in Agreement 2000 are obsolete and, in Ramirez's case, have been replaced with his Port Director and the El Paso DFO.

Callaway, 518 F.2d 466 (D.C. Cir. 1975)) ("courts have developed exceptions to the exhaustion requirement in circumstances 'where the reasons supporting the doctrine are found inapplicable.'"). First, pursuing a remedy under the grievance procedure would be futile. Under the Agreement 2000 procedures described above, the final decision on a grievance filed by Ramirez would be issued by the El Paso DFO. But the orders that would be challenged in any such grievance--the December 22, 2006 order directing Ramirez to resign from the City Council and the subsequent March 6, 2008 denial of Ramirez's request to serve a new term--were issued by the DFO, first by Garcia and then by his successor Garza. See, supra, at 3. Pursuing relief under a grievance procedure that culminates with the same management official ruling on the validity of an order he had previously issued would be pointless. See Randolph-Sheppard, 795 F.2d at 104-07, and cases cited therein.

Second, the interests of judicial economy "do not stand to be advanced substantially by the general grievance procedure." McCarthy, 503 U.S. at 155. As noted above, the portions of the negotiated grievance procedure within the employee's control, like the Bureau of Prisons (BOP) grievance procedure at issue in McCarthy, do not include a formal hearing and offer no opportunity for the grievant to call witnesses or to present

17

documentary evidence.[6]  Consequently, no "formal factual record
of the type that can be relied on conclusively by a court for
disposition of a . . . claim on the pleadings or at summary
judgment without the aid of affidavits" would be created.
McCarthy, 503 U.S. at 155-56.

Third, the grievance procedure "imposes short, successive
filing deadlines that create a high risk of forfeiture of a
claim for failure to comply."  McCarthy, 503 U.S. at 152 (noting
that the BOP imposed deadlines of 15, 20, and 30 days in order
for an inmate to move successfully through the multi-stage
grievance procedure).  Here, as noted above, the negotiated
grievance procedure imposes deadlines of 22, 10, and 10
workdays, similar to those under the BOP procedures.  See
Agreement 2000, at Art. 47, § E(1)-(3) (Att. 3).  These
deadlines are significant, because, as in McCarthy, Ramirez is
not challenging a continuing violation, but, rather, distinct

---

[6] The employee would only get a formal hearing at which witnesses
could testify and documentary evidence produced if his or her
union chose to invoke arbitration on the grievance.  Additional
review would be available if the union filed exceptions to an
adverse arbitration decision with the FLRA.  5 U.S.C. § 7122(a).
Because invocation of arbitration and FLRA review are beyond the
control of the individual employee, those steps cannot be
considered part of the administrative process that is to be
exhausted.  Indeed, the government has argued in another case
that arbitration and review by the FLRA are not part of the
exhaustion requirement it advocates here.  See Whitman v. Dep't
of Transp., Case No. 3:02-cv-112-RRB (D. Ak.), Def. Reply to Pl.
Resp. to Def. Mot. To Dismiss the Compl. & the Am. Compl., at 15
n.9 (Dkt. No. 48).

management determinations.  See McCarthy, 503 U.S. at 153 n.5.

Thus, as in McCarthy, "rapid filing deadlines counsel strongly

against exhaustion as a prerequisite to the filing of a federal

court action."  McCarthy, 503 U.S. at 153.

Fourth, Ramirez has sought relief under the APA, in

addition to directly under the Constitution.  Implication of an

exhaustion requirement is therefore improper under Darby, 509

U.S. at 153-54.  In the absence of an express congressional

statement requiring exhaustion, Darby makes clear that "[c]ourts

are not free to impose an exhaustion requirement as a rule of

judicial administration where the agency action has already

become 'final' under § 10(c)" of the APA.  Id. at 154.  Under

Darby, exhaustion is a prerequisite of judicial review of APA

claims "only when expressly required by statute or when an

agency rule requires appeal before review and the administrative

action is made inoperative pending that review."  Id. (emphasis

in original).  In other words, if no statute expressly requires

exhaustion, exhaustion is required only where the agency action

being challenged is not "final" under Section 10(c) of the APA,

5 U.S.C. § 704, because an agency rule requires additional

appeals.  See Darby, 509 U.S. at 154.

As shown above (at 8-15), the CSRA does not expressly

require exhaustion of the negotiated grievance procedure before

pursuing judicial relief.  Moreover, CBP's orders to Ramirez are

clearly "final"; indeed, the government does not dispute this point.

Nor does the government identify any "agency rule" that could be construed to require exhaustion of the grievance procedure before seeking judicial relief under the APA.  See Darby, 509 U.S. at 154.  But even if the phrase "agency rule" could be contorted to include the collectively bargained grievance procedure, there is no provision in those procedures that would make the challenged agency action inoperative during the grievance process.  Id.  Indeed, the agency did not make inoperative pending review its initial decision to demand that Ramirez resign his City Council seat or be terminated; Ramirez had to obtain a preliminary injunction to block the agency from enforcing its decision.  Though it has now agreed to make inoperative its subsequent decision to deny him authorization to serve a new term on the City Council pending this Court's decision, that decision is practical and based on the existing preliminary injunction, not on any agency rule.

It follows that none of the Darby prerequisites for an exhaustion requirement is satisfied in this case.  Accordingly, it would be erroneous for the Court to impose an exhaustion requirement on Ramirez.

## II.  RAMIREZ'S APA CLAIM IS NOT PRECLUDED

The government concedes that Ramirez's constitutional claim is not precluded by the CSRA, but it contends that his APA claim is precluded.  See Gov't Memo, at 5-8.  This argument suffers from the same fundamental flaw as its exhaustion argument, namely, that Ramirez does not challenge a personnel action.  In addition, to the extent the government relies on 5 U.S.C. § 7121(a)(1) to support its preclusion argument, the 1994 amendments to the CSRA completely refute its claim.

### A.  Ramirez's APA Claim Is Not Precluded Under the Reasoning of United States v. Fausto Because It Does Not Involve a "Personnel Action"

In United States v. Fausto, 484 U.S. 339, 455 (1988), the Supreme Court held that "the CSRA established a comprehensive system for reviewing personnel action taken against federal employees."  Id. at 455 (emphasis added).  At issue was whether a "non-preference eligible excepted service employee" could bring an action under the Tucker Act, 28 U.S.C. § 1491, to challenge a 30-day suspension.  A 30-day suspension clearly qualifies as a personnel action that falls within the adverse action procedures of the CSRA.  See 5 U.S.C. § 7512; Fausto, 484 U.S. at 446-47.  Employees in Fausto's excepted service category, however, do not have access to the CSRA's adverse action procedures.  See Fausto, 484 U.S. at 446-47.  Fausto

argued that because he had no remedy under the CSRA, his Tucker Act claim was not precluded.

The Court disagreed.  It held that Congress had "deliberate[ly] exclu[ded] . . . employees in [Fausto's] service category from the provisions establishing administrative and judicial review for personnel action of the sort at issue . . . ."  Id. at 455.  In other words, Congress had intended to provide no adverse action remedy to employees in Fausto's service category.  Thus, it held that Fausto's claim was precluded.

Fausto's preclusion holding applies to personnel actions only.  This is confirmed by the Federal Circuit, which is the court of appeals that is vested with exclusive jurisdiction over numerous claims arising out of federal employment.[7]  That court has recognized that not all claims "related to . . . employment" of a federal employee are precluded, but only those that concern "personnel actions" and form the predicate for "prohibited personnel practices" or "adverse actions."  Bosco v. United States, 976 F.2d 710, 713-14, reh'g en banc denied, 1992 U.S. App. LEXIS 33515 (Fed. Cir.).  Though "the CSRA is complete and

---

[7] The Federal Circuit has exclusive jurisdiction over appeals involving adverse actions, 5 U.S.C. § 7703(b)(1), as well as appeals from decisions of the United States Court of Federal Claims, 28 U.S.C. § 1295(a)(3).  The Court of Federal Claims routinely hears cases involving monetary claims by federal employees arising under money mandating statutes.  28 U.S.C. § 1491.

exclusive in the areas it expressly governs," i.e., for adverse actions and prohibited personnel practices, it "leave[s] undisturbed what the statute does not expressly extinguish." Id.; see also Orsay v. Dep't of Justice, 289 F.3d 1125, 1131 (9th Cir. 2002) ("In order for the CSRA to preempt a federal cause of action, the underlying conduct must involve 'personnel action' . . .").

As shown above (at 6-7), Ramirez's claims do not concern a personnel action and, therefore, do not fit into either the prohibited personnel practice or adverse action category.  If there is no personnel action involved, then the CSRA's comprehensive scheme is simply not implicated.  See Collins v. Bender, 195 F.3d 1076 (9th Cir. 1999) (rejecting government's CSRA preclusion argument because warrantless search was not a personnel action and therefore did not fall within CSRA's scheme); cf. Bush, 462 U.S. at 386 n.28 (noting that "[c]ertain actions by supervisors against federal employees, such as wiretapping, warrantless searches, or uncompensated takings, would not be defined as 'personnel actions' under the CSRA").

Because Ramirez's statutory claim does not concern a personnel action, it is not precluded under Fausto and its progeny.[8]

---

[8] The other cases relied upon by the government (Gov't Memo, at 5, 7, 8) are not to the contrary, as they also involve

23

**B.   The 1994 Amendments to the CSRA Eliminated Any Argument That Ramirez's APA Claim Is Precluded by 5 U.S.C. § 7121(a)(1)**

In an opaque footnote (see Gov't Memo, at 10 n.6), the government appears to suggest that there is still vitality to its view, expressed more elaborately in other cases, that Ramirez's APA claim is precluded by 5 U.S.C. § 7121(a)(1). Though the government does not expand on this theory here, we set forth below the reasons why there is absolutely no support for it to cling to Section 7121(a)(1) as a basis for its preclusion argument, so that we may put this matter to rest, once and for all.

Chapter 71 of the CSRA requires that collective bargaining agreements in the federal sector "provide procedures for the settlement of grievances, including questions of arbitrability." 5 U.S.C. § 7121(a)(1). Under 5 U.S.C. § 7103(a)(9), a "grievance" may include "any matter relating to the employment of the employee" and "any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation, affecting conditions of employment." Matters, however, may be excluded from the grievance procedure by agreement of the union and agency. See 5 U.S.C. § 7121(a)(2).

---

challenges to personnel actions. See Spagnola, 859 F.2d at 225 (promotion); Harrison v. Bowen, 815 F.2d 1505 (D.C. Cir. 1987) (removal); Doe v. Goss, 2007 U.S. Dist. LEXIS 2708 (D.D.C.) (denial of promotion and removal); Carducci v. Regan, 714 F.2d 171 (D.C. Cir. 1983) (demotion).

Section 7121(a)(1) provides, in pertinent part, that "[e]xcept as provided in subsections (d), (e), and (g) of this section, the [negotiated] procedures shall be the exclusive administrative procedures for resolving grievances which fall within its coverage."[9]  The government's footnote 6 (Gov't Memo at 10) hints at an argument that Section 7121(a)(1) requires federal employees alleging statutory violations to pursue relief exclusively under the grievance procedure applicable to them, if the matter falls within the scope of that procedure.  As shown above (at 6-7), Ramirez's claims do not fall within the scope of the grievance procedure.  In any event, the interpretation of Section 7121(a)(1) suggested by the government is unsupportable. That statute, as amended, makes clear that the existence of a remedy under the negotiated grievance procedure does not preclude courts from exerting jurisdiction over pre-existing statutory causes of action.

---

[9] Subsection (d) of section 7121 gives employees the right to elect the negotiated procedure or "statutory procedures" for resolving complaints of discrimination that constitute "prohibited personnel practices" under 5 U.S.C. § 2302(b)(1).  5 U.S.C. § 7121(d).  Subsection (e) of 7121 preserves employees' rights to file appeals with the Merit Systems Protection Board to challenge serious adverse actions based on misconduct or poor performance, under Chapters 75 and 43 of Title 5.  5 U.S.C. § 7121(e).  Subsection (g), which, like the word "administrative", was added to the statute in 1994, preserves employees' rights to file complaints with the Office of Special Counsel in cases involving prohibited personnel practices other than those identified in subsection (d).  Id. at § 7121(g).  None of these provisions is applicable to Ramirez's claims.

**1.**    The interpretation of a statute begins with its language.  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 756 (1975).  Where that language is clear, "the sole function of the courts is to enforce it according to its terms."  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989); Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, reh'g denied, 468 U.S. 1227 (1984).  As the Federal Circuit held in Mudge v. United States, 308 F.3d 1220 (2002), reh'g & reh'g en banc denied, 2003 U.S. App. LEXIS 3372 (Fed. Cir.), "[t]he plain language of § 7121(a)(1) as amended is therefore clear:  while § 7121(a)(1) limits the administrative resolution of a federal employee's grievances to the negotiated procedures set forth in his or her [collective bargaining agreement], the text of the statute does not restrict an employee's right to seek a judicial remedy for such grievances."  Id. at 1228 (emphasis added); accord ASEDAC v. Panama Canal Comm'n, 329 F.3d 1235 (11th Cir. 2003).[10]

---

[10] The government also cites Whitman v. Dep't of Transp., 382 F.3d 938 (9th Cir. 2004), and Toledo v. Jackson, 485 F.3d 836 (6th Cir. 2007).  See Gov't Memo, at 10 n.6.  Whitman, however, was vacated by the Supreme Court and remanded for further proceedings.  See Whitman v. Dep't of Transp., 547 U.S. 512 (2006).  And, Toledo is not contrary to Mudge, as the Sixth Circuit there assumed that the Mudge court's interpretation of 5 U.S.C. § 7121(a)(1) was correct.  See Toledo, 485 F.3d at 840.

**2.**    The context in which the current version of Section 7121(a)(1) was enacted underscores the correctness of the Mudge holding.  Prior to 1994, Section 7121(a)(1) provided that the negotiated grievance procedure was the "exclusive procedure" for resolving matters that fell within its coverage.  See Carter v. Gibbs, 909 F.2d 1452 (Fed. Cir. 1990) (en banc), cert. denied sub nom. Carter v. Goldberg, 498 U.S. 811 (1990).  The absence of the word "administrative" from the pre-1994 version of Section 7121(a) led the Federal Circuit to read that version to divest employees of their rights to pursue relief in federal court over matters falling within the scope of the negotiated grievance process.  See id.

Carter arose out of a lawsuit brought under the Fair Labor Standards Act (FLSA).  A panel of the Federal Circuit held that the lower court had misinterpreted Section 7121(a)(1) to preclude the plaintiffs' FLSA enforcement action.  Carter v. Gibbs, 883 F.2d 1563 (Fed. Cir. 1989).  An en banc Federal Circuit reversed.  Carter, 909 F.2d 1452.  It held that the language of Section 7121(a)(1), in its original incarnation, contained no qualifying language confining its reach to "administrative" procedures and made the grievance procedure exclusive as to all other procedures, whether administrative or judicial.  Id. at 1454-55.  See also Muniz v. United States, 972 F.2d 1304 (Fed. Cir. 1992), cited in Gov't Memo, at 7 (following

27

_Carter_ in holding that federal employees must grieve FLSA violations).

In 1994, Congress responded to _Carter_ by adding to the statute the very term whose absence had dictated the Federal Circuit's conclusion.  _See_ Act of October 29, 1994, Pub. L. No. 103-24 (H.R. 2970), 108 Stat. 4361, 4365, § 9(b) (1994).  As modified, Section 7121(a)(1) now provides, in pertinent part, that a grievance procedure found in a federal sector collective bargaining agreement "shall be the exclusive _administrative_ procedure for resolving covered grievances."  5 U.S.C. § 7121(a)(1) (emphasis added).

It is well established, of course, that Congress is presumed to be aware of existing law when it passes legislation. _Miles v. Apex Marine Corp._, 498 U.S. 19, 32 (1990).  Further, when Congress amends an existing statute, it is presumed to do so with knowledge of the interpretation that had been given to the existing statute, at least insofar as the amendment effects the existing statute.  _Lorillard v. Pons_, 434 U.S. 575, 580-581 (1978).  In this case, an _en banc_ court had rejected an argument that Section 7121(a)(1) applied only to other administrative avenues of relief, not judicial, because the word "administrative" was not contained in the statute.  Congress responded by amending the law to add the word "administrative."

28

It thus necessarily follows that under the plain language of Section 7121(a)(1), as amended, the negotiated grievance procedure is exclusive only as to other administrative remedies, not as to judicial causes of action.

**3.**    As the Supreme Court has held, "only the most extraordinary showing of contrary intentions from [the legislative history] would justify a limitation on the 'plain meaning' of the statutory language." Garcia v. United States, 469 U.S. 70, 75 (1984); see also Mansell v. Mansell, 490 U.S. 581, 592 (1989). Here, the legislative history confirms--rather than contradicts--the plain meaning.

Section 9(b) of the Act of October 29, 1994, which added the word "administrative" to Section 7121(a)(1), was ultimately enacted as part of H.R. 2970. Representative McCloskey originally introduced H.R. 2970 in the House of Representatives in August 1993. 139 Cong. Rec. H6379 (daily ed. Aug. 6, 1993). That bill did not include an amendment to Section 7121(a)(1).

At hearings on the bill, however, officials of the National Treasury Employees Union (NTEU), the union which had provided legal counsel to the plaintiffs in Carter, testified that Section 7121(a)(1) should be amended to overturn the result reached in that case. See To Reauthorize the Office of Special Counsel and To Make Amendments to the Whistleblower Protection

29

Act:  Hearing on H.R. 2970 before the Subcomm. on the Civil
Serv. of the Comm. on Post Office and Civil Serv., 103d Cong.
20-23 (1993) (hereinafter "Hearings").  Then-NTEU President
Robert Tobias testified that the Union was proposing "a change
to existing law, as interpreted by the Federal Circuit in Carter
v. Gibbs, to ensure the negotiated grievance procedure is the
exclusive administrative procedure, but does not supplant any
remedies which allow Federal employees to be heard directly in
Federal court."  Hearings at 23.[11]

After H.R. 2970 was reported out of the Committee, the
House Committee on Education and Labor issued a report on
another bill, H.R. 2721, which had also been introduced by
Representative McCloskey.  H.R. 2721 included a provision
identical to the one that ultimately became law that would amend
5 U.S.C. § 7121(a)(1) to add the word "administrative."  The
Committee explained that the amendment

> clarifies Congress' original intent that the grievance
> procedure would be an exclusive administrative procedure
> for matters that it covers.  The grievance procedure was
> never intended to deprive employees of access to the

---

[11] See also id. at 21 (testimony of NTEU Assistant Counsel
Timothy Hannapel)(proposing that Section 7121(a)(1) be amended
to ensure that the provision's exclusivity language conformed to
Congress' original intent that the grievance procedure be
exclusive only with respect to administrative remedies, and
explaining that "Congress intended the grievance procedure to be
a strong avenue but courts have misinterpreted that intent to
take away the individual rights of individual employees [to go
to court] under, for example, the overtime pay statutes and the
Privacy Act. . .").

> courts.  This clarification is necessary to correct an
> erroneous decision of the U.S. Court of Appeals for the
> Federal Circuit, Carter v. Gibbs, 909 F.2d 142 (Fed. Cir.
> 1990), cert. denied sub nom. Carter v. Goldberg, 111 S. Ct.
> 46 (1990), which denied employees the right to judicial
> review of claims under the Fair Labor Standards Act.

Federal Employee Fairness Act of 1994, H. Rep. No. 103-599, pt.

1, at 56 (1994).

The Committee on Post Office and Civil Service (the same

committee that had reported on H.R. 2970) similarly reported

favorably on H.R. 2721.  Its report stated that the purpose of

the amendment "is to clarify that section 7121 is not intended

to limit judicial remedies otherwise provided by law."  Federal

Employee Fairness Act of 1994, H. Rep. No. 103-599, pt. 2 at 16,

75 (1994).

Thereafter, in October 1994, Representative McCloskey

offered amendments to H.R. 2970 that included the language

contained in H.R. 2721, adding the word "administrative" to

Section 7121(a)(1).  H.R. 2970, including the amendments offered

by Representative McCloskey, passed both Houses of Congress on

October 7, 1994, and was signed into law by the President on

October 29, 1994.  140 Cong. Rec. S14670, H11422 (daily ed. Oct.

7, 1994); Pub. L. No. 103-424, § 9(c)(2), 108 Stat. 4361, 4366

(1994).

The reports accompanying H.R. 2970 did not explain why

Congress added the word "administrative" to Section 7121(a)(1).

31

Nonetheless, the reports that accompanied H.R. 2721, also offered by Representative McCloskey and which would have made exactly the same change in Section 7121(a)(1), are highly instructive, particularly when viewed against the backdrop of the hearing testimony NTEU officials presented on this issue. See Rivers v. Roadway Express, Inc., 511 U.S. 298, 306-309 (1994) (examining legislative history of provision in vetoed bill that was identical to provision in later-enacted statute); United States v. Emmons, 410 U.S. 396, 405 n.14 (1973) (legislative history of unenacted bill "wholly relevant to an understanding of" subsequently enacted statute containing same operative language). This history thus confirms that Congress intended to reverse Carter by making clear that (with exceptions not relevant here) only other administrative avenues of relief were foreclosed by Section 7121(a)(1).[12]

---

[12] The government has contended, in Mudge and elsewhere, that Congress added the word "administrative" in 1994 "to clarify the remedies available to federal employees for grievances" in light of the new subsection (g) of Section 7121, which gave federal employees a choice of administrative remedies for grievances concerning prohibited personnel practices. The Mudge court has, correctly, rejected this argument. Thus, it held that there was "no need for Congress to clarify § 7121" in this fashion because the pre-1994 statute, which already provided a choice of administrative remedies under subsections (d) and (e), had unambiguously made the negotiated procedure exclusive as to other administrative remedies. Mudge, 308 F.3d at 1228.

## III. RAMIREZ'S CHALLENGE TO THE INITIAL ORDER DIRECTING HIM TO RESIGN HIS CITY COUNCIL SEAT IS NOT MOOT

Ramirez's second amended complaint maintains his challenge to CBP's December 22, 2006 order directing him to resign his City Council seat and adds new claims concerning its decision of March 6, 2008, denying him authorization to serve a new term. The government contends that the challenge to the December 22, 2006 order is moot, though it "makes no argument at this time" that his challenge as to the March 6, 2008 denial is moot. See Gov't Memo, at 4 n.1. Although Ramirez's 2006-2008 term on the Council has now expired, his claims concerning that term are not moot.

As an initial matter, CBP's order was allegedly pursuant to a centralized procedure implementing a nationwide policy, a policy whose lawfulness is here challenged. Ramirez has argued that CBP reversed course in his case when it denied him permission to serve as city councilmember, after years during which local officials granted him and other CBP Officers permission to fill similar nonpartisan posts. As this Court recognized in its decision granting Ramirez's request for a preliminary injunction (Ramirez, 477 F. Supp. 2d at 157-58), a key issue is therefore why that policy was changed, as well as the implications for the First Amendment freedoms of government employees throughout the country. In addition, the reasons

given in the denial of Ramirez' renewed request echo the reasons
given initially in CBP's 2006 denial.  CBP has now represented
that it will take further action against Ramirez "upon issuance
of, and in accord with, the District Court's opinion in the
pending civil action."  Att. 1, at 2-3.  Accordingly, the merits
of the December 2006 denial remain very much a live controversy.

In any event, this case continues to present a live
controversy under the long-standing "capable of repetition, yet
evading review" exception to the mootness doctrine.  See
Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 514 (1911).
This exception applies when "(1) the challenged action was in
its duration too short to be fully litigated prior to its
cessation or expiration, and (2) there was a reasonable
expectation that the same complaining party would be subjected
to the same action again."  Weinstein v. Bradford, 423 U.S. 147,
149 (1975).

The Supreme Court has routinely held that disputes
involving elected office satisfy these criteria.  Norman v.
Reed, 502 U.S. 279, 288 (1992) ("There would be every reason to
expect the same parties to generate a similar, future
controversy subject to identical time constraints if we should
fail to resolve the constitutional issues that arose in 1990");
Storer v. Brown, 415 U.S. 724, 737 n. 8 (1974) ("The 'capable of
repetition, yet evading review' doctrine, in the context of

election cases, is appropriate where there are 'as applied' challenges as well in the more typical case involving only facial attacks."); <u>Moore v. Ogilvie</u>, 394 U.S. 814, 816 (1969) ("But while the 1968 election is over, the burden which <u>MacDougal v. Green</u>, [335 U.S. 281 (1948)], allowed to be placed on the nomination of candidates for statewide offices remains and controls future elections. . . . The need for its resolution thus reflects a continuing controversy in the federal-state area where our 'one man, one vote' decisions have thrust."). Indeed, "legal disputes involving election laws almost always take more time to resolve than the election cycle permits." <u>Libertarian Party of Ohio v. Blackwell</u>, 462 F.3d 579, 584 (6th Cir. 2006) (<u>citing</u> <u>Moore</u>, 394 U.S. at 816; <u>Lawrence v. Blackwell</u>, 430 F.3d 368, 371 (6th Cir. 2005)).

In this case, CBP first issued its order directing Ramirez to resign his City Council seat on December 22, 2006. This was 17 months before his term was set to expire. The rule of thumb in the D.C. Circuit is that anything less than two years is insufficient time to litigate a dispute. <u>See</u> <u>Fund for Animals, Inc. v. Hogan</u>, 428 F.3d 1059, 1064 (D.C. Cir. 2005); <u>Burlington N. R.R. Co. v. STB</u>, 75 F.3d 685, 690 (D.C. Cir. 1996); <u>see also</u> <u>So. Pac. Terminal Co. v. ICC</u>, 219 U.S. 498, 514-16 (1911). Accordingly, under the D.C. Circuit rule, "the challenged action

35

was in its duration too short to be fully litigated prior to its cessation or expiration. . . ." <u>Weinstein</u>, 423 U.S. at 149.

Also, there is more than a "reasonable expectation" that the same dispute would arise in this case. <u>Id.</u> at 149. It has already arisen, in connection with Ramirez's request for approval to serve a new two-year term. Ramirez's claims concerning his 2006-2008 term, therefore, remain part of a live controversy under the capably of repetition, yet evading review exception to the mootness doctrine.

## CONCLUSION

For the foregoing reasons, plaintiff Ramirez respectfully requests that the Court deny the government's motion to dismiss.

Respectfully submitted,

/s/ Gregory O'Duden
GREGORY O'DUDEN
General Counsel
D.C. Bar No. 254862

/s/ Elaine Kaplan
ELAINE KAPLAN
Senior Deputy General Counsel
D.C. Bar No. 292441

/s/ Barbara A. Atkin
BARBARA A. ATKIN
Deputy General Counsel
D.C. Bar No. 225797

/s/ Robert H. Shriver, III
ROBERT H. SHRIVER, III
Assistant Counsel
D.C. Bar No. 456858

NATIONAL TREASURY EMPLOYEES UNION
1750 H Street, NW
Washington, DC 20006
(202) 572-5500

Date:  May 30, 2008          Attorneys for Plaintiff

# ATTACHMENT 1

# U.S. CUSTOMS AND BORDER PROTECTION
## Department of Homeland Security

### FACSIMILE TRANSMITTAL
CD 2110-035

Date: 3-6-08

Control Number:

| TO | | |
|---|---|---|
| | Name: | John Prewit |
| | Organization: | PR/ Presidio POE |
| | Fax Number: | 432  229-4124 |
| | Number of Pages (including cover): | 6 |

| FROM | | |
|---|---|---|
| | Sender: | **GENE GARZA ACTING DIRECTOR, FIELD OPERATIONS** **EL PASO FIELD OFFICE** **9400 VISCOUNT BLVD.** |
| | Originating Location: | **EL PASO, TEXAS  79925** |
| | Return FAX Number: | **(915) 633-7345** |
| | Voice Number: | **(915) 633-7300, EXT. 141** |

| REMARKS | |
|---|---|
| | Re: CBPO Jaime Ramirez |

Important: This document may contain confidential and sensitive U.S. Government Information. Please deliver it immediately only to the intended recipient(s) listed above. The Bureau of Customs and Border Protection has not approved the documents review, retransmission, dissemination or use by anyone other than the intended recipient(s).

CBP Form 3 (05/03)

MAR-06-2008 THU 02:51 PM                          FAX NO.                        P. 02
03/06/2008  13:30    9156337345
                                          DIRECTOR US CUSTOMS                   PAGE  02

9400 Viscount Blvd., Suite 104
El Paso, TX 79925-7040


**U.S. Customs and
Border Protection**

March 6, 2008

MEMORANDUM FOR:     CBPO JAIME RAMIREZ
                    PORT OF PRESIDIO, TEXAS

FROM:               Acting Director, Field Operations
                    El Paso Field Office

SUBJECT:            Request For Outside Employment as Presidio City Council
                    Member

This memorandum responds to your request for permission to engage in outside employment. On January 9, 2008, you submitted a "Request to Engage in Outside Employment or Business Activities," CBP Form 3031, ("Request," attached hereto), seeking authorization to run for reelection, and if reelected to serve, as a Council Member for the City of Presidio, Texas. In 2004 you made a similar request which was originally denied, but later granted, allowing you to serve a two-year term as City Councilman provided you agreed in writing that you would recuse yourself from acting in your capacity as Council Member in any matters involving the Presidio Port of Entry, for the operation of which, CBP is responsible. After serving a two-year term as City Councilman, you ran for reelection, were reelected, and began to serve a second term as City Councilman, although you had not made a request for approval of this outside employment.

On December 22, 2006, after DFO Luis Garcia became aware of the fact that you had run for reelection to a second term as City Councilman, and that you had begun to serve your second term, he issued a memorandum informing you that you were required to resign from your position as City Councilman. In a memorandum issued to you on January 5, 2007, the DFO informed you that you had the choice of resigning your position as a City Councilman, or resigning your position as a CBPO, within 30 days, or you would face disciplinary action up to and including removal. You subsequently filed a lawsuit naming the Agency as defendant, in the U.S. District Court for the District of Columbia. (Ramirez v. U.S. Customs and Border Protection, D.D.C. Civil Action No. 1:07-65 (GK).) The judge in that action, which is pending final decision, issued an order enjoining the Agency from forcing you to choose between resigning your position as City Councilman and resigning your position as a CBP Officer.

I am denying your current request for outside employment. However, in light of the preliminary injunction, the Agency has determined not to take any action against you because of your outside activity as a member of the Presidio City Council. The Agency will review the issue and

consider its options upon issuance of, and in accord with, the District Court's opinion in the pending civil action.

I understand that, in the pending litigation, and in a letter from former DFO Luis Garcia, the interplay among the requirements of Government-wide ethics regulations, CBP Standards of Conduct and the Hatch Act has been explored. The critical issue for the Agency now is that, to ensure compliance with the Hatch Act, its implementing regulations, the Ethical Standards of Conduct for the Executive Service, and the CBP Standards of Conduct, outside activity on your part must not create a conflict of interest, or the appearance of a conflict of interest, between the exercise of your authority and responsibilities as a CBPO in the Port of Presidio, and your duties and interests as a member of the Presidio City Council. See 5 C.F.R. § 2635. In evaluating whether a conflict of interest or the appearance of one would be created by your service as a Presidio City Councilman, the Agency looks at all relevant circumstances and information available, and evaluates those facts and circumstances as would a reasonable person with knowledge of the relevant facts. For the reasons set forth below, it is my opinion that your continued service as a City Councilman, should you be elected, will create at least the appearance of a conflict of interest, in violation of § 2635.801(c).

As a GS-11 CBPO, a federal law enforcement officer, you are required to perform the full range of inspection, intelligence analysis, examination, and law enforcement duties relating to the arrival and departure of persons, conveyances, and merchandise at Ports of Entry – currently at the Presidio, Texas, Port of Entry. I recently visited the Port of Presidio and, as Port Director of Laredo, Texas, am familiar with situations presented in ports of entry on the land border. As a CBPO, one of your primary responsibilities is to identify potential terrorists and instruments of terror and to perform layered enforcement activities relative to counter-terrorism. The purpose of these enforcement activities is to prevent the entry into the United States of terrorists and instruments of terror, harmful pests and diseases, illegal drugs and contraband, illegal aliens and importations/exportations violative of law and trade agreements. Your position and responsibilities as a City Council Member must neither conflict with, nor appear to be in conflict with your performance of your official CBP duties or create the appearance of the loss of impartiality in the performance of your duties. Similarly, it is not permissible for political considerations to impact or affect the performance of those CBP duties.

As noted above, in performing your regular and customary duties, you conduct inspections and searches of vehicles, cargo, persons and their property. In carrying out such activities, you are entrusted with considerable discretion. Many of those subject to the exercise of your law enforcement responsibilities are also your political constituents, whose votes and continued approval you have sought, and will continue to seek, in order to secure your reelection. In some cases, these are the same individuals who have made, or will make, contributions—whether of time, effort or money—to assist you in your campaign. Should you be reelected and continue to serve as a member of the Presidio City Council, there is an inherent conflict between the requirement for impartiality, objectivity and vigilance in performing your CBPO duties, and a very natural inclination on your part as an officeholder to maintain a good relationship with the individuals and the community upon whom you rely for support, and whom you have a responsibility to serve, in your role as a member of the City Council. While I have no reason to

2

question your integrity in carrying out your official duties, I believe the inherent conflict set forth above will often present situations that create an appearance of impartiality.

I believe that an appearance of a loss of impartiality in the performance of your official duties exists because, due to the small population of Presidio, you will undoubtedly recognize many of the people that seek entry at the POE as your constituents. As an example, a perfectly sound decision not to refer a particular individual for secondary inspection might take on overtones of preferential treatment, if the individual is one of your constituents, or is known to have supported you in your campaign, to have benefited from action attributable to you as a municipal official, or to wield substantial influence among the local electorate. The appearance of impartiality is also present when you make an otherwise sound decision to refer to secondary inspection an individual who opposed your candidacy. Even knowing all the facts, it would still be reasonable for members of the public to believe there was an appearance of a conflict of interest in you wielding discretionary law enforcement authority over your constituents on a daily basis.

In addition to your inspectional duties, as a CBPO you have access to electronic investigative systems that contain law enforcement sensitive information contributed by many federal law enforcement agencies and entities. It may contain information about members of the local community, including political opponents, constituents, the Mayor, and even fellow City Council Members. While I do not suspect you would use such systems in an unethical or unlawful manner, the fact that your official duties give you access to information that could provide you with a political advantage could undermine the confidence of the public in your actions as a CBPO.

In addition to the conflicts you may encounter in performing your day-to-day duties, there is a broader landscape of activity which could raise questions of loss of impartiality on your part. In the recent past there have been some matters that have brought the Presidio Port of Entry (POE) (a CBP-operated facility) and the City of Presidio into direct conflict. For instance, I recall that there was a piece of property adjacent to the POE that had been seized by DEA, and that the City sought to obtain, in order to lease it back to the federal government. I note that you recused yourself from the Council's consideration of this matter, however, such property disputes between federal and municipal authorities are likely to arise in the future. As you know, the POE, currently located on private property, is set to undergo major expansion to accommodate increased border-related activity anticipated due to the construction of rail and highway systems from the interior of the Republic of Mexico to Ojinaga, Presidio's sister city across the Rio Grande. Additionally, I have been informed that the County and City of Presidio, as reflected in proposed legislation before the Texas State Senate, have joined together in an effort to acquire the United States portion of the Presidio International Bridge, for the purpose of initiating tolls for U.S.-to-Mexico crossings.

I believe that your service on the City Council could become problematic in a number of other contexts in which the City-CBP relationship is implicated. There are numerous overlaps between the City of Presidio and the Presidio Port of Entry that could raise issues of conflict, such as those arising from local federal housing, city zoning restrictions affecting CBP operations, interaction between respective law enforcement authorities, and the impact of certain CBP or DHS operations on the provision of municipal services. More specifically, the

3

construction of the fence along the southern border has been quite controversial and has involved condemnation proceedings by the federal government against landowners along the border and local officials filing lawsuits against the federal government. The very divisiveness of this hot topic creates an appearance of a conflict of interest between your duties on behalf of your constituents and those on behalf of CBP. In that same vein, the Western Hemisphere Travel Initiative, which requires the use of passports that may be expensive to acquire, both in terms of time and money, would also create an appearance of a conflict of interest, particularly due to the fact that you will be required to enforce the mandatory usage of passports by your constituents crossing the border.

Therefore, based upon my review of the totality of the circumstances and the applicable laws and regulations, I am denying your outside employment request, if elected, to serve as a Presidio City Council Member.

EUGENIO GARZA, JR.

Attachment

4

MAR-06-2008 THU 02:51 PM                                FAX NO.                          P. 06
03/06/2008  13:30   9156337345          DIRECTOR US CUSTOMS            PAGE  05
UNK UO  2000 WED 09:30 PM                        FAX NO.                       P. 03

## U.S. DEPARTMENT OF HOMELAND SECURITY
## Bureau of Customs and Border Protection

## REQUEST TO ENGAGE IN OUTSIDE EMPLOYMENT OR BUSINESS ACTIVITIES
Directive 51735-001A

| Name | Grade | Salary | Length of CBP Employment |
|---|---|---|---|
| Jaime Ramirez | 11.3 | $ 56,439.00 | 63 months |

| Position Title | Office, Port or Station where employed by CBP |
|---|---|
| CBPO | Presidio, Texas |

| Office Hours of Work | | | | Days of Normal Work Week | If over 40 hours indicate periods involving premium or overtime |
|---|---|---|---|---|---|
| From | AM PM | To | AM PM | Regular | As schedule |
| 0800 | ☒ ☐ | 1600 | ☐ ☒ | | |

### OUTSIDE EMPLOYMENT INFORMATION

Nature and detailed description of outside employment

City of Presidio Councilman, an unpaid, non-partisan elected office.  If re-elected, I would
serve a two year term on the City Council.

| Name and address of outside employer | Type of business |
|---|---|
| 507 W O'Reilly Street, Presidio, Texas 79845 | Local Government (Non Partisan) |

Does employer engage in importation of merchandise for sale in the United States? If answer is Yes, specifically explain the relationship of his/her business contact with Customs and Border Protection.

NO

Does employer do business with other Federal agencies or represent clients on matters, which affect the interest of the United States Government? (This includes employment with attorneys or accountants who are authorized to practice before U. S. Courts or other regulatory organizations.) If answer is Yes, give details.

No, as in the past, I would recuse myself form considering any issue taken u by the City
Council affecting CBP.

| Specific hours of outside employment | | | | Number of outside employment hours | | Days of the week you expect to work |
|---|---|---|---|---|---|---|
| From | AM PM | To | AM PM | Daily | Weekly | 2nd Thursdays each month |
| 6:30 | ☐ ☒ | 10:00 | ☐ ☒ | | | |

I hereby certify that my services in connection with the outside employment or business referred to above will not conflict with or infringe on my duties with or responsibilities to the Bureau of Customs and Border Protection and that the statements made herein are complete and correct to the best of my knowledge. I have read and understand the regulations on outside employment (5CFR 2635.802 and 5CFR3101.110(a)) on the reverse and I understand that if my outside employment or business request is approved that I must

(a) Submit another written request for approval if the nature of the employment or business changes.
(b) Submit another written request for approval upon movement or transfer to a different approving official.
(c) Notify my supervisor, in writing, when my approved employment or business activity is terminated.

| Employee's Signature | Date |
|---|---|
| | 01/04/2007 |

RECOMMENDATION BY IMMEDIATE SUPERVISOR AND OTHER OFFICIALS (Indicate reason(s) where disapproval is recommended or, in cases with unusual circumstances where approval has been recommended.)

| | Signature and Title of Immediate Supervisor | Date |
|---|---|---|
| ☐ Approved  ☐ Disapproved | | |
| ☐ Approved  ☐ Disapproved | | |
| ☐ Approved  ☐ Disapproved | | |

CBP Form 3031 (02/00)

# ATTACHMENT  2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAIME RAMIREZ,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )
                                        )    Case No. 07-0065
U.S. CUSTOMS AND BORDER PROTECTION,     )    Judge Gladys Kessler
et al.,                                 )
                                        )
          Defendants.                   )
                                        )

### DECLARATION OF JAIME RAMIREZ

I, Jaime Ramirez, hereby declare and affirm as follows:

1.  I am the plaintiff in this action.  I am employed as
an officer by United States Customs and Border Protection (CBP),
an agency within the Department of Homeland Security.  I am also
a member of the nonpartisan City Council of Presidio, Texas.

2.  I ran for re-election to the Presidio City Council for
a term running from May 2006 to May 2008.  The election took
place on May 10, 2008, and I was elected to serve a new term on
the City Council.  I was sworn into office for that term on May
20, 2008.

I declare under penalty of perjury that the foregoing is true
and correct.  Executed this 29th day of May, 2008, in Presidio,
Texas.

_____
Jaime Ramirez

# ATTACHMENT 3

4. **ARTICLE 47 - Grievance Procedure**

A. **Purpose**. The purpose of this Article is to provide a fair, simple and expeditious means of processing grievances. This negotiated procedure shall be the exclusive procedure available to the Union and employees in the unit for resolving grievances which come within its coverage, except as specifically provided in B below. However, any employee or group of employees in the unit may present such grievances to the Service and have them adjusted, without the intervention of the exclusive representative, as long as the adjustment is not inconsistent with the terms of the Agreement and the exclusive representative has been given an opportunity to be present during the processing.

The initiation or presentation of a grievance by employees will not cause any reflection on their standing with or their loyalty to the Service.

B. **Definition**: A grievance means a complaint either by a unit employee concerning his or her conditions of employment, by the Union in its own behalf concerning conditions of employment of any employee, or alleged contractual violations by the Service, or by the Service concerning alleged contractual violations by the Union. Unless excluded below, such a complaint may concern the adverse impact of:

(1) **Violation of Agreements**. The effect of interpretation, or claim of breach of this master Agreement, or other written agreement between the parties; or

(2) **Violation of Law, Rule, or Regulation**. Any claimed violation, misinterpretation, or misapplication of any law, rule, or regulation affecting conditions of employment.

**Exclusion**: This procedure does not cover grievances concerning:

(1) **Beyond Authority**. Matters which are not subject to control by Management of this Service; Matters which are not subject to control by the Union;

(2) **Political Activities**. Any claimed violation of Subchapter III of Chapter 73 of Title 5 U.S. C. (relating to prohibited political activities);

(3) **Benefits**. Retirement, life insurance, or health insurance;

(4) **National Security**. A suspension or removal under Section 7532 of Title 5 U.S.C. for reasons of national security;

(5) **Hiring Authority**. Any examination, certification, or appointment;

(6) **Classification**. The classification of any position which does not result in a reduction in grade or pay of any employee;

(7) **Statutory Discrimination Appeal**. A complaint of discrimination which is listed in 5 U.S.C. Section 2302(b)(1) if the employee has elected to use the statutory appeal procedure;

(8) **Statutory Adverse Action Appeal**. An appeal of an adverse action based on performance under 5 U.S.C. 4302 or for efficiency under 5 U. S. C. 7512 if the employee elects the statutory appeal procedure provided under 5 U.S.C. 7701;

(9) **Union Appeal of Non-represented Statutory Process**. A Union appeal of an adverse action or an allegation of discrimination against any employee if the Union is not expressly designated by the employee as his or her representative on the matter.

(10) **Already Filed**. Issues which can be raised under the grievance procedure or as an unfair labor practice may, in the discretion of the aggrieved party, be raised under either procedure but not under both procedures.

(11) **Probation**. The removal of a probationary employee during his or her probationary period.

(12) **Temporary Appointments**. The termination of a temporary appointment.

(13) **Proposed Actions**. Notices of proposed disciplinary/adverse actions, furloughs, or removals. Issues relating to such proposal notices may, however, be raised in connection with any grievance over the final decision on the proposed action.

C. **Identical Grievances**. In the case of an identical grievance involving a group of employees one employee's grievance may be selected by the Union for processing. All decisions for that grievance will be binding on the other grievance(s). The Parties agree that for the purposes of this section identical grievances are ones arising from a common set of circumstances which adversely affect the grievants in the same manner where all of the witnesses would be testifying to the same or substantially similar facts. The term "substantially similar" means facts which are sufficiently alike so that a reasonable person would conclude that application of the same rules to the facts in each grievance would result in the same conclusions with regard to the outcome of those grievances.

D. **Resolve at Lowest Possible Level**. The Service and the Union agree that every effort will be made by Management and the aggrieved party(s) to settle grievances at

the lowest possible level. It is agreed that the employee and his or her representative will be given a reasonable amount of time to present the grievance.

## E. **Procedures for Grievances Filed by Employees**:

### (1) **First Step**

Informal grievance must be filed within 22 workdays after the incident occurs. This time limit will not apply where it is established that the employee had no way of being aware of the incident. The grievance shall first be taken orally by the concerned employee with the first level of supervision in an attempt to settle the matter. If the first level supervisor is also the official designated as a Step II official, the grievance will be filed with that official. The grievant may, if he or she desires, be assisted in the presentation by a Union representative.

The Union representative must be present if the employee so desires. If the employee presents a grievance directly to Service Management for adjustment consistent with the terms of this Agreement, the Union shall be given the opportunity to have an observer present, on official time, at the time of adjustment. Within five (5) workdays after receiving the employee's grievance, the immediate supervisor (or designee) shall complete such inquiry as he or she deems necessary and render his or her decision to the grieving employee. After receiving the decision of the immediate supervisor, the employee may, at his or her option, pursue his or her informal grievance to the next higher level of supervision, if that level is not one of the Management officials cited in Step II. All aforementioned procedures for Step I shall apply at this level for informal resolution of the employee's grievance. The employee may, at his or her option, reduce the grievance to writing

### (2) **Second Step**

If the employee is dissatisfied with the decision of the immediate supervisor and desires to proceed to Step II, the employee (or the employee's union representative acting on behalf of the employee) must submit a written grievance, to the appropriate official as specified below, within ten (10) workdays after receiving the immediate supervisor's decision on the grievance.

Submission of Step II Grievances:

District Office employees: to the District Director

Telephone Service Center and Service Center employees: to the Center Director

<u>Asylum Office</u> employees: to the Asylum Office Director

<u>Foreign Office</u> employees other than Foreign Districts: To the Officer in Charge

<u>Administrative Center</u> employees: to the appropriate Assistant Center Director

<u>Regional Office</u> employees: to the Deputy Regional Director

<u>Regional Counsel</u> employees: to the Regional Counsel

<u>HQ Non-Operational</u> employees: to the appropriate Associate Commissioner or Director

<u>HQ Operational</u> employees: as appropriate, to the Associate Commissioner for Enforcement or the Associate Commissioner for Examinations

The employee shall set forth in precise terms exactly what his or her grievance is; all the facts relating thereto, including the names of any individuals against whom the grievance is made; the Article and Section of the Agreement which is in dispute; the reason for his or her dissatisfaction, and the corrective action desired. The Grievant will also include documents and evidence related to the grievance. When the Union is designated as the representative of an employee in a grievance, the employee will also furnish the name and address of the representative to the Service in writing. The employee will also furnish the name and address of any witnesses.

Within fifteen (15) workdays after receiving the grievance, the Deciding Official (or designee) shall hold such meetings and complete such inquiry as he or she deems necessary and shall render his or her written decision on the grievance. The written decision shall set forth, in precise terms, the basis of the decision.

No letter from an employee designating the Union as his or her representative in pursuing a grievance will be required in those cases where the Union is presenting a grievance concerning the Union's rights under the contract or law, or in those cases where the Union files a grievance on behalf of an employee and the election of the grievance procedure does not represent a choice between the grievance procedure and other administrative or judicial procedures that may be available to the employee.

## (3) **Third Step**

If the employee is dissatisfied with the decision at Step II and desires to proceed to Step III, the employee (or the employee's union representative acting on behalf of the employee) must submit a written grievance, to the appropriate official as specified below, within ten (10) workdays after receiving the Step II decision.

Submission of Step III Grievances

<u>District and Region Office</u> employees: to the Regional Director (or his/her designee who is an official above the Step II official)

<u>Administrative Center</u> employees: to the Administrative Center Director

<u>Telephone Service Center and Service Center</u> employees: to the Assistant Commissioner, Service Center Operations

<u>Regional Counsel</u> employees: to the General Counsel

<u>Asylum Office</u> employees: to the Deputy Asylum Director Headquarters

<u>Foreign District and Office</u> employees: Director, Office of International Affairs

<u>Headquarters</u> employees: to the appropriate Executive Associate Commissioner

The written grievance must include the information specified at Step II above, including also a copy of the Step II decision and an explanation as to why that decision was not acceptable to the employee. Within twenty (20) workdays after receiving the grievance, the Deciding Official (or designee) shall complete such inquiry as he or she deems necessary and render a written decision on the grievance. Such written decision shall set forth, in precise terms, the basis for the decision. If the employee is dissatisfied with this decision, he or she may submit the grievance to the appropriate Local for a decision by the Union as to whether to process the case through arbitration as provided in Article 48.

If a dispositive issue in the grievance involves interpretation of this agreement, either the Step III Official or the Union may refer the grievance to the national parties for an interpretation of the contract within thirty (30) days of the Step III decision. A joint response from the national parties will be binding on the local/regional parties, absent which the matter shall proceed to arbitration.

F. **Requested Relief Granted**. In no case in which the precise relief requested is granted, will the grievance be continued on to the next Step, including the invoking of arbitration.

G. **Exceptions to Step I**. Except as otherwise specified below, all employee grievances are to be initiated at Step I of the grievance procedure within the time frame as stated at Step I:

(1) **Policy of Director**. Grievances that are based on the written decision or policy of the District Director are to be initiated at Step II of the grievance procedure within the time frame specified at Step I.

(2) **Reprimands**. Grievances concerning written reprimands are to be initiated at Step III of the grievance procedure within the time frame specified at Step I.

(3) **Suspensions and Adverse Actions**. Grievances concerning suspensions and adverse actions are to be initiated at the arbitration stage of the grievance procedure as provided at Article 31.

(4) **MP&RP Violations**. Employee grievances concerning alleged violations of the Merit Promotion and Reassignment Plan (MP&RP) are to be filed and processed as follows:

(a) Step A. Such grievances are to be filed in writing with the Head of the Human Resources Office that serviced the particular promotion/vacancy action at issue within 22 work days. The Head of the servicing Human Resources Office shall conduct whatever inquiry or review he or she deems appropriate and render a written decision on the grievance within 15 work days after receipt of the grievance.

(b) Step B. If the grievant is not satisfied with the decision of the Head of the servicing Human Resources Office, he or she may pursue the grievance further by filing a Step III appeal with the appropriate Administrative Center Director (or the INS Director of Human Resources for grievances in which the position/vacancy at issue is serviced by the INS Headquarters Human Resources Office) within 10 work days after receipt of the decision of the head of the servicing Human Resources Office. Such appeal must include a copy of the decision received from the Head of the servicing Human Resources office.

H. **Grievability / Arbitrability**. When the Service or the Union has reason to believe that a grievance is not grievable or arbitrable, it will endeavor to so inform the other party as soon as possible. If the Union or the Service elects to proceed to arbitration of the grievance, such grievability/arbitrability questions are to be decided as a threshold issue by the arbitrator who decides the merits of the grievance. The final written decision of the arbitrator in such a case shall consist of two parts. In the first part, the arbitrator shall decide the grievability/arbitrability issue in the case. In the second part, he or she will pass upon the merits of the grievance. If the arbitrator should determine that the grievance is either not grievable or not arbitrable, however, the decision shall consist of one part, the determination on grievability/arbitrability, and no consideration of the merits of the grievance shall be provided.

If either party raises an arbitrability question later than fourteen (14) calendar days

prior to the date scheduled for a hearing, the other party shall have the right to postpone the hearing, if it deems postponement necessary. Any additional costs by the arbitrator for cancellation required by the late notification as to the arbitrability issue shall be borne by the party raising the question.

## I. **Procedures for Grievances Filed by the Union or the Service**:

(1) District Level Disputes:

(a) Step A. If a dispute arises between a Local of the Council and a District, Service Center, Telephone Service Center, Asylum Office, or Administrative Center, either the President of the Local or the Head of the particular organizational component (or their respective designees) may file a written grievance with the other party, provided such grievance is filed within twenty-two (22) workdays after the event giving rise to the grievance. This time limit will not apply where it is established that the grieving party had no way of being aware of the incident. Any such grievance must include the relevant facts, the provisions of any law, rule, or contract allegedly violated, and the relief being sought. The party against whom the grievance was filed shall render a written decision on the grievance within fifteen (15) workdays after receipt of the grievance.

(b) Step B. If the decision on the grievance is unacceptable, the matter may be escalated to the appropriate Council Vice-President or the appropriate Regional Director for reconsideration within 15 workdays of receipt of the Step I decision. A copy of the original grievance and response shall be included in the grievance when it is escalated to the next step. The Council Vice-President or Regional Director (or their respective designees) shall render a written decision on the grievance within 15 workdays of receipt. If the grievance is not resolved to the mutual satisfaction of the parties, either party to the grievance may refer the matter to arbitration within the time frame as described at Article 48.

(2) **Regional Level Disputes**. If a dispute arises between one or more Locals and a Region, either the appropriate Council Vice President or the Regional Director (or their respective designees) may file a written grievance with the other party within 22 workdays after the event giving rise to the grievance. This time limit will not apply where it is established that the grieving party had no way of being aware of the incident. The party against whom the grievance was filed shall render a written decision on the grievance within 15 workdays after receipt of the grievance. If the grievance is not resolved to the mutual satisfaction of the parties, either party to the grievance may refer the matter to arbitration within the time frame as described at Article 48.

(3) **National Level Disputes**. If a dispute arises between the Council and

Headquarters, either the Council President or the Associate Commissioner for Human Resources and Development (or their respective designees) may file a written grievance with the other party within 22 workdays after the event giving rise to the grievance. This time limit will not apply where it is established that the grieving party had no way of being aware of the incident. The party against whom the grievance was filed shall render a written decision on the grievance within 15 workdays after receipt of the grievance. If the grievance is not resolved to the mutual satisfaction of the parties, either party to the grievance may refer the matter to arbitration within the time frame as described at Article 48.

J. **Time Limits**.

(1) **Extensions**. All time limits herein may be extended by mutual agreement of the parties involved. If a grievant should fail to meet an applicable time limit for moving a grievance forward, the grievance shall be deemed to have been withdrawn. If a deciding official fails to meet the time limit for rendering a decision on the grievance, such failure shall entitle the grievant to advance the grievance to the next step (including arbitration, if appropriate) within the applicable time frame for such action as measured from the date the deciding official should have rendered his or her decision.

(2) **Service of Process**. All time limits of this grievance procedure, including arbitration, shall be controlling. Service of grievances and the decisions thereon, including arbitration notices, shall be accomplished either by personal delivery or by U. S. Mail-Return Receipt Requested. As applicable, time limits shall begin to run from the date of receipt of the document that triggers the particular time limit. Service will be deemed timely if the required document is either personally delivered or postmarked within the specified time limit. The parties agree that they will act in good faith in receipting for documents and will not attempt to evade the service of documents upon them.

## ARTICLE 48 - Arbitration

A. **Invoking Arbitration**. If the Service and the Union fail to settle any grievance processed under the negotiated grievance procedures, such grievance, upon written request by the Union or the Service, may be submitted to arbitration within fifteen (15) workdays from the date the Service or the Union's final decision is received. In cases involving suspensions of less than fifteen (15) days or adverse actions, requests for arbitration must be filed after receipt of the Notice of Decision, but not later than fifteen (15) workdays after the effective date of the action. Requests for arbitration filed by the Union will be submitted to the Servicing Labor Relations Officer. Issues involving Service wide interpretation or application of this agreement will be filed with the Chief Labor Employee Relations Policy Section at Headquarters.

B. **Selection of Panels**. The parties agree to the establishment of three Regional panels to handle arbitrations under this Article. Each Regional panel shall consist of ten (10) arbitrators. The Regional representatives of the parties will nominate ten (10) arbitrators. If both sides nominate the same arbitrator, he/she will automatically become a member of the panel. Otherwise, the parties will alternate strikes until ten (10) arbitrators are chosen.

(1) **Replacements**. Should any arbitrator ask to be removed from the panel, the parties will each nominate three new arbitrators. If one or more names are on both lists, they will be selected and added to the list. Otherwise, the parties will alternate strikes until the arbitrator is chosen.

(2) **Removal**. During the life of the agreement, either party at the national level may unilaterally remove three (3) arbitrators from the panels by providing the other party with written notice. Such removal shall not be effective until thirty days after receipt of the written notice by the other party. Any additional removals must be done by mutual agreement. Selection for a replacement will be done by the procedures outlined above.

(3) **Rotation**. Arbitrators will be used alphabetically on a rotational basis. If an arbitrator is not available within a mutually agreeable time, the parties may agree to select the next arbitrator on the list.

5. **Headquarters Arbitrations**. For arbitrations involving Headquarters, the parties will request the name of the next arbitrator on each Regional list and select the arbitrator using alternate strikes.

C. **Threshold Issues**. In cases where there is a threshold issue, such as jurisdiction, the parties may agree that an initial decision be requested on the threshold issue.

(1) **Arbitrators Decision**. The parties may agree to use stipulations and / or briefs to obtain the arbitrator's decision on the threshold issue. If there is no agreement and either party elects to proceed to arbitration of the grievance, such grievability / arbitrability questions are to be decided as a threshold issue by the arbitrator. If the arbitrator should determine that the grievance is either not grievable or not arbitrable, the decision shall consist of one part and no consideration of the merits of the grievance shall be provided.

(2) **Postponement**. If either party raises an arbitrability question later than fourteen (14) calendar days prior to the date scheduled for a hearing, the other party shall have the right to postpone the hearing, if it deems postponement necessary. Any additional costs by the arbitrator for cancellation required by the late notification, as to the arbitrability issue, shall be borne by the party raising the question.

D. **Transcripts**. Each party will inform the other no later than fourteen (14) calendar days prior to the start of the arbitration hearing whether it desires a transcript of the hearing. If the parties mutually agree upon the need for a transcript, they shall equally share the cost of the transcript and management will make the arrangements for securing a transcript. If they do not agree on the need for a transcript, the party desiring a transcript will arrange for the transcript and will bear the full cost. However, should the other party change its mind prior to the close of the arbitration hearing and indicate its desire for a copy, it shall then be responsible for half of the costs.

E. **Proceedings**. The arbitrator will be requested to render his or her decision as quickly as possible but, in any event, no later than twenty-two (22) workdays after the conclusion of the hearing unless the parties mutually agree to extend the time limit. Each party has the obligation to cooperate promptly with the designated arbitrator in setting a date for a hearing. Failure of either party to proceed with due diligence in responding to an offer of dates may serve as a basis for establishment of a hearing date by the arbitrator or dismissal of the grievance. At the request of either party, the Service or the Union shall be provided a complete list of the other's known witnesses no later than five (5) days prior to the hearing, along with a brief synopsis of the anticipated testimony.

F. **Docket Review**. Discussion of any cases where arbitration has been requested and pending in the Region will be conducted upon advance request. Such discussions may include possible settlements in pending cases or in pending grievance matters.

G. **Expedited Procedure**. The parties recognize the importance of promptly handling demotions, indefinite suspensions, suspensions of 30 days or more and removal cases. These timelines may be used in other cases where it is mutually agreeable. For such cases, the parties have agreed to ask the arbitrator to adhere to the following time lines:

(1) **Hearing**. Arbitrators are to conduct a hearing within fifteen (15) working days of selection.

(2) **Briefs**. Post hearing briefs will be submitted within fifteen (15) workdays after completion of hearing or receipt of transcript unless the parties agree to an extension.

(3) **Decision**. Arbitrators are to render a decision within fifteen (15) workdays of closing of the record. The record will be considered closed upon receipt of briefs, receipt of transcript, or completion of hearing whichever is later.

H. **Costs**. The arbitrator's fee and the expenses of the arbitration, if any, shall be borne equally by the Service and the Union. Fees to be paid by the Service will be governed by

existing regulations.

I. **Cancellation**. The parties will share cancellation costs equally when notice is provided at least 96 hours prior to the scheduled hearing date. The party seeking the cancellation will pay arbitration costs incurred for canceling less than 96 hours prior to any hearing.

J. **Location**. The arbitration hearing will be held, if possible, on the Service's premises during the regular day shift of the basic workweek. The arbitration will normally be held within the commuting area of the grievant unless the grievant has transferred from the site of the dispute; and in such cases the hearing will be held at the site of the dispute unless both parties agree to hold it in another location.

K. **Participants**.

(1) **Duty Status**. All participants in the hearing shall be on administrative leave, if they would otherwise be in a duty status. If a hearing is scheduled on what would otherwise be a participant's day off, the Service will adjust the employee's schedule so that the employee would be in a duty status.

(2) **Travel and Per Diem**. Where the grievant or relevant witnesses are not within the commuting area of the hearing site, the Service will pay travel and per diem. Should there be a disagreement as to the relevance of a witness where travel and per diem is required, the Union will pay travel expenses and the issue will be presented to the arbitrator who will decide on the relevancy of the testimony. If the arbitrator decides that the witness is relevant, the arbitrator will so state in the decision and the agency will pay travel and per diem at a rate no greater than that authorized by government travel regulations.

L. **Binding Awards**. The arbitrator's award shall be binding on the parties unless either party files exceptions with the Federal Labor Relations Authority, under the regulations prescribed by the Authority. However, any adverse action appeals shall be presented to the appropriate appellate jurisdiction.